UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _11/27/2023_

------------------------------------------------------------------------X
   :
JC HOSPITALITY d/b/a THE SURF LODGE and   :
JAYMA CARDOSO   :
   :
         Plaintiffs,   :        23-cv-2051 (LJL)
   :
      -v-   :       OPINION AND ORDER
   :
MARISA HOCHBERG (In Her Individual and   :
Professional Capacities)   :
   :
         Defendant.   :
   :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiffs JC Hospitality, LLC ("JC Hospitality") and Jayma Cardoso ("Cardoso," and with JC Hospitality, "Plaintiffs") move, pursuant to Federal Rule of Civil Procedure 15(a)(2), to file a Second Amended Complaint ("SAC"). Dkt. No. 33. Defendant Marisa Hochberg ("Hochberg" or "Defendant") opposes the motion to amend and cross-moves, pursuant to Federal Rule of Civil Procedure 12(b)(1) and/or 12(b)(6) to dismiss Plaintiffs' First Amended Complaint ("FAC") on the grounds that Plaintiffs lack standing on their federal claims, and pursuant to Federal Rule of Civil Procedure 12(b)(2), (4), or (5) for lack of jurisdiction. Dkt. No. 39. Defendant also seeks an order for attorneys' fees and costs. *Id.* The Court grants the motion to file the SAC and then grants Defendant's motion in part and denies the motion in part.

## BACKGROUND

The primary changes made by the SAC is to add one cause of action and detail regarding Plaintiffs' licensing agreement to use the trademarks and the sole ground upon which Defendant opposes Plaintiffs' motion to file the SAC is futility. It is expedient for the Court to accept the SAC and to judge the motion to dismiss against the allegations of the SAC. *See, e.g.*, *Stout v.*

*Town of Tonawanda Police Dep't*, 2011 WL 1260049 (W.D.N.Y. Mar. 31, 2011).  Accordingly, the Court grants the motion to file the SAC.  *See, e.g.*, *Doe v. Cty. of Rockland*, 2022 WL 2533151 (S.D.N.Y. July 7, 2022).  The Court accepts the allegations of the SAC as true for purposes of the motion to dismiss.

### A.  Allegations of the SAC

This lawsuit grows out of a business and personal dispute between Cardoso and her former employee and friend, Hochberg, involving properties in the Hamptons, New York. Cardoso owns 100% of Plaintiff JC Hospitality which, in turn, owns, operates, and manages "The Surf Lodge," a well-known boutique hotel, restaurant, bar and outdoor music venue located in Montauk, New York.  Dkt. No. 33-6 ¶¶ 7–8, 22.  The Surf Lodge opened in April 2008.  *Id.* ¶ 21.  Hochberg was an employee of The Surf Lodge for a brief period of time, *id.* ¶ 23, and was friends with Cardoso, *id.* ¶ 37.

Prior to the COVID-19 pandemic, The Surf Lodge primarily hosted large gatherings, which were often attended by celebrities and wealthy clientele.  *Id.* ¶ 24.  It also began to shift its focus to wellness and began offering classes and retreats intended to create holistic experiences for relaxation and "rejuvenat[ion]."  *Id.* ¶ 25.  It positioned itself not only as a luxury destination but as a lifestyle brand.  *Id.* ¶ 26.

Cardoso has been and remains a co-owner in a company named TSL Management, Inc. ("TSLM").  *Id.* ¶ 9.  TSLM is the registered owner of various The Surf Lodge trademarks.  *Id.* ¶ 11.  Since the opening of the Surf Lodge, Cardoso and her attorneys filed and obtained numerous trademarks for the names "The Surf Lodge" with the United States Patent and Trademark Office ("USPTO") in order to maintain and protect the brand.  *Id*. ¶ 29.  Those trademarks were initially held by a company named Montauk Properties, LLC ("Montauk Properties"), and subsequently

by TSLM.  *Id.*  At all pertinent times, TSLM has been the registered owner and holding company of intellectual property assets related to The Surf Lodge.  *Id.* ¶ 34.

Due to The Surf Lodge's branding success, in 2019, Cardoso and The Surf Lodge's team opened a year-round restaurant and lounge in Aspen, Colorado, under the trademarked name "The Snow Lodge."  *Id.* ¶ 27.  The Snow Lodge has become a similarly notable destination for clientele seeking luxury experiences, and is also a registered trademark with the USPTO.  *Id.* ¶ 29.  The trademark for "The Snow Lodge" was initially held by Montauk Properties and then by TSLM.  *Id.*

In 2012, Montauk Properties entered into a License Agreement with JC Hospitality.  *Id.* ¶ 30.  The Agreement granted JC Hospitality an exclusive license to use The Surf Lodge trademarks.  *Id.*  In 2013, Montauk Properties assigned and delegated the License Agreement in its entirety to TSLM.  *Id.* ¶ 31.  In 2022, the License Agreement between TSLM and JC Hospitality was amended and JC Hospitality's exclusive license to use The Surf Lodge trademarks was renewed.  *Id.* ¶ 32.[1]

In or around April 2019, Cardoso and Hochberg conceived of a yoga studio named "The Sanctuary," which would operate in the town of Montauk, New York, more than one mile from The Surf Lodge's property.  *Id.* ¶ 37.  Cardoso incorporated in New York as JM Sanctuary LLC doing business as The Sanctuary.  *Id.* ¶ 39.  Cardoso was the only listed member of JM Sanctuary LLC.  *Id.* ¶ 40.  During the brief business partnership in The Sanctuary, Hochberg controlled the social media accounts, including the Instagram account, for the Sanctuary.  *Id.* ¶ 43.

---

[1] The relevant License Agreements are incorporated by reference and described in more detail below.

Cardoso and Hochberg had a falling out in the summer of 2020, after the outbreak of the COVID-19 pandemic.  In the summer of 2020, Hochberg was sued by her landlord for failing to pay rent on a luxury property that she had leased in Montauk.  *Id.* ¶¶ 46–47.  The lawsuit, including allegations that Hochberg was abusing state law that protected tenants from eviction during the height of the pandemic, garnered major media attention.  *Id.* ¶¶ 47–49. The negative publicity about Hochberg started to cause reputational harm to Cardoso and The Surf Lodge.  *Id.* ¶¶ 50–52.  Cardoso sought to intervene on Hochberg's behalf to shift negative attention away from The Surf Lodge, but was rebuffed.  *Id.* ¶ 52.  Cardoso concluded that she could no longer conduct business with Hochberg, sought to dissolve JM Sanctuary LLC, and notified Hochberg of her intention to permanently cease business relationship with Hochberg and to close JM Sanctuary LLC.  *Id.* ¶¶ 53–55.

Shortly after Cardoso informed Hochberg of her plans to dissolve JM Sanctuary LLC, the alleged trademark infringement began.  In or around January 2021, Hochberg began using the name "The Sanctuary" and Cardoso's name individually as a means of luring one of The Surf Lodge's major clients to do business with Hochberg in the neighboring town of Bridgehampton, New York.  *Id.* ¶ 56.  Hochberg secretly made unauthorized references to The Surf Lodge and Cardoso in business decks she sent to Saks Fifth Avenue and American Express for her project in Bridgehampton.  *Id.* ¶¶ 57–58.  When Cardoso learned of Hochberg's efforts, Cardoso informed Hochberg that she was not authorized to conduct business as The Sanctuary without Cardoso's permission or consent and that her deceptive use of Cardoso's name and The Surf Lodge to gain business for herself was illegal and damaging to both Cardoso and The Surf Lodge.  *Id.* ¶¶ 59–64.  When Hochberg continued soliciting business for The Sanctuary and affiliating herself with The Surf Lodge, Cardoso's counsel sent Hochberg two cease and desist letters in the final

months of 2021, advising Hochberg that she was infringing on The Surf Lodge's intellectual property. *Id.* ¶¶ 66–68. Despite Plaintiffs' warnings and cease-and-desist letters, Hochberg persisted in using intellectual property belonging to The Surf Lodge without issuing any disclaimer disassociating herself from The Surf Lodge or Cardoso through the time that the FAC was filed in May 2023. *Id.* ¶¶ 65–71.

Hochberg's use of The Surf Lodge's trademark and trade name took several forms. Most significantly, in the months leading up to the present lawsuit and while The Surf Lodge's counsel was demanding Hochberg cease her infringing conduct, Hochberg, who apparently retained control of The Sanctuary's social media accounts after the business dissolved, changed the Instagram username from @TheSanctuaryWellness to @TheSurfLodgeSanctuary to create a clear false association and likelihood of confusion that The Sanctuary was affiliated with Cardoso and The Surf Lodge. *Id.* ¶ 72. As of the time of the filing of the proposed SAC, Hochberg was still actively portraying The Sanctuary as open and conducting business, as evidenced by the fact that @TheSurfLodgeSanctuary Instagram profile listed a business address on Montauk Highway, in Montauk, New York. *Id.* ¶ 74.

**B. Allegations Relevant to Plaintiffs' "Standing"**

Plaintiffs' allegations are supported by a License Agreement between Montauk Properties and JC Hospitality dated June 13, 2012 ("License Agreement") and a First Amendment to the License Agreement signed by Montauk Properties, TSLM, and JC Hospitality, purportedly effective February 1, 2022 ("Amendment"), both of which were provided by Plaintiffs in

opposition to the motion to dismiss.[2]  Dkt. No. 44-1.  First, the License Agreement recites that Montauk Properties is "the Owner of the business, the United States Trademark and Brand of the Surf Lodge Operation located at premises known and designated as 183 S. Edgemere Rd., Montauk, New York ('The Premises')," that JC Hospitality, which is wholly owned and managed by Cardoso, "has offered to lease The Premises and to pay [Montauk Properties] to become the exclusive licensee of the Surf Lodge business, the United States Trademark, and Brand of the Surf Lodge," and that Montauk Properties is willing to grant JC Hospitality an exclusive license for ten years.  Dkt. No. 44 at 1.  It then provides that Montauk Properties grants JC Hospitality a ten year "exclusive License to operate the Surf Lodge . . . restricted to the Town of East Hampton."  *Id.*  The License fee that JC Hospitality owes Montauk Properties is calculated, in part, as a function of JC Hospitality's profitability.  The License requires JC Hospitality to pay a "target" annual payment and a minimum annual payment.  In the event that JC Hospitality fails to make a stipulated amount in any year, then the target annual payment is reduced so that it will not exceed 80% of JC Hospitality's net profit.  The License also provides that it may be extended for additional one-year periods based on the payment by JC Hospitality of a lump sum above a contractually specified amount.  Dkt. No. 47.

The License also contains several restrictions and conditions to which JC Hospitality must adhere "to maintain the value of the Surf Lodge business, The United States Trademark and the Surf Lodge Brand."  *Id.* at 2 § 4.  These include that JC Hospitality "(i) exercise prudent hiring practices, (ii) provide prudent sensitivity and other training to employees on an ongoing

---

[2] "In resolving a motion to dismiss for lack of subject matter jurisdiction under 12(b)(1), a district court . . . may refer to evidence outside the pleadings."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Fed. Treasury Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62 (2d Cir. 2013).

basis, and/or (iii) prudently supervise all employees at all times, in a manner reasonably

necessary to avoid sexual harassment, wrongful termination and discrimination claims," *id.*

§ 4(e), that it ensure that "there are no violations of any applicable law, rule, and/or regulation

affecting the operation of the Premises," *id.* § 4(h), that it "shall insure that at all times the

Premises and the business are maintained and operated in a clean, safe and attract condition,

and . . . have sufficient, appropriate, and proper operating supplies and equipment, so as to

provide the hotel, food and beverage service consistent with the operation of the Surf Lodge

business and Brand," *id.* § 4(i), and that JC Hospitality obtain a New York State Liquor License,

*id.* § 4(l).

> The License provides:

> JCH specifically covenants and agrees that Jayma Cardoso may not assign,
> convey, or in any manner transfer or pledge any interest in JCH or its obligations
> hereunder, without the prior written approval of MP; which approval MP shall
> have the right and authority to deny with or without cause.

*Id.* § 4(j).  It goes on to say:

> MP may terminate this contract with or without cause should MP in its sole
> discretion determine the JCH's operation of the Licensed business is in any way
> harmful to the Surf Lodge business, the Trademark or the Brand or that JCH is in
> default of its proper discharge of its obligations and covenants as set forth herein.

> *Id.* § 4(k); The Amendment recites and acknowledges that the License has been

assigned and delegated in its entirety by Montauk Properties to TSLM and that TSLM

"possesses all of the rights necessary to grant the license to use the Service Marks in the

manner and to the extent set forth in the License Agreement."  Dkt. No. 44-1 at 1.  It

further provides that the License "shall continue in full force and effective through June

13, 2024," and shall automatically renew for one-year periods thereafter unless TSLM

provides notice to JC Hospitality of its intent not to renew before the end of the then-

applicable term of the License.  *Id.*  It also adds a new subparagraph 4(n) to the License:

JCH shall promptly notify Licensor if any legal action is instituted against JCH relating to JCH's use of the Service Marks.  JCH shall also promptly notify Licensor of any counterfeiting or other infringement of the Service Marks, or any other unauthorized use thereof of which JCH becomes aware.  Licensor shall have the right, but not the obligation, to institute legal action or take any other actions which it deems necessary to protect its interest in the Service Marks, and JCH shall fully cooperate with Licensor in any such action.  Any monetary recovery resulting from any such action shall belong solely to Licensor.  Licensee, with the consent of Licensor, which will not be unreasonably withheld, shall also have the right, but not the obligation, to either join Licensor in any action against a third party or institute legal action or take any other actions against third parties which it deems necessary to protect its interest in the Service Marks, at its sole expense, in which event: (i) JCH shall not make any statement or admission that might implicate Licensor and/or the Service Marks and/or the validity or ownership therefrom in any way without the prior written consent of Licensor in each instance; (ii) Licensor shall approve any counsel retained by JCH; and (iii) any monetary recovery to JCH resulting therefrom shall be split evenly between Licensor and JCH after JCH deducts therefrom the costs of legal fees directly relegated to pursuing the relevant action.

*Id.* at 1–2.

## PROCEDURAL HISTORY

Plaintiffs initiated this action by complaint filed on March 10, 2023.  Dkt. No. 1.  On April 20, 2023, Defendant filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.[3]  Dkt. No. 8.  Defendant argued that Plaintiffs lacked standing to bring a claim under Section 32 of the Lanham Act because they were not the registered owners of the trademarks at issue in this case and lacked standing under Section 43(a)(1)(A) of the Lanham Act because they were not owners of the marks.  Dkt. No. 9.  On April 27, 2023, the Court granted Plaintiffs' letter motion to amend the complaint, noting that Plaintiffs were entitled to amend the complaint as of right under Rule 15(a)(1).  Dkt. No. 14.  Plaintiffs filed the FAC on May 16, 2023.  Dkt. No. 19.  The Court accordingly denied Defendant's motion to dismiss the complaint as moot.  Dkt. No. 17.

---

[3] In her initial motion to dismiss, Defendant also complained that the summons she received was unsigned and unsealed, but did not raise a 12(b)(4) or 12(b)(5) motion.  Dkt. No. 9 at 4 nn.1, 5.

On June 12, 2023, Plaintiffs filed this motion to file the SAC.  Dkt. No. 33.  The proposed SAC asserts a federal claim under the Lanham Act for trademark infringement and false designation of origin.  Dkt. No. 33-6 ¶¶ 99–110.  Plaintiffs allege that Defendant has infringed on Plaintiffs' trademarks by using the marks "The Surf Lodge" in connection with her services, including by changing the name of The Sanctuary's social media to "@TheSurfLodgeSanctuary" in order to create a likelihood of confusion, false association and false affiliation with The Surf Lodge for monetary gain.  *Id.* ¶ 106.  Plaintiffs also allege a claim for federal trademark dilution.  *Id.* ¶¶ 111–116.  Plaintiffs allege that by using "The Surf Lodge" trademark in connection with the service Hochberg is offering, Hochberg has created a false designation of origin and misrepresentation of facts as to the origin and sponsorship of the services to the general public.  *Id.* ¶ 113.  The SAC also adds a third federal claim for violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  *Id.* ¶¶ 117–21. Plaintiffs allege that by incorporating "The Surf Lodge" name into the @TheSurfLodgeSanctuary Instagram handle, Defendant has created a false association with Plaintiff and TSLM's "The Surf Lodge" trademark and is attempting to illegally profit off of The Surf Lodge's well known and distinctive brand and trademark. *Id.* ¶ 118.

Plaintiffs further assert state law claims for trademark infringement under N.Y. Gen. Bus. L § 360-K, *id.* ¶¶ 122–26, injury to business reputation and dilution under N.Y. Gen Bus. L. § 360-L, *id.* ¶¶ 127–31, common law trademark infringement and unfair competition, *id.* ¶¶ 132–140, and violations of New York's consumer fraud statute, N.Y. Gen. Bus. L. § 349, *id.* ¶¶ 141–46, and deceptive advertising statute, N.Y. Gen. Bus. L. § 350, *id.* ¶¶ 147–151.  Finally, Plaintiffs assert claims for a violation of the New York City Consumer Protection Law, *id.* ¶¶ 152–157, and for tortious interference with prospective economic advantage, *id.* ¶¶ 158–164.

9

Within two weeks of Plaintiffs' motion to submit the SAC and submission of the proposed SAC, on June 23, 2023, Defendant filed her opposition to the motion to file a SAC and her cross-motion to dismiss for lack of subject matter jurisdiction, personal jurisdiction, and for improper process and service of process (pursuant to Rules 12(b)(1), (2), (4), and (5), respectively).[4]  Dkt. Nos. 39, 40.  She also requests attorneys' fees pursuant to 15 U.S.C. § 1117(a).  Dkt. No. 41.  On July 7, 2023, Plaintiffs filed a memorandum of law in opposition to Defendant's motion to dismiss.  Dkt. No. 42.  A week later, Defendant filed a reply memorandum in support of her motion to dismiss.  Dkt. No. 51.

## DISCUSSION

Defendant's primary argument concerns Plaintiffs' right to bring the federal claims. Defendant argues specifically that Plaintiffs lack standing to bring their federal claims because they are, at most, exclusive licensees and owners of The Surf Lodge trademarks, rather than the trademark registrant.  Dkt. No. 40 at 4–9.  Defendant notes that neither the FAC nor the SAC alleges that either Plaintiff owns the trademark rights to The Surf Lodge.  *Id.* at 4–5.  Rather, as Plaintiffs assert, TSLM, which is not a named party, is the owner and registrant for the trademark rights to The Surf Lodge.  Dkt. No. 33-6 ¶¶ 9–10, 32–33, 99.  Cardoso is a co-owner of TSLM but not of the intellectual property related to The Surf Lodge.  *See id.* ¶ 82 ("Cardoso is an owner of TSLM, the registered owner and holding company of all intellectual property related to The Surf Lodge.").

---

[4] Defendant raises, but only barely, 12(b)(2), 12(b)(4) and 12(b)(5) motions in her Motion to Dismiss the FAC based on the initial unsigned and unsealed summons.  Dkt. No. 40 at 1.  These defenses are untimely because they were available to Defendant when she submitted her initial motion to dismiss and yet she did not bring them.  *See* Dkt. Nos. 8, 9.  As such, Defendant has waived these defenses.  Fed. R. Civ. P. 12(g)(2); *id.* 12(h)(1)(A).

Defendant frames her motion as under Federal Rule of Civil Procedure 12(b)(1).  A court properly dismisses a claim for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it."  *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A motion to dismiss for lack of subject matter jurisdiction may 'raise a facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence.'"  *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283, 296 (E.D.N.Y. 2012) (quoting *Guadagno v. Wallack Ader Levithan Assocs.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996)).  Where the defendant challenges the legal sufficiency of a complaint's allegations, the Court must treat all factual allegations as true and draw reasonable inferences in favor of the complaining party.  *Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001).  A bare assertion of standing alone will not do.  Although injury may be pleaded generally, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), the plaintiff must still allege "facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue," *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).  Where the jurisdictional challenge is fact-based, the defendant may "proffer[] evidence beyond the [p]leading," and the plaintiff "will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction."  *Carter*, 822 F.3d at 57 (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)).  In that case, "no presumptive truthfulness attaches to the complaint's jurisdictional allegations," and "the burden is on the

plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts." *Guadagno*, 932 F. Supp. at 95.

However, Defendants raise an argument regarding whether Congress has given Plaintiffs a right to pursue the federal causes of action she pursues and not whether the Court has subject matter jurisdiction. Accordingly, it is better judged under Federal Rule of Civil Procedure 12(b)(6).[5] To survive a 12(b)(6) motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. Here, to state a claim, Plaintiffs must show that they fall within the "zone of interests" of the relevant Lanham Act provisions. *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 118 (2d Cir. 2023).

Whether analyzed under Rule 12(b)(1) or 12(b)(6), the same conclusions regarding the validity of the SAC follow. Plaintiffs do not have statutory standing and do not state a claim for federal trademark infringement (§ 32(1)) and dilution (§ 43(c)) because they are not the owners or assignees of the mark at issue. Plaintiffs also do not state a claim for cyber-squatting. The

---

[5] The language of "statutory standing" used by Defendants and the older cases is something of a misnomer. *See Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 129 (2014); *Annabi v. N.Y. Univ.*, 2023 WL 6393422, at *23 (S.D.N.Y. Sept. 29, 2023); *Bibliotechnical Athenaeum v. Am. Univ. of Beirut*, 527 F. Supp. 3d 625, 633 (S.D.N.Y. 2021), *aff'd*, 2022 WL 710896 (2d Cir. Mar. 10, 2022). The question has come to be known as whether the particular plaintiff has a right of action under the federal statute. Throughout this opinion, the Court uses the language "standing" and "statutory standing" colloquially and not to refer to Article III standing.

claim for false designation of origin and misrepresentation of facts as to origin (§ 43(a)),

however, does state a claim for relief.

### A. Infringement (15 U.S.C. §§ 1114-1117)

Section 32(1) of the Lanham Act protects registered trademarks against infringement.

*See SPI Spirits Ltd.*, 726 F.3d at 72.  By its terms, the statute provides a cause of action for the

"registrant" against any person who "without the consent of the registrant" "use[s] in commerce

any reproduction, counterfeit, copy, or colorable imitation of a registered mark . . . likely to

cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a).  The statute defines

"registrant" to "embrace the legal representatives, predecessors, successors and assigns" of the

registrant.  11 U.S.C. § 1127.  Accordingly, the cause of action under Section 32(1) is

available . . . only to 'registrant[s]' of the trademarks at issue, [including] the actual registrant's

'legal representatives, predecessors, successors and assigns.'" *SPI Spirits Ltd.*, 726 F.3d at 72

(quoting 15 U.S.C. § 1127).

The statutory claim under Section 32(1) cannot be asserted by a mere licensee or even an

exclusive licensee.  *Id.* at 78; *see also Telebrands Corp. v. Del Lab'ys, Inc.*, 719 F. Supp. 2d 283,

293 (S.D.N.Y. 2010) ("[A]n exclusive licensee only has standing if the licensing agreement

grants the licensee a property interest in the mark or otherwise assigns to the licensee the

registrant-licensor's ownership rights." (internal quotations omitted)); Restatement (Third) of

Unfair Competition § 33 (1995) ("Actions for the infringement of registered trademarks under

§ 32 of the Lanham Act must be brought 'by the registrant,' 15 U.S.C.A. § 1114, which includes

the registrant's 'legal representative, predecessors, successors and assigns.' 15 U.S.C.A. § 1127.

A licensee is thus precluded from maintaining an action under § 32 unless the transaction is

characterized as an assignment.").  Therefore, a plaintiff "must show that its 'license' amounts,

in fact, to an assignment to establish entitlement to sue under Section 32(1)." *SPI Spirits Ltd.*, 726 F.3d at 78; *see Allstar Mktg. Grp., LLC v. Allstar_Place*, 2023 WL 1437679, at *4 (S.D.N.Y. Feb. 1, 2023).

The Second Circuit has held that "[a]t least two requisites are inherent in the concept of assignment under the Act: (1) the need for the relevant assigning document to be effected 'by [an] instrument[] in writing duly executed,' 15 U.S.C. § 1060(a)(3); and (2) the need for the assignment to transfer an ownership interest in the marks at issue." *SPI Spirits Ltd.*, 726 F.3d at 73. Both elements are critical. "A clear writing effecting an assignment signals to the parties and the world that the assign is the party that owns the mark and is authorized to exclude others from use." *Id.* at 74. The Circuit has also "accepted that a transfer of an ownership interest in a mark is a predicate to standing for any putative 'assign.'" *Id.* at 76.

The Second Circuit has "not precisely delineated the bundle of rights that a trademark assignment must extent to a purported assignee to support the latter's standing to bring a Section 32(1) suit." *Id.* Several points emerge from case law. First, it is insufficient that the registrant grant the third party the right to use its mark for a limited purpose and for a limited time. As long as the registrant retains control over quality, she may choose to exploit her name through any number of different forms of distribution networks without forfeiting the right to trademark protection. *See* 3 McCarthy on Trademarks and Unfair Competition § 18.40 (5th ed. 2023). In that instance, the distributor or franchisee or licensee who has the right to use another's mark for "administration," *SPI Spirits Ltd.*, 726 F.3d at 76, is best characterized as a "renter" and not an "owner," *see* 3 McCarthy on Trademarks and Unfair Competition § 18:52 (5th ed. 2023) ("The licensee of a trademark is in the position of a renter of an apartment, who does not acquire real

estate ownership rights, no matter how long the tenancy.").[6]  Second, it is relevant whether the registrant has retained or ceded an "operational interest" in the mark.  *SPI Spirits Ltd.*, 726 F.3d at 75.  Trademark rights "are not accorded 'in gross.'"  *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 236 (S.D.N.Y. 2022) (quoting *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979)).  They have value and enjoy protection only by virtue of the goodwill they symbolize.  *See Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984).  It follows that when the registrant retains both control over and an interest in the goodwill that the registrant has generated, the registrant—and not the party with whom it has contracted— possesses the ownership interest necessary to bring a Section 32(1) claim.  *See Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 128 (4th Cir. 2019) ("it is black letter law that a licensee's use of a mark inures to the benefit of the licensor and the licensee does not acquire its own ownership rights").  Third, it is relevant whether the agreement reserves to the registrant "certain rights that are generally inherent in the concept of ownership," such as the right to further assign the marks at issue, to withdraw its counterparty's right to use the marks, or to use the marks itself.  *SPI Spirits Ltd.*, 726 F.3d at 77.  Such provisions not only tend to denote the registrant as the continued owner of the mark, but they also make clear that the ultimate interest in the goodwill that the mark represents remains with the registrant.

Plaintiffs fail to allege or establish facts sufficient to show that they are assignees and have the right to bring an action under Section 32(1) of the Lanham Act.  The Court examines

---

[6] This was also the rule prior to the enactment of the Lanham Act. *See, e.g., Hicks v. Anchor Packing Co.*, 16 F.2d 723, 726 (3d Cir. 1926) ("A grant of an exclusive use of a trade-mark, limited as to duration and place, . . . , does not convey title or establish ownership of the trade-mark in the licensee."); *Crown Fabrics Corp. v. Am. Viscose Corp.*, 145 F.2d 246, 248 (C.C.P.A. 1944) ("Whatever right appellant might have to use its marks under its license agreements with appellee, it obviously is not entitled to the exclusive use of such marks, and, therefore, is not entitled to register them.").

"the terms of the license agreement to determine whether the licensee held a property interest in the mark, becoming effectively an assignee for standing purposes." *Telebrands Corp.*, 719 F. Supp. 2d at 293.  As an initial, and perhaps dispositive, matter, the agreement is entitled a "license agreement."  Dkt. No. 44-1.  The language of the agreement thus reflects the understanding of the parties that the rights being conveyed to Plaintiffs were not those of an assignee and would not confer the right to sue as an assignee.  *See, e.g., U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981) ("To say that the licensee has acquired rights that survive the legal termination of that license, destroys the entire concept of a license."); *Watec Co., Ltd. v. Liu*, 403 F.3d 645 (9th Cir. 2005) (affirming jury verdict that foreign manufacturer was the owner of the trademark and that the U.S. importer and distributor's licensed use inured to the benefit of the foreign manufacturer); *Quality Candy Shoppes/Buddy Squirrel of Wis., Inc. v. Grande Foods*, 90 U.S.P.Q.2d 1389 (T.T.A.B. 2007) ("[Y]ears of precedent make it very clear that proper use of a mark by a trademark owner's licensee or related company constitutes 'use' of that mark attributable to the trademark owner.").  A licensee's use inures to the benefit of the licensor.  3 McCarthy on Trademarks and Unfair Competition § 18:52 (5th ed. 2023); Restatement (Third) of Unfair Competition § 33 Comment *b* (1995) ("[A] license does not transfer ownership of the designation."); Restatement (Third) of Unfair Competition § 33 Comment *d* (1995) ("[A] license does not transfer ownership of the mark.").

Second, JC Hospitality has the right to use the marks only for a very limited period and in a limited respect.  JC Hospitality has the right to use the trademarks until June 13, 2024 (less than a year), and thereafter only if TSLM—by not providing notice otherwise—agrees to JC Hospitality's continued use of the marks.  Dkt. No. 44-1 at 1.  The license is limited to the Surf Lodge and limited to the Town of East Hampton.  Dkt. No. 44 at 1. *See Brooklyn Bottling of*

*Milton, N.Y., Inc. v. Ecuabeverage Corp.,* 2008 WL 577288, at *2 (S.D.N.Y. Mar. 3, 2008) (finding no assignment, despite language in an agreement authorizing licensee to bring enforcement actions, where the agreement restricted the license to a geographical location and expressly stated that licensor remained the owner of the trademarks).[7]  TSLM can use the mark elsewhere.  It thus is apparent that TSLM retains its ownership interest in the mark.  Indeed, TSLM is entitled to a license fee calculated on the basis of JC Hospitality's profitability, further suggesting that TSLM has not relinquished its interest in the mark but maintains it.  Dkt. No. 44 at 1.  The goodwill generated by the marks thus expressly inures to the partial benefit of TSLM.

Third, the License imposes extensive obligations on JC Hospitality, reflective of TSLM's continued "operational interest" in the marks.  The Surf Lodge is a mark reflecting the value of hospitality.  Under the License Agreement, TSLM retains control over the goodwill it has generated and temporarily loaned to JC Hospitality.  JC Hospitality is not free to exploit the marks as it wishes; it is contractually obligated to exercise prudent hiring practices and to provide sensitivity training to employees and to maintain the Premises in clean, safe, and attractive condition.  *Id.* §§ 4(e), 4(h), 4(i).  Although JC Hospitality can use the mark, TSLM retains the interest in the goodwill.  *See G & F Licensing Corp.,* 2010 WL 2900203, at *2–3 (refusing to find an assignment where the licensee was limited to using the mark for certain uses, could only use the mark in connection with "highest quality" merchandise, and could not

---

[7] *Telebrands Corp. v. Del Laboratories*, on which Plaintiff relies, Dkt. No. 42, is distinguishable. There, the license agreement gave the plaintiff broad rights to sell the trademarked property "throughout the United States, royalty free, for a potentially unlimited period" and did "not set forth any restrictions on [the plaintiff's] ability to enforce the trademarks or other intellectual property" of the registrant.  719 F. Supp. 2d at 293.  In addition, the license gave the plaintiff the right to sue infringers in its own name and without joining the owner, "to the extent permitted by applicable law."  *Id.* at 291.  Under those distinct circumstances, the court held that the plaintiff "has a property interest in the trademark and qualifies as an assignee of the registrant for standing purposes."  *Id.* at 293.

prosecute a trademark unless it notified the licensor and kept the licensor appraised of the action if the licensor did not pursue an action itself).

Fourth, TSLM retains not only formal title to the marks, but also the rights "that are generally inherent in the concept of ownership." *SPI Spirits Ltd.*, 726 F.3d at 77.  JC Hospitality has no independent right to assign the trademarks.  JC Hospitality is required to covenant that Cardoso will not transfer or pledge "any interest" in JC Hospitality or its obligations" without the prior consent of TSLM which may be denied "with or without cause."  Dkt. No. 47 § 4(j); *see Fed. Treasury Enter.*, 726 F.3d at 77 ("FTE has not cited any persuasive authority within or outside our Circuit holding that a valid assignment of a trademark right can occur when the putative assignor retains the right to rescind the trademark, to grant a license for its use to others, or to exclude others from using the mark.  We decline to create such a rule here.").

Fifth, TSLM has the right at any time to terminate the license if, in its "sole discretion," TSLM determines that JC Hospitality's operation of the license business is "in any way harmful" to the Surf Lodge business or the Trademark or the Brand.  *Id.* § 4(k); *see SPI Spirits*, 726 F.3d at 77 (noting that Russian Federation was "free to withdraw FTE's right to use the Marks"); *Prince of Peace Enters. v. Top Quality Food Market, LLC,* 2007 WL 704171, at *3 (S.D.N.Y. Mar. 7, 2007) (finding no assignment where a distribution agreement granted plaintiff the exclusive use of and enforcement rights to various trademarks but explicitly permitted licensor to terminate the license); *L'Oreal USA, Inc. v. Trend Beauty Corp.*, 2013 WL 4400532, at *12 (S.D.N.Y. Aug. 15, 2013) (finding that an agreement was a license, rather than an assignment, when its geographic scope was limited to the United States, and included requirements to pay licensing fees, "maintain the trademarks' quality and workmanship, subject to inspection" by the licensor, and reserved termination rights in the licensor).

18

Finally, under the License Agreement, JC Hospitality does not have the unilateral right to sue to protect the marks.  Although TSLM retains "the right, but not the obligation, to institute legal action or take any other actions which it deems necessary to protect its interest in the Service Marks," JC Hospitality must obtain the consent of TSLM to sue.  *Cf. Telebrands Corp.*, 719 F. Supp. 2d at 292 ("One policy underlying the requirement to join the patent owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer."); *see also Nespresso USA, Inc. v. Peet's Coffee, Inc.*, 2023 WL 374980, at *5 (S.D.N.Y. Jan. 24, 2023) (finding that exclusive license was not an assignment where it did not transfer all substantial rights in the trademark and the registrant retained the rights to enforce the marks).

 Because the license does not amount to an assignment, Plaintiffs lack the right to bring a claim under § 32(1) of the Lanham Act.

**B.  Trademark Dilution (15 U.S.C. § 1125(c)) and False Designation of Origin and Misrepresentation of Facts as to Origin and Sponsorship (15 U.S.C. § 1125(a))**

Plaintiffs allege that "Defendant's conduct constitutes dilution, willful false designation of origin, and misrepresentation of facts as to the origin and/or sponsorship of the services to the general public."  Dkt. 33-6 ¶¶ 113–14.  However, dilution claims are governed by § 43(c) of the Lanham Act, while willful false designation and misrepresentation of facts claims are governed by § 43(a).  Because these different sections have different requirements, the Court will consider them separately.  *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114–19 (2d Cir. 2006).  The Court finds that Plaintiffs have not established a right to sue under § 43(c), but have the right to sue under § 43(a).

Plaintiffs do not have a right to sue for their action under § 43(c) of the Lanham Act because they are neither the owners nor the assigns of the mark.  Section 43(c) provides a cause

19

of action for the *owner* of a mark for dilution by blurring or tarnishment of a "famous mark."  15

U.S.C. § 1125(c); *Fed. Treasury Enter.,* 726 F.3d at 72.  The text makes clear that only owners

of the mark or their assigns have standing to sue under § 43(c).  *Nespresso USA*, 2023 WL

374980, at *7 ("Section 43(c) claims may only be brought by the 'owner of a famous mark.'");

*see also Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 392–

93 (S.D.N.Y. 2011) ("Absent a valid assignment transferring all ownership rights in a mark, even

an exclusive licensee and distributor . . . is not a mark's 'owner' for purposes of Section 43(c).");

*L'Oreal USA, Inc. v. Trend Beauty Corp.*, 2013 WL 4400532, at *13 (S.D.N.Y. Aug. 15, 2023).

As previously established, Plaintiffs are neither the owners nor assignees of the trademarks, and

therefore they lack standing to sue for dilution under § 43(c).[8]

---

[8] Even if Plaintiffs were the owners of the trademarks, their dilution claim would fail because the
pleadings do not establish that the mark at issue is sufficiently famous to qualify for § 43(c)
coverage.  The Act lists four factors a court should consider in determining whether a mark is
sufficiently recognizable:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark,
> whether advertised or publicized by the owner or third parties; (ii) The amount, volume,
> and geographic extent of sales of goods or services offered under the mark; (iii) The
> extent of actual recognition of the mark; (iv) Whether the mark was registered under the
> Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).  "Courts in this District have recognized that 'fame is the key
ingredient in a trademark dilution claim . . . .'  To be considered famous, a mark must be 'widely
recognized by the general consuming public of the United States.'"  *Adidas Am., Inc. v. Thom
Browne Inc*., 599 F. Supp. 3d 151, 161 (S.D.N.Y. 2022) (quoting *DigitAlb, Sh.a v. Setplex, LLC*,
284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018)).  It is not clear from the pleadings that the marks at
issue here meets this burden.  The SAC indicates that the Surf Lodge has been in operation since
2008, and its branding was apparently "so distinctive and well known" that Cardoso and The Surf
Lodge team opened a new restaurant in Aspen, named The Snow Lodge.  Dkt. No. 33-6
¶¶ 21, 27.  While the trademarks were allegedly known by celebrities or wealthy clientele, it is
not clear that notoriety extended to the broader public.  The Surf Lodge was an exclusive
getaway for high-end clientele, physically operating in a small, set location, though also
publicized online; the exclusivity of The Surf Lodge cuts against the amount, volume, and
geographic extent of services offered under the mark.  Dkt. No. 42 at 7.  Therefore, even if
Plaintiffs were the owners of the trademark, neither the FAC nor the SAC sufficiently establish
the requisite fame to claim § 43(c) coverage.

The language Section 43(a) of the Lanham Act is different.  Section 43(a) provides that a person who engages in a false designation of origin and/or misrepresentation of facts with respect to a trademark (registered or unregistered)[9] "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."  15 U.S.C. § 1125(a)(1); *see Thursday LLC v. DNVB, Inc.*, 2021 WL 2689061, at *3 (S.D.N.Y. June 29, 2021) ("Unlike Section 32, Section 43(a) does not limit infringement actions to 'registrants' or require a federal trademark registration.").  Thus, a person need not be the owner of a mark to bring suit under § 43(a) for damages.  *See Calvin Klein Jeanswear Co. v. Tunnel Trading*, 2001 WL 1456577, at *5 (S.D.N.Y. Nov. 16, 2001) ("Courts have consistently recognized that this broad language confers standing on trademark licensees."); *Murphy v. Provident Mut. Life Ins. Co. of Phila.*, 756 F. Supp. 83, 86 (D. Conn.), *aff'd* 923 F.2d 923 (2d Cir. 1990) ("[T]he question of ownership is immaterial to standing under § 43(a), since standing may lie with mere users of trademarks."); *Silverstar Enters., Inc. v. Aday*, 537 F. Supp. 236, 241 (S.D.N.Y. 1982) ("[S]tanding under this section may lie with users of trademarks who are not owners of the marks."); 6 McCarthy on Trademarks and Unfair Competition § 32:12 (5th ed. 2023) ("Courts have held that one need not be the 'owner' or 'registrant' of a mark in order to assert a § 43(a) claim for trademark infringement."); § 27:45 ("[A] claim brought under Lanham Act § 43(a)(1)(A) . . . for infringement of an unregistered mark does not require ownership of a federal trademark registration.").

Rather than ownership, Section 43(a) accords the right to sue to a party who has a valid interest in the mark—an interest that will likely be damaged by false and/or misleading claims.

---

[9] *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 314 (S.D.N.Y. 2010) ("Section 43(a) protects both registered and unregistered marks.").

"To establish standing under Section 43(a), a plaintiff must "demonstrate a 'reasonable interest to be protected' against the advertiser's false or misleading claims, and a 'reasonable basis' for believing that this interest is likely to be damaged by the false or misleading advertising.'" *Havana Club Holding, S.A. v. Galleon S.A.,* 203 F.3d 116, 130 (2d Cir. 2000) (citation omitted) (quoting *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994)); *see also* 6 McCarthy on Trademarks and Unfair Competition § 32:12 (5th ed. 2023) ("To maintain a § 43(a) claim for infringement, the plaintiff must show that it has a valid commercial interest in the mark that may be harmed by the alleged infringement."). "[A]t a minimum, standing to bring a section 43 claim requires the potential for a commercial or competitive injury." *Berni v. Int'l Gourmet Restaurants of Am., Inc.,* 838 F.2d 642, 648 (2d Cir. 1988) (citations omitted)); *see also Glob. Merch. Servs., Ltd. v. Sunfrog, LLC,* 2018 WL 11223365, at *1 (S.D.N.Y. Aug. 9, 2018) ("The claims brought pursuant to § 1125 (*i.e.*, unfair competition and false designation of origin), which does not limit infringement actions to 'registrants' or require a federal trademark registration, are not dismissed for lack of standing."); *Iconix Brand Grp., Inc. v. Bongo Apparel, Inc.*, 2008 WL 2695090, at *6 (S.D.N.Y. July 8, 2008).

Taking the allegations of the SAC as true and as supplemented by the License and the Amendment, Plaintiffs have shown a valid commercial interest in the mark and preventing harm to that interest resulting from false designation and misrepresentation of origin or sponsorship. Plaintiffs operated The Surf Lodge.  Dkt. No. 44 at 1.  JC Hospitality has exclusive right to use the Trademark in connection with The Surf Lodge.  Dkt. No. 19 ¶¶ 12, 30.  Both Plaintiffs and Defendant operate in the same general geographic location, and with a similar customer and collaborator base.  Defendant's conduct has also harmed the reputation of Cardoso and by extension The Surf Lodge.  During Defendant's dealings with American Express and Saks Fifth

Avenue (a major client of The Surf Lodge) after Plaintiff severed ties with the Defendant, a third

party noticed Plaintiff's absence in phone calls, Zoom meetings, and other communications

related to the project Defendant was allegedly illicitly pitching using The Surf Lodge and The

Sanctuary trademarks.  Taken as true, this allegation demonstrates that Defendant's co-opting of

the Surf Lodge trademark has already created confusion.  Dkt. No. 42 at 11–12.  At the pleading

stage, Plaintiff has therefore alleged sufficient economic interest in preventing false and/or

misleading claims to have the right to bring suit under Section 43(a).  *See Bus. Trends Analysts v.*

*Freedonia Grp., Inc.*, 650 F. Supp. 1452, 1457–58 (S.D.N.Y. 1987) (Weinfeld, J.) ("As the

exclusive licensee of the Predicasts industry studies, BTA would clearly be damaged by false

description . . . .  [T]he absence of the trademark's 'owner' . . . does not prevent a plaintiff with a

concrete interest in protecting the mark from bringing suit.").

## C.  Anti-Cybersquatting (15 U.S.C. § 1125(d))

Plaintiffs also fail to state a claim under the ACPA, 15 U.S.C. § 1125(d), for the same

reason they fail to state a claim for trademark infringement and dilution: Plaintiffs are not the

owners of the mark. Cybersquatting has come to mean the "bad faith and abusive registration and

use of the distinctive trademarks of others as internet domain names, with the intent to profit

from the goodwill associated with those trademarks."  *N.Y.C. Triathlon*, 704 F. Supp. 2d at 324.

"The statute is explicit that only the 'owner' of a mark can sue for a violation of the ACPA.  This

means that an exclusive licensee cannot sue under the ACPA."  6 McCarthy on Trademarks and

Unfair Competition § 32:12 (5th ed. 2023); *see* 15 U.S.C. § 1125(d) ("A person shall be liable in

a civil action by the owner of a mark"); *Heron Dev. Corp. v. Vacation Tours, Inc.*, 2017 WL

5957743, *4 (S.D. Fla. 2017) (standing limited to owner of the mark, citing cases).  As the

exclusive licensee, rather than owner of the Surf Lodge trademark, Plaintiffs are not within the "zone of coverage" of the ACPA, and therefore lack the right to bring an ACPA claim.

### D.   Costs and Attorneys' Fees (1117(a))

Finally, Defendant contends that she should be awarded attorneys' fees and costs.  Dkt. No. 40 at 13–15.  The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  A case may be "exceptional" within the meaning of the Act either because one party has a particularly strong case, or because a party has litigated their case in a particularly unreasonable manner (e.g., frivolously, in bad faith, or objectively unreasonably either as to the facts or the law).  *Id.*

The Supreme Court has encouraged district courts to evaluate the totality of the circumstances, considering, *inter alia*, the "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 n.6 (2014); *see Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530–31 (2d Cir. 2018) (applying definition to attorneys' fees provision in the Lanham Act).  The Court addresses each in turn.

First, Plaintiffs' action is not frivolous.  The Circuit has instructed, in the context of *in forma pauperis* actions, that an action is frivolous "when either: (1) 'the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy;' or (2) 'the claim is based on an indisputably meritless legal theory.'"  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (quoting *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam)).  Courts in this District have used this definition to guide its understanding of frivolity in the trademark context as well.  *See, e.g.*, *Jackpocket, Inc. v. Lottomatrix NY LLC*,

2023 WL 4145515, at *4 (S.D.N.Y. June 23, 2023) (citing *Reply All Corp. v. Gimlet Media, Inc.*, 2021 WL 1291103, at *2 (E.D.N.Y. Apr. 5, 2021)).

Nor is there evidence that Plaintiffs brought this action with improper motive or in bad faith.[10] An action is brought in bad faith when, for example, it is clear that a plaintiff has no intention of testing the merits of its claims, but wants to extort a "nuisance value settlement" from a Defendant who otherwise would have to spend tens or hundreds of thousands of dollars in discovery. *Jackpocket, Inc.*, 2023 WL 4145515, at *5 (citing *Reply All Corp.*, 2021 WL 1291103, at *2) (quotation marks omitted). Defendant points to nothing that would indicate such bad faith dealing. In fact, Plaintiffs have forcefully presented their claims for judicial scrutiny, presumably at considerable cost. *See, e.g.*, *Universal Church, Inc. v. Universal Life Church/ULC Monastery*, 2019 WL 4601741, at *4 (S.D.N.Y. Sept. 19, 2019) (considering costs that non-moving party incurred).

Defendant's contention that "Plaintiffs have conducted themselves in an objectively unreasonable manner that has needlessly consumed both the Court's and the Defendant's time and resources" fares no better. Dkt. No. 40 at 14. Defendant identifies no evidence that supports her claim. On the contrary, Plaintiffs have corrected their mistakes as to the identity of the trademark owner, have shown that The Surf Lodge is a registered trademark, that Plaintiff JC Hospitality was the exclusive licensee of that trademark, and that Plaintiffs have a legitimate economic interest in protecting that mark from misappropriation and false designation of origin. Neither their factual nor legal submissions to this Court are clearly baseless. Nor has the method

---

[10] The Supreme Court has, however, expressly rejected a definition of exceptional that requires the moving party to show that the action was pursued for a "vexatious" purpose or "in bad faith." *See Octane Fitness*, 572 U.S. at 555 (overruling *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005)).

by which Plaintiff has provided the relevant licensing language proved so unwieldy that it constitutes bad faith or an unreasonable litigation method.

In short, this case does not resemble the quintessential "bad faith" case. *See, e.g.*, *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 136 (S.D.N.Y. 2000). Rather, Plaintiffs seem intent on reaching the stage where they can litigate the case on its merits, thereby protecting a mark in which they have an economic interest. As such, an award of attorneys' fees and costs would be inappropriate.

## CONCLUSION

Plaintiffs' motion to amend is GRANTED. Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART. Defendant's motion to dismiss Plaintiffs' claims of trademark infringement, 15 U.S.C. §§ 1114–1117, trademark dilution, *id.* § 1125(c), and cybersquatting, *id.* § 1125(d), for lack of standing, is GRANTED and those claims are dismissed in the SAC. However, Defendant's motion to dismiss Plaintiffs' claims under § 1125(a) is DENIED. Defendant's motion for attorneys' fees and costs is likewise DENIED. Because Plaintiffs maintain a valid federal claim, the Court will retain this case, and exercise supplemental jurisdiction over Plaintiff's state law claims.

The Clerk of Court is respectfully directed to close Dkt. Nos. 33 and 39.

SO ORDERED.

Dated: November 27, 2023
      New York, New York
                                            LEWIS J. LIMAN
                                  United States District Judge