UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/07/2025
```

------------------------------------------------------------------------X
                                         :

JC HOSPITALITY et al.,                                  :

                   Plaintiffs,        :

                                         :        23-cv-2051 (LJL)

         -v-                                       :

                                         :        OPINION AND ORDER

MARISA HOCHBERG,                                      :

                   Defendant.          :

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiffs JC Hospitality, LLC ("JC Hospitality") and Jayma Cardoso ("Cardoso" and with JC Hospitality, "Plaintiffs") move, pursuant to Federal Rule of Civil Procedure 55, for a default judgment. Dkt. No. 115.

For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are drawn from the Second Amended Complaint ("SAC") and are assumed to be true for purposes of this motion. Dkt. No. 33-6.[1]

JC Hospitality is a New York limited liability company which owns, operates, and manages "The Surf Lodge," a well-known boutique hotel, restaurant, bar and outdoor music venue located in Montauk, New York. SAC ¶¶ 7–8, 22. Cardoso is a New York resident who owns 100% of JC Hospitality. *Id.* ¶¶ 6–7. Non-party TSL Management, Inc. ("TSLM") is the

---

[1] The Court gave Plaintiffs leave to file the SAC and, in its Opinion and Order on the motion to dismiss, treated it as filed. Dkt. No. 56. Plaintiffs never separately filed the SAC. However, Defendant was served with the SAC and, accordingly, the Court treats the pleading at Dkt. No. 33-6 as the operative pleading.

registered owner of various The Surf Lodge trademarks. *Id.* ¶ 11. Cardoso is a co-owner of TSLM. *Id.* ¶ 9.

Cardoso opened The Surf Lodge in Montauk, New York, in April 2008. *Id.* ¶ 21. For a brief period of time, Defendant Marissa Hochberg ("Defendant" or "Hochberg") was an employee of The Surf Lodge. *Id.* ¶ 23. Hochberg and Cardoso had a friendship and a business relationship through Hochberg's employment at The Surf Lodge. *Id.* ¶ 37.

Prior to the COVID-19 pandemic, The Surf Lodge primarily hosted large gatherings, which were often attended by celebrities and wealthy clientele. *Id.* ¶ 24. It also began to shift its focus to wellness and to offer classes and retreats intended to create holistic experiences for relaxation and "rejuvenat[ion]." *Id.* ¶ 25. It positioned itself not only as a luxury destination but as a lifestyle brand. *Id.* ¶ 26.

The branding associated with The Surf Lodge was so distinctive and well-known that, in 2019, Cardoso and The Surf Lodge's team opened a year-round restaurant and lounge in Aspen, Colorado, under the trademarked name "The Snow Lodge." *Id.* ¶ 27. Since its opening, The Snow Lodge has become a similarly notable destination for clientele searching for luxury experiences and, consequently, The Snow Lodge is presently a permanent fixture at the St., Regis Aspen Resort. *Id.* ¶ 28.

In or around April 2019, Cardoso and Hochberg conceived of a yoga studio named "The Sanctuary," which also would operate in Montauk, more than one mile from The Surf Lodge's property. *Id.* ¶ 37. Around this time, Cardoso incorporated JM Sanctuary LLC doing business as The Sanctuary in New York. *Id.* ¶ 39. Cardoso was the only listed member of JM Sanctuary LLC. *Id.* ¶ 40. Cardoso and Hochberg had a brief business partnership in The Sanctuary, during

which Hochberg controlled the social media accounts (including the Instagram account) for The Sanctuary and would use The Sanctuary's social media for marketing efforts.  *Id.* ¶ 43.

In or about March 2020, as the Covid-19 pandemic was declared a national and global emergency, The Surf Lodge and The Sanctuary were forced to cease providing services to the public in accordance with federal, state and local guidelines.  *Id.* ¶ 44.  Cardoso was forced to close all operations of The Sanctuary in or about mid-2020.  *Id.* ¶ 45.

Cardoso and Hochberg had a falling out in the summer of 2020, after the outbreak of the coronavirus pandemic.  In the summer of 2020, Hochberg was sued by her landlord for failing to pay rent on a luxury property that she had leased in Montauk.  *Id.* ¶¶ 46–47.  The lawsuit, including allegations that Hochberg was abusing state law that protected tenants from eviction during the height of the pandemic, garnered media attention, *id.* ¶¶ 47–49, and the negative publicity about Hochberg started to cause reputational harm to Cardoso and The Surf Lodge, *id.* ¶¶ 50–52.  Cardoso sought to intervene on Hochberg's behalf to shift negative attention away from The Surf Lodge, but was rebuffed.  *Id.* ¶ 52.  Cardoso concluded that she could no longer conduct business with Hochberg, sought to dissolve JM Sanctuary LLC, and notified Hochberg of her intention to permanently cease the business relationship with Hochberg and to close JM Sanctuary LLC.  *Id.* ¶¶ 53–55.

Shortly after Cardoso informed Hochberg of her plans to dissolve JM Sanctuary LLC, however, Hochberg began using the name The Sanctuary and Cardoso's name individually as a means of "luring" in clients.  *Id.*  ¶ 56.  Plaintiffs allege that Hochberg infringed on Plaintiffs' trademarks by using the marks The Surf Lodge in connection with her services, including by changing the name of The Sanctuary's social media to @TheSurfLodgeSanctuary in order to create a likelihood of confusion, false association, and false affiliation with The Surf Lodge for

monetary gain.  *Id.* ¶ 106.  Hochberg also secretly made unauthorized references to The Surf Lodge and Cardoso in business decks she sent to Saks Fifth Avenue and American Express for her project in Bridgehampton.  *Id.* ¶¶ 57–58.

The business decks proposed a business entitled "The Sanctuary Hamptons House" to be sponsored by Saks Fifth Avenue and American Express.  Dkt. No. 33-8.  They state that The Sanctuary was "[b]orn out of the wellness programming at The Surf Lodge," and advertise Hochberg[2] and Cardoso as founders, *id.* at 3; they also attach press for The Sanctuary, including a heading from a publication that "The Surf Lodge Is Launching A Zen New Wellness Hub, The Sanctuary," *id.* at 17.

When Cardoso learned of Hochberg's efforts, Cardoso informed Hochberg that she was not authorized to conduct business as The Sanctuary without Cardoso's permission or consent and that her deceptive use of Cardoso's name and that of The Surf Lodge to gain business for herself was illegal and damaging to both Cardoso and The Surf Lodge.  SAC ¶¶ 59–64.  When Hochberg continued soliciting business for The Sanctuary and affiliating herself with The Surf Lodge, Cardoso's counsel sent Hochberg two cease and desist letters in the final months of 2021, advising Hochberg that she was infringing on The Surf Lodge's intellectual property.  *Id.* ¶¶ 66–68.[3]  Despite Plaintiffs' warnings and cease-and-desist letters, Hochberg persisted in using intellectual property belonging to The Surf Lodge without issuing any disclaimer disassociating herself from The Surf Lodge or Cardoso.  *Id.* ¶¶ 65–71.

Hochberg's use of The Surf Lodge's trademark and trade name took several forms.  In the months leading up to the present lawsuit and while The Surf Lodge's counsel was demanding

---

[2] Misspelled as Hocberg.
[3] In particular, counsel sent a letter dated October 28, 2020, accusing Hochberg of continuing to identify herself as an employee of The Surf Lodge.  Dkt. No. 33-8 at 20.

Hochberg cease her infringing conduct, Hochberg, who apparently retained control of The Sanctuary's social media accounts after the business dissolved, changed the Instagram username from @TheSanctuaryWellness to @TheSurfLodgeSanctuary to create a clear false association and likelihood of confusion that The Sanctuary was affiliated with Cardoso and The Surf Lodge. *Id.* ¶ 72.  Hochberg actively portrayed The Sanctuary as open and conducting business, as evidenced by the fact that @TheSurfLodgeSanctuary Instagram profile listed a business address on Montauk Highway, in Montauk, New York.  *Id.* ¶ 74.[4]

## PROCEDURAL HISTORY

The procedural history of this case is lengthy.

Plaintiffs initiated this case by complaint filed on March 10, 2023.  Plaintiffs alleged that Defendant violated the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, common law protections for trademark infringement and unfair competition, and New York State business and consumer protection laws, and committed tortious interference with prospective economic advantage.  Dkt. No. 1.  Defendant appeared on April 19, 2023, Dkt. No. 6, and filed a motion to dismiss on April 20, 2023, Dkt. No. 8.

On May 16, 2023, Plaintiffs filed a First Amended Complaint.  Dkt. No. 19.  In that complaint, they maintained the same causes of action as in the original complaint.  The Court denied Defendant's motion to dismiss as moot in light of the filing of that pleading.  Dkt. No. 17.

Plaintiffs filed a motion to file a Second Amended Complaint on June 12, 2023, Dkt. No. 33.  Defendant opposed the motion and filed a cross-motion to dismiss the First Amended Complaint, along with a memorandum of law.  Dkt. Nos. 39, 40.  Plaintiffs opposed the motion

---

[4] In December 2021, Hochberg also appeared at the Snow Lodge's property inside the St. Regis in Aspen, Colorado.  *Id.* ¶ 70.  Although Plaintiffs allege that Cardoso filed a police report with the Aspen Police Department, *id.* ¶ 71, it is not clear what if anything was done by Hochberg that gave rise to a police report.

to dismiss on July 7, 2023, Dkt. No. 42, and Defendant submitted her reply brief on July 14, 2024. Dkt. No. 51.

On November 27, 2023, the Court granted Defendant's motion to dismiss the First Amended Complaint in part and denied it in part and granted Plaintiffs' motion to file the SAC. The Court dismissed Plaintiffs' claims for federal trademark infringement under Section 32(1) of the Lanham Act and dilution under Section 43(c) of the Lanham Act and cyber-squatting in violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), as pled in the First Amended Complaint, and sustained Plaintiffs' claims for false designation of origin and misrepresentation of facts as to origin under Section 43(a) of the Lanham Act. Dkt. No. 56.[5] The Court concluded that Plaintiff did not have statutory standing to bring an action for infringement of the registered marks in The Surf Lodge under Section 32(1), dilution under Section 43(c), or cybersquatting under Section 43(d) because those marks were owned and registered by TSLM and because JC Hospitality and Cardoso were not the registrants or owners or assignees but mere licensees. *Id.* at 13–20, 23–24. The Court held that Plaintiffs could sue for false designation of origin and for misrepresentation of facts regarding origin under Section 43(a) because that statute accords the right to sue to any party with a valid interest in the mark and Plaintiffs had pleaded a valid commercial interest in the mark The Surf Lodge and in preventing harm to that interest resulting from false designation and misrepresentation of origin or sponsorship. *Id.* at 21–22.

On May 22, 2024, the Clerk of Court issued a certificate of default with respect to Defendant. Dkt. No. 93.

---

[5] Hochberg's only argument as to the state law causes of action is that the court could not retain jurisdiction once the federal actions were dismissed. Dkt. No. 51.

On May 28, 2024, Plaintiffs filed this motion for a default judgment for failure to defend the lawsuit.  Dkt. No. 94.  The Court held a hearing on the motion on August 21, 2024.  Aug. 21, 2024 Minute Entry.  Counsel for Plaintiffs appeared.  Defendant did not.  Dkt. No. 108.  The Court noted that Plaintiffs had submitted only hearsay evidence with respect to their motion for an injunction and no evidence in support of their request for damages.  *Id.*  It gave Plaintiffs until September 4, 2024 to make a supplemental submission with evidence and gave Defendant until September 11, 2024 to respond.  *Id.*  Plaintiffs filed a supplemental submission on September 4, 2024, in the form of an affidavit from Cardoso.  Dkt. No. 109.  The submission was served on Defendant.  Dkt. No. 110.  Hochberg did not respond.

On September 11, 2024, Plaintiffs' counsel filed an unopposed motion for attorneys' fees.  Dkt. No. 111.

Because no party requested a hearing on the motion for a default judgment, the Court cancelled the hearing scheduled for September 13, 2024.  Dkt. No. 112.

On November 27, 2024, the Court issued an order denying without prejudice Plaintiffs' motion for a default judgment because Plaintiffs had failed to submit a "memorandum of law, setting forth the cases and other authorities relied on in support of the motion," as required by Local Rule 7.1(a)(2).  Dkt. No. 114.

Plaintiff filed a renewed motion for a default judgment on August 6, 2025, supported by a memorandum of law in support of the motion and the affidavits of John J. Zidziunas and Jayma Cardoso.  Dkt. No. 115.  The Court issued an order on August 7, 2025, directing that Defendant respond to the renewed motion for default judgment by August 27, 2025, and that Plaintiffs reply by September 3, 2025.  Dkt. No. 116.  The motion for a default judgment was sent to Defendant on August 8, 2025.  Dkt. No. 117.  On August 26, 2025, Defendant submitted pro se a motion for

an extension of time.  Dkt. Nos. 118, 120–21.  Plaintiffs opposed the motion.  Dkt. No. 122.  By order of August 28, 2025, the Court granted the motion for an extension in part and denied it in part, giving Defendant a 30-day extension of time to file a response to the motion for a default judgment.  Dkt. No. 123.  The Court warned that if Defendant did not respond by September 27, 2025, the Court would consider the motion to be unopposed.  *Id.*

Plaintiffs filed a letter with the Court on October 2, 2025, noting that Defendant had not responded to the motion and asking the Court to grant it as unopposed.  Dkt. No. 125.

Defendant has not responded to the motion.

## LEGAL STANDARD

Federal Rule of Civil Procedure 55 sets forth a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default and the entry of a default judgment.  *See New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).  The first step, entry of a default, simply "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011); *see* Fed. R. Civ. P. 55(a).

Rule 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead *or otherwise defend*, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a) (emphasis added). "[T]he 'typical Rule 55 case [is one] in which a default has entered because a defendant failed to file a timely answer.'"  *Mickalis Pawn Shop, LLC*, 645 F.3d at 129 (alteration in original) (quoting *Brock v. Unique Racquetball & Health Clubs, Inc.*, 786 F.2d 61, 64 (2d Cir. 1986)). "Nonetheless, a district court is also empowered to enter a default against a defendant that has failed to . . . 'otherwise defend.'"  *Id.* (internal quotation marks and alteration omitted).  The Second Circuit has "embraced a broad understanding of the phrase 'otherwise defend.'"  *Id.*  For

example, the Second Circuit held that where a limited partnership defendant "had willfully disregarded the district court's order that the defendant appear through counsel, the court was justified in imposing default." *Mickalis Pawn Shop*, 645 F.3d at 130 (discussing *Eagle Associates v. Bank of Montreal*, 926 F.2d 1305 (2d Cir. 1991)).

The second step, entry of a default judgment, "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted" by the pleadings. *Id.* at 128; *see also* Fed. R. Civ. P. 55(b). Whether entry of default judgment at the second step is appropriate depends upon whether the well-pleaded allegations against the defaulting party establish liability as a matter of law. *See Mickalis Pawn Shop*, 645 F.3d at 137.

Although a defendant who defaults admits the well-pleaded factual allegations in a complaint, because a party in default does not admit conclusions of law, "a district court need not agree that the alleged facts constitute a valid cause of action." *Id.* (internal quotation marks and citation omitted); *see Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 367 (S.D.N.Y. 2020) ("The essence of Fed. R. Civ. P. 55 is that a plaintiff can obtain from a default judgment relief equivalent to but not greater than it would obtain in a contested proceeding assuming it prevailed on all of its factual allegations."). Therefore, this Court is "required to determine whether the [plaintiff's] allegations establish the [defendant's] liability as a matter of law." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

The legal sufficiency of a non-defaulting party's claims "is analyzed under the familiar plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), aided by the additional step of drawing inferences in the movant's favor." *WowWee Group Ltd. v. Meirly*, 2019 WL 1375470, at *5

(S.D.N.Y. Mar. 27, 2019). A default judgment entered on well-pleaded allegations does not reach the issue of damages, and a plaintiff "must therefore substantiate [her] claim for damages with evidence to prove the extent of those damages." *Hood v. Ascent Med. Corp.*, 2016 WL 1366920, at \*15 (S.D.N.Y. Mar. 3, 2016), *report and recommendation adopted*, 2016 WL 3453656 (S.D.N.Y. June 20, 2016), *aff'd*, 691 F. App'x 8 (2d Cir. 2017) (summary order).

Although "a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). Rather, the plaintiff "bears the burden of establishing her entitlement to recovery and thus must substantiate her claim with evidence to prove the extent of damages." *Dunn v. Advanced Credit Recovery Inc.*, 2012 WL 676350, at \*2 (S.D.N.Y. Mar. 1, 2012), *report and recommendation adopted*, 2012 WL 1114335 (S.D.N.Y. Apr. 3, 2012); *see HTV Indus., Inc. v. Agarwal*, 317 F. Supp. 3d 707, 717 (S.D.N.Y. 2018) (noting that a plaintiff must "substantiate its claim with sufficient evidence to prove its damages with reasonable certainty"). "Damages, which are neither susceptible of mathematical computation nor liquidated as of the default, usually must be established by the plaintiff in an evidentiary proceeding in which the defendant has the opportunity to contest the amount." *Greyhound Exhibitgroup*, 973 F.2d at 158. Federal Rule of Civil Procedure 55(b)(2) "leaves the decision of whether a hearing is necessary to the discretion of the district court." *Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012).

## DISCUSSION

I.     **Step One: Defendant has Failed to "Otherwise Defend"**

Plaintiffs have satisfied the requirements of Federal Rule of Civil Procedure 55(a). On May 22, 2024, Plaintiffs obtained a certificate of default from the Clerk of the Court. Dkt. No. 93. The default is based on Defendant's persistent defiance of the rules and orders of this Court

and failure to comply with the schedule of this Court, frustrating Plaintiffs' efforts to prosecute the case to judgment. The case has been plagued by Defendant's obstructive behavior, wasting the time of the Court and the parties.

Defendant's obstructive behavior started with the initiation of the present lawsuit. She was originally represented by Steven Storch, Esq. Dkt. No. 6. On May 18, 2023, the parties were due to file a joint proposed Case Management Plan and Scheduling Order. Dkt. No. 15. The parties failed to do so because Defendant did not cooperate in addressing the case management plan. Dkt. No. 22 ¶ 2. As a result, on May 18, 2023, Mr. Storch filed the first of what was to be three motions to withdraw as counsel. Dkt. No. 20. He cited as a reason that "[i]n the course of representing Defendant in this action, it has become increasingly difficult to effectively communicate with Defendant to the point where meaningful discussion and decision-making no longer occurs, rendering effective representation by the Firm essentially impossible." Dkt. No. 22 ¶ 3. Mr. Storch explained that the breakdown in communication was what had prevented his firm from agreeing to the case management plan and scheduling order. *Id.* ¶ 2; *see also* Dkt. No. 25. Defendant was served with the motion for her lawyer to withdraw as counsel. Dkt. Nos. 23–24. The Court issued an order on May 18, 2023, suspending the requirement to file a case management plan and advising that it would address the motion to withdraw at the initial pretrial conference scheduled for May 25, 2023. May 18, 2023 Minute Entry. The Court directed that Hochberg be present for the conference. *Id.* At the conference on May 25, 2023, Mr. Storch indicated that he had addressed the issues with his client and would be withdrawing the motion to withdraw. Dkt. No. 37 at 2–3; Dkt. No. 54 ¶ 8; Dkt. No. 94 ¶ 9; May 25, 2023 Minute Entry; June 6, 2023 Minute Entry.

The Court entered a Case Management Plan and Scheduling Order on May 31, 2023,

providing for all fact discovery to be completed by September 22, 2023, and all discovery to be completed by December 6, 2023.  Dkt. No. 28.

On July 28, 2023, however, Mr. Storch filed his second motion to withdraw as counsel. Dkt. No. 52.  Mr. Storch reiterated: "In the course of representing Defendant in this action, it has become increasingly difficult to effectively communicate with Defendant to the point where meaningful discussion and decision-making no longer occurs, rendering effective representation by the Firm essentially impossible."  Dkt. No. 54 ¶ 3.  He explained that the relationship of his firm with Defendant had "continued to degenerate" since the first motion to withdraw on May 18, 2023, notwithstanding his firm's "concerted efforts to improve relations," that Defendant had sent counsel an email four days earlier informing that she wished to terminate his representation effective immediately, and that continued representation was impossible.  *Id.*

The Court scheduled a hearing on the motion to withdraw for August 7, 2023, directing that Defendant be present.  July 31, 2023 Minute Entry.  The Court held the hearing on August 7, 2023.  Aug. 7, 2023 Minute Entry.  Counsel attended but Hochberg did not.  *Id.*  At the conference, Mr. Storch withdrew his motion to withdraw as counsel and the Court granted his request to stay discovery pending a decision on the then-pending cross-motion to dismiss the First Amended Complaint.  *Id.*; *see also* Aug. 17, 2023 Minute Entry (denying motion to withdraw as moot).

As noted, on November 27, 2023, the Court issued its Opinion and Order, granting in part but denying in part Defendant's motion to dismiss the FAC and permitting the filing of the SAC. Dkt. No. 56.  The Court held a conference on December 7, 2023, at which it directed the parties to file a new proposed case management plan by the following day.  Dec. 7, 2023 Minute Entry. On December 8, 2023, Mr. Storch wrote the Court that he had cooperated with Plaintiffs'

counsel in preparing a proposed scheduling order.  Dkt. No. 57.  However, the letter advised:

"Based upon communications with my client over the past twenty-four hours, it is not clear that

my client authorizes me to submit this on her behalf . . . I will sort out quickly whether, under the

circumstances, I am able to continue as counsel, whether new counsel will be substituting in, or

whether I will, regretfully, and with the sincerest apologies to the Court for the imposition that it

has placed on the Court and its resources, file a third motion to withdraw which I can assure the

Court will be the last one."  *Id.*

On December 14, 2023, Mr. Storch filed his third motion to withdraw as counsel.  Dkt.

No. 58.  The Court quotes portions of Mr. Storch's declaration in support of that motion at

length:

> …
>
> 3. This is the third application for leave to withdraw. As explained in connection with the prior motions, we are unable to work with Ms. Hochberg who has, at various times during our representation in this matter, fired us and subsequently begged us to represent her, threatened us, refused to communicate with us, and has refused to authorize us to take actions required by the Court's scheduling orders and applicable rules.
>
> 4. The previous two applications were withdrawn following extensive discussions with Ms. Hochberg and family members during which we thought that we had reached agreements as to how we could proceed with a mutually respectful attorney-client relationship that would provide Ms. Hochberg with the representation she deserves and enable the undersigned to fulfill obligations to the Court and adhere to Court's schedules.
>
> 5. As the Court may recall, on August 7, 2023, at the hearing on the Firm's second application to be relieved as counsel, I advised the Court that a key reason for our decision to withdraw the application was that Ms. Hochberg's aunt, a prominent attorney, had agreed to step in as an intermediary to help facilitate communication and decision-making.  Unfortunately, the aunt has now indicated to me that she no longer wishes to be involved for reasons that I will share with the Court, *in camera*, if the Court requires such information.
>
> 6. On Sunday, December 3, 2023, I met with Defendant and another lawyer (the "Second Lawyer") acting on her behalf in White Plains, NY.  The meeting was requested by Ms. Hochberg to discuss how to proceed with the representation in

light of, among other thing, the death of her father Herman Hochberg on October 19, 2023, who had agreed to pay our bills and had paid the initial retainer. Although Ms. Hochberg, in requesting the meeting, had made explicit threats against me and my Firm, I attributed that to grief over the passing of her father and agreed to the meeting.

7. During the meeting we had what I believed was a fruitful discussion which resulted in Ms. Hochberg agreeing that the Second Lawyer would act as an intermediary between Defendant and the Firm, similar to how Defendant's aunt had previously acted as such an intermediary. I also discussed at the meeting a schedule for responding to the Second Amended Complaint now that the Court had ruled on the motion to dismiss. We discussed a time frame which I believed would likely be acceptable to the other side and the Court and to which Ms. Hochberg seemed to be in agreement.

8. At the conclusion of the meeting, it was agreed that Ms. Hochberg and I would speak the following day to discuss a mechanism for payment of our fees in light of the death of her father. The next day, Ms. Hochberg refused to speak to me. Instead, I once again received accusatory and hostile texts from her.

9. I attempted to contact Second Counsel but when I did so Ms. Hochberg accused me of improperly reaching out to him. When Second Counsel then indicated that we should have a three-way call to discuss, I could not obtain a date or time from either Ms. Hochberg or Second Counsel for the discussion.

10. Given the increasing uncertainty as to what I was authorized to report to the Court, I send a letter to the Court on Friday, December 8, 2023, alerting the Court to the issue with regard to the deadline to submit a scheduling order, a copy of which is annexed hereto as Exhibit A.

11. In the interest of avoiding any prejudice to Defendant, I am prepared to submit additional explanation and evidence of this now complete and irreparable breakdown in communications to the Court *in camera*. I believe that this information may be helpful to the Court in determining whether other relief may be appropriate under the Federal Rules of Civil procedure for the future conduct of this litigation.

Dkt. No. 60 ¶¶ 3-11. The motion was served on Defendant. Dkt. No. 61.

The Court issued an order on December 20, 2023, scheduling a hearing in person on the

motion to withdraw for January 4, 2024, and directing Defendant to attend. Dec. 20, 2023

Minute Entry. Mr. Storch responded on December 22, 2023, with a letter stating that he had

informed his client of the hearing and of the requirement that she attend in person, but that

Defendant had replied that she was out of the country and would not attend.  Dkt. No. 62.  When Mr. Storch followed up to ask her when she would be returning to the United States, Hochberg refused to respond.  *Id.*  Plaintiffs replied with a letter that, while not opposing the motion to withdraw, highlighted the prejudice caused to Plaintiffs by Defendant's disruptive behavior. Dkt. No. 63.  The repeated motions to withdraw had caused Plaintiffs' legal expense to grow and had prevented discovery from going forward.  *Id.*  As or more concerning, Defendant had used the motion practice to engage in harassing behavior intended to improperly influence the case. She had contacted Plaintiffs' counsel on three occasions directly notwithstanding that she was a represented party and had leveled false accusations against counsel.  *Id.* at 3–4.  She also had involved herself in a separate lawsuit to cast aspersions about the character and supposed "unlawful motives" of defense counsel.  *Id.* at 4–5.

The Court held the conference as scheduled on January 4, 2024.  Dkt. No. 64.  Counsel attended.  *Id.*  Defendant violated the Court order and did not attend.  *Id.*  The Court granted the motion to withdraw.  *Id.*  The Court also ordered that an in-person hearing be held on February 8, 2024, to establish a renewed case management plan and that Defendant appear personally or through counsel on pain that if she did not she would risk default.  *Id.*  The Court ordered Plaintiffs' counsel to serve Defendant with a copy of the order at an email address provided by Mr. Storch as the email address at which Defendant could be reached.  *Id.*

A lawyer named Alexander Martin Dudelson appeared on behalf of Defendant on February 8, 2024, Dkt. No. 68, and the Court entered an Amended Case Management Plan and Scheduling Order providing a new deadline for the completion of fact discovery of June 7, 2024, and a new deadline for expert discovery and the completion of all discovery of August 9, 2024, Dkt. No. 69.  The Court ordered Defendant to file an answer no later than February 22, 2024.  *Id.*

15

On application of Defendant made on February 21, 2024 (the day before the deadline), the Court extended the time for an answer to February 29, 2024. Dkt. Nos. 72–73. However, on February 27, 2024, Mr. Dudelson filed a motion to withdraw. Dkt. No. 74. Mr. Dudelson's declaration in support of the motion stated, in pertinent part, as follows:

…

2. On the evening of February 7, 2024, after approximately a month and a half of consultations regarding this proceeding, as well as other matters, Ms. Hochberg signed a retainer with my office to represent her in this action. The case was scheduled for February 8, 2024, and the defendant was risking default if she or counsel did not appear. . .

4. Based on the retainer agreement and the defendant's promise to arrange for the retainer to be wired to my account, I filed my Notice of Appearance in this action on February 8, 2024 (Dkt. 68), hours before a hearing to establish a revised case management plan.

5. At the February 8, 2024 conference, the parties entered into a revised case management plan. Defendant's deadline to file her responsive pleading to the second amended complaint by February 22, 2024.

6. On February 12, 2024, I inquired about issues relating to the retainer payment and the pressing deadlines in this matter. At first the defendant advised me that she would come to my office the following day. However, after a short dialogue, the defendant advised me that she would be seeking different counsel.

7. On February 13, 2024, I advised the defendant that I needed to know how we were proceeding, and if she was retaining other counsel, I wanted to be substituted as soon as possible. The defendant indicated that she would get back to me with an answer. On February 15, 2024, the defendant sent me an email that she would get back to me by the end of the day.

8. After not hearing from the defendant, I contacted her on February 20, 2024 to reminded her that the answer was due in two days.

9. That day, the defendant advised me of certain medical conditions that prevented her from working on the answer. I was then accused of patently false conduct, which I am willing to share with this Court *in camera,* and was advised that my conduct was being reported by a third-party. At several points of the day, I was accused of making the defendant's medical condition worse. That evening the defendant, demanded that I seek an extension for the filing of her answer and counterclaims. Thereafter, I was contacted by a third party, purporting to be acting on her behalf, requesting that I seek an extension to file the answer.

10. On February 21, 2024, I filed for an extension after the defendant indicated, via text message, that she would be at a medical provider for the day.  I had initially inquired if the defendant would be appearing in my office to work on the answer.

11. Despite the late application, this Court found good cause for a one week extension based on the medical circumstances.

12. Since obtaining the extension, I have been unable to have a meaningful conversation with the defendant.  I have made every effort to schedule a time with her to work on her responsive pleading.  I have faced nothing but hostility from the defendant. On February 25, 2024, I asked the defendant if she would be coming to my office on February 26, 2024.   I then received threats and wholly false characterizations of my conduct.  She also accused me of lying about District Court Judge Liman and Magistrate Judge Parker's individual rules that a request for an extension be filed two business days in advance of a deadline.  Later that evening, defendant had a second third-party contact me on the her behalf.

13. At this juncture, the defendant is in breach of our legal services agreement and continues to make baseless accusations regarding my conduct.

14. I am prepared to submit additional information and evidence to this Court regarding the breakdown of the attorney-client relationship *in camera.*

Dkt. No. 75 ¶¶ 2, 4-14.  Counsel sought a stay of the proceedings for at least 30 days for Defendant to obtain new counsel.  *Id.* ¶ 18.

Plaintiffs responded on February 28, 2024, opposing the motion to withdraw and for a stay.  Dkt. No. 78.  Plaintiffs pointed out that Defendant's conduct had resulted in repeated motions to withdraw that had cost Plaintiffs significant legal fees and expenses and had caused undue delay and prejudice to the prosecution of the case and asked that, if Defendant did not file an answer, Plaintiffs be permitted to commence default proceedings.  *Id.*  The Court denied the motion for a stay but held the motion to withdraw sub judice.  Dkt. No. 79.  Hence the February 29, 2024 deadline for an answer remained in place.  The Court observed then that the progress of the case had "been frustrated by what the Court can only interpret as Hochberg's repeated efforts to avoid answering the claims against her."  *Id.* at 1.  After recounting the history of Defendant's failure to cooperate to date, the Court stated:

> The election of counsel to represent Defendant is not something that Hochberg can
> turn on and turn off, whenever she chooses not to meet a Court deadline. She has
> been warned that she would have to proceed with counsel or proceed pro se. Not
> weeks ago, she elected to proceed with counsel. Having done so, counsel will file
> an answer on her behalf on the timetable set by the Court. If she chooses not to
> continue with counsel, then counsel may file the answer drafted by Hochberg
> tomorrow and simultaneously renew his motion to be relieved. At that point, with
> some assurance that the case will move forward with an answer either drafted by
> Hochberg or drafted by counsel, the Court will consider the motion to withdraw.

*Id.* at 2. An answer was filed by Defendant, by and through Mr. Dudelson, on February

29, 2024. Dkt. No. 80.

On March 7, 2024, Mr. Dudelson wrote the Court requesting that it set a date for him to

be heard on his motion to be relieved as counsel, noting that to date he had not been contacted by

substituting counsel. Dkt. No. 81. The Court scheduled a hearing on that motion for March 27,

2024. Mar. 11, 2024 Minute Entry. The Court granted the motion to withdraw on March 27,

2024. Dkt. No. 84. It found that Defendant's failure to cooperate with counsel and failure to pay

attorney's fees due and owing provided satisfactory reasons for withdrawal. *Id.* at 1. It stated

the following with respect to the impact of withdrawal on the timing of the proceedings:

> Permitting counsel to withdraw will not have an adverse impact on the timing of
> the proceeding, any more than Ms. Hochberg's dilatory response to this litigation
> already has had on the proceeding. The case management plan in effect provides
> for all fact discovery to be complete by June 7, 2024, all discovery to be complete
> by August 9, 2024, and a status conference on August 14, 2024, in person in
> Courtroom 15C at 500 Pearl Street. Dkt. No. 69. There is no stay in discovery in
> the case. As an individual defendant proceeding *pro se*, Mr. Hochberg will be
> subject to the same responsibilities as if she were represented, and will suffer the
> same consequences if she defaults in those responsibilities that she also would have
> were she represented. Each party may serve discovery on the other. If Ms.
> Hochberg fails to respond to ordered discovery, she may face a number of potential
> sanctions including but not limited to the issuance of a default judgment against
> her. *See* Fed. R. Civ. P. 37(b)(2)(A)(vi). The Court may also impose similar
> sanctions on Ms. Hochberg, including entry of a default judgment, if she fails to
> disclose information required by discovery, *see* Fed. R. Civ. P. 37(c)(1), or fails to
> attend her own deposition, *see* Fed. R. Civ. P. 37(d). Finally, if Ms. Hochberg fails
> to "otherwise defend" this lawsuit, she may be subject to a default judgment. *See*
> Fed. R. Civ. P. 55(a).

*Id.* at 1–2.

Plaintiffs filed a first set of interrogatories and a request for production of documents as well as a request for admission on May 1, 2024.  Dkt. Nos. 87–89.  Defendant has not responded to the interrogatories or requests for production of documents and has not served discovery upon Plaintiffs.  Dkt. No. 115-1 at 9.

On May 6, 2024, the Honorable Katharine Parker, United States Magistrate Judge, to whom the case had been assigned for purposes of settlement, *see* Dkt. No. 70, issued an Order Requiring Appearance at Settlement Conference to Defendant in advance of a mandatory in-person settlement conference scheduled for May 9, 2024.  Dkt. No. 90.  Plaintiffs served Defendant with the Order.  Dkt. No. 94 ¶ 41.  Plaintiffs attended the conference, but Defendant defied the Court's order and failed to appear.  May 9, 2024 Minute Entry; Dkt. No. 94 ¶ 43.

On May 22, 2024, the Clerk of Court issued a certificate of default with respect to Defendant.  Dkt. No. 93.  On May 28, 2024, Plaintiffs filed a motion for a default judgment for failure to defend the lawsuit.  Dkt. No. 94.  Plaintiffs' counsel noted that following the withdrawal of Defendant's second counsel on March 27, 2024, and as of the filing of the motion for a default judgment on May 28, 2024, Plaintiffs had not received correspondence from Defendant or anyone purporting to act on behalf of Defendant.  Dkt. No. 94 ¶ 52.  Defendant had not provided any discovery responses to Plaintiffs or propounded discovery requests on Plaintiffs, had failed to respond to any correspondence regarding the lawsuit, and had failed to appear for three hearings and a mandatory settlement conference at which her appearances were ordered by the undersigned and by Judge Parker.  *Id.* ¶ 53.

While Defendant was ignoring the Court and these proceedings, she apparently had time to exercise extrajudicial efforts to address Plaintiffs' complaint.  As Plaintiffs subsequently

informed the court, on the night of May 28, 2024, and in response to an email attaching a copy of the motion for a default judgment, Defendant emailed an associate at Plaintiffs' counsel's law firm and made threats against her.  Dkt. No. 99 ¶ 46.  On June 13, 2024, Plaintiffs filed an order to show cause why Defendant should not be restrained from making threats against Plaintiffs' counsel or persons known to be associated with Plaintiffs' counsel and served that order to show cause on Defendant.  Dkt. Nos. 98–99.[6]  The Court scheduled a telephonic hearing on the order to show cause for June 24, 2024.  Dkt. No. 100.  Defendant did not appear and, on June 24, 2024, the Court issued the requested order.  Dkt. No. 103.

Defendant did not defend against the first motion for a default judgment.  She did not submit papers in opposition to the motion.  She did not appear at the hearing on the motion for a default judgment.  Aug. 21, 2024 Minute Entry; Dkt. No. 108.  The Court *sua sponte* declined to issue the requested default judgment on August 21, 2024 because Plaintiffs had not submitted the proper evidence to support the motion.  Dkt. No. 108.  After Plaintiffs submitted an affidavit containing evidence by the deadline of September 4, 2024, *see* Dkt. No. 109, Defendant did not submit any opposition or request a hearing.  *See* Dkt. No. 112.  Defendant did not respond to Plaintiffs' motion for attorneys' fees and expenses filed on September 11, 2024.  Dkt. No.

The Court *sua sponte* denied the first motion for a default judgment for failure to comply with the Local Rules.  Dkt. No. 114.  But even after the Court gave Defendant an extension of time to respond to the second motion for a default judgment, Defendant still failed to respond and to defend.

A party who willfully and repeatedly fails to respond to allegations of a complaint forfeits

---

[6] By order of June 21, 2024, the Court directed Defendant to provide her home address to the Clerk of the Court.  Dkt. No. 102.  Defendant failed to comply with that order.

the right to dispute the allegations of a complaint. Defendant has acted with "cavalier disregard" toward court orders and has taken no action to defend against the allegations of the SAC despite having repeated opportunities. She thus has defaulted. *See Shapiro, Bernstein & Co. v. Cont'l Rec. Co.,* 386 F.2d 426, 427 (2d Cir. 1967); *see also Bricklayers and Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry * Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015) (defendant's conduct "indicates just such a clear pattern of willful and deliberate disregard for the litigation."); *Brown v. Good Friendship Deli & Tobacco Corp.*, 2021 WL 5822232, at *3–4 (S.D.N.Y. Dec. 7, 2021).

## II.    Step Two: The Allegations of the SAC Establish Liability on Counts II, VII, VIII and X of the SAC

Although default has been established, a court may not enter a default judgment simply because it is unopposed. The court must satisfy itself that the well-pleaded allegations of the complaint, if proven, would establish a violation of law. *See Spin Master Ltd.*, 463 F. Supp. 3d at 367.

Plaintiffs seek a default judgment on Counts II, VII, VIII, and X of the SAC alleging respectively claims for false association and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), violations of the New York Consumer Protection Act, N.Y. Gen. Bus. L. §§ 349 & 350, and tortious interference with prospective economic advantage. SAC ¶¶ 111–16, 141–51, 158–64.

### A.    Lanham Act Liability (Count II)

Section 43(a) of the Lanham Act provides, in pertinent part, that

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).[7]  Plaintiffs assert that they have stated a claim under either of the two avenues of recovery, false association under Section 1125(a)(1)(A) and false advertising under Section 1125(a)(1)(B).  *See Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014) ("Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."); 4 McCarthy on Trademarks and Unfair Competition § 27:9 (5th ed. 2025) (describing § 43(a) as "the foremost federal vehicle for the assertion of two major and distinct types of 'unfair competition': (1) infringement of even unregistered marks, names and trade dress, and (2) 'false advertising.'").

Preliminarily, a sustainable claim must establish that the Defendant made "use in commerce" of Plaintiff's mark to begin with.  *See Buti v. Perosa, S.R.L.*, 139 F.3d 98, 102 (2d Cir. 1998) (the "history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause.") (quoting *United We Stand America, Inc. v. United We Stand, America New York Inc.*, 128 F.3d 86, 92 (2d Cir. 1997)).  Such use "must be decided as a threshold matter because, while any number of activities may be 'in commerce' or create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark."  *1-800 Contacts, Inc. v.*

---

[7] In the Lanham Act, the portion codified at 11 U.S.C. § 1125(a) is section 43(a).

*WhenU.Com, Inc.*, 414 F.3d 400, 412 (2d Cir. 2005).  The Lanham Act defines "use in

commerce," in relevant part, as follows:

> For purposes of this Chapter, a mark shall be deemed to be in use in commerce-
>
> (1) on goods when-
>
>> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>>
>> (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce

15 U.S.C. § 1127.  Here, Plaintiffs claim that the use in commerce metric is satisfied because

Defendant "misrepresented and claimed a false association "with The Surf Lodge brand identity

on Instagram via the @TheSurfLodgeSanctuary Instagram handle."  Dkt. No. 115at 41.

"[C]ourts have found that the 'in commerce' requirement is satisfied where the infringing act had

an adverse effect on the plaintiff's ability to participate in interstate commerce."  *C=Holdings*

*B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 240 (S.D.N.Y. 2013) (citing cases); *see Franchised*

*Stores of New York, Inc. v. Winter*, 394 F.2d 664, 669 (2d Cir. 1968) ("A substantial effect on

interstate commerce is present when the trademark owner's reputation and good will, built up by

use of the mark in interstate commerce, are adversely affected by an intrastate infringement.");

*World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d 514, 529 (S.D.N.Y. 2001)

("defendants' use of the Internet also satisfies the Lanham Act's 'in commerce' requirement.");

*Soter Technologies*, *LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 399 (S.D.N.Y. Feb. 26, 2021)

("district courts in this circuit and elsewhere have sustained trademark infringement and Lanham

Act unfair competition claims where a defendant has used a competitor's name as its own

domain name, including where the domain name itself is not registered as a trademark.")

Accordingly, Defendant's use of @TheSurfLodgeSanctuary on the internet, used in a manner that had an adverse impact on the Plaintiffs' ability to participate in interstate commerce, satisfies the use in interstate commerce requirement of the statute.

### 1.    False Association

Turning to the substantive provisions of Section 1125, false association claims under Section 1125(a)(1)(A) forbid "reverse passing off," which consists of a "producer misrepresent[ing] someone else's goods or services as his own." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003).  It also prohibits "false endorsement"—i.e., "falsely implying the endorsement" or "approval" "of a product or service" by another.  *Avalos v. IAC/Interactivecorp.*, 2014 WL 5493242, at *4 (S.D.N.Y. Oct. 30, 2014).  "This cause of action is broad and has been interpreted to cover conduct including infringement of an unregistered mark, trade dress infringement, passing off, reverse passing off, and false designation of geographic origin—'all of which simply describe different methods of trademark infringement.'"  *Lehrman v. Lovo, Inc.*, 790 F. Supp. 3d 348, 363 (S.D.N.Y. 2025) (quoting *Red Rock Sourcing LLC v. JGX LLC*, 2024 WL 1243325, at *22 n.10 (S.D.N.Y. Mar. 22, 2024)).  Claims under Section 1125(a)(1)(A) are "governed by a 'familiar two prong test.'"  *Soter Technologies*, 523 F. Supp. 3d at 397 (quoting *Coty Inc. v. Excell Brands, LLC.*, 277 F. Supp. 3d 425, 440 (S.D.N.Y. 2017)).  "The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause confusion as to the origin or sponsorship of the defendant's goods."  *Id.* (quoting *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 486 (S.D.N.Y. 2008)); *see Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) ("The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.")

As to the first prong of the two-part test, taking Plaintiffs' allegations as true, JC Hospitality is the exclusive licensee of The Surf Lodge trademarks and entitled to use those marks in all actions of business.  SAC ¶¶ 31–32.  The Surf Lodge marks are registered with the United States Patent and Trademark Office.  *Id.* ¶ 29.  Moreover, the branding associated with The Surf Lodge is distinctive and well-known—it is not only a luxury destination but also a lifestyle brand.  *Id.* ¶¶ 26–27.  *See Lehrman*, 790 F. Supp. 3d at 364 ("courts in this Circuit and others have long approved of claims involving mark-like devices such as a celebrity's 'image,' 'likeness,' 'persona,' or 'identity.'")

On the second prong, Plaintiffs have also adequately alleged that Defendant's use of the mark is likely to cause confusion as to the services and brand offered by Plaintiffs.  In evaluating the likelihood of confusions, courts frequently turn to the eight-factor balancing test articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).  Those factors are: (1) the strength of the trademark; (2) the similarity of the marks; (3) the proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) the respective quality of the products; and (8) the sophistication (or lack thereof) of consumers in the relevant market.  *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005).  Application of the Polaroid test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused."  *Id.*

In brief: on the first two factors, Plaintiffs have alleged that The Surf Lodge is a luxury destination and lifestyle brand, whose branding associated with its mark is distinctive and well

known.  SAC ¶¶ 26–27.  *See Soter Technologies*, 523 F. Supp. 3d at 405 (where a term is "inherently distinctive," and another name uses that distinctive term for "precisely" that reason, the factors are satisfied.)  Plaintiffs have alleged on the third and fourth factors that Defendants changed the Instagram username of @TheSanctuaryWellness to @TheSurfLodgeSanctuary, and that both offer wellness programming and collaborate with national brands.  Also, both The Surf Lodge and The Sanctuary are located in Montauk.  *Id.* ¶ 78.  *See Soter*, 523 F. Supp. 3d at 405 (third and fourth factors satisfied where the "offending site was 'compet[ing] for the same audience [as Plaintiff]—namely, Internet users who are searching for a web site that uses [P]laintiff's mark as its address.'") (quoting *New York State Soc. of Certified Public Accountants v. Eric Louis Assocs.*, 79 F. Supp. 2d 331, 341 (S.D.N.Y. 1999)).  On the fifth factor, Plaintiff's evidence of actual consumer confusion is thin.  They allege that Defendants changed their Instagram username "in order to create a clear and false association and likelihood of confusion." SAC ¶ 75; 106.  In an affidavit attached to the Motion for Default Judgment, Plaintiffs state also that in searching for The Surf Lodge on Instagram, @TheSurfLodgeSanctuary" is the first account to pop up.  Dkt. No. 115-4 ¶ 44.  In that affidavit, Cardoso states too that "[o]ver the last four years, I have been informed by several patrons of The Surf Lodge, vendors, and business associates of mine who believed that . . . 'The Sanctuary' was directly associated with The Surf Lodge."  *Id.* ¶ 47.  As to the sixth, "[t]he good-faith factor considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product."  *Savin Corp.*, 391 F.3d at 460.  As alleged, Defendant was aware of The Surf Lodge mark and its distinctive nature before changing the name of the Sanctuary's Instagram page, and did so in order to cause a false association between the two.  On the seventh factor, Plaintiff alleges that The Sanctuary has been closed and

inactive since mid-2020—there is therefore no service actually offered by that business that could be compared to the service offered by The Surf Lodge. Plaintiffs do not reference the sophistication of the consumers in the relevant market.

Considering the allegations and the *Polaroid* factors together, Plaintiffs have stated a claim. At least five of the factors weigh in favor of the Plaintiffs, and none cut directly against their Lanham Act false association claim. The use of @TheSurfLodgeSanctuary Instagram username has created confusion and deception amongst the general public as to some association, sponsorship, or approval by The Surf Lodge of The Sanctuary. Plaintiffs have thus established liability under 15 U.S.C. § 1125(a)(1)(A).

### 2.    False Advertising

Under Section 1125(a)(1)(B), a person is liable if the misleading fact or representation was used in commercial advertising promotion. 15 U.S.C. § 1125(a)(1)(B). A claim under this section "requires (1) a false or misleading statement (2) in connection with commercial advertising or promotion that (3) was material, (4) was made in interstate commerce, and (5) damaged or will likely damage the plaintiff." *C=Holdings*, 992 F. Supp. 2d at 242. The false or misleading representation element is shown if either (1) the "challenged advertisement is literally false, i.e., false on its face" or (2) "the advertisement, while not literally false, is nevertheless likely to mislead or confuse customers." *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 112 (2d Cir. 2010). To be literally false, the message must be unambiguous; if the representation "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false," and the advertisement is actionable only upon a showing of actual consumer confusion. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). "However, literal falsity may be proved by implication." *C=Holdings B.V.*, 992 F. Supp. 2d at 242. "Under the false by necessary implication doctrine, '[i]f the words or images, considered in context,

necessarily imply a false message, the advertisement is literally false.'" *Id.* (quoting *Time Warner Cable*, 497 F.3d at 158). Consumer deception is presumed when the defendant "intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard [was] of an egregious nature." *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir.1992).

Plaintiffs' false advertising claim revolves primarily on Hochberg's activities taken with regard to attempting to pitch AMEX (American Express) and Saks Fifth Avenue for a partnership deal with The Sanctuary in early 2021. SAC ¶ 57.[8] Plaintiffs state that Defendant misrepresented in a pitch deck to those companies that "The Sanctuary," which at that point had been shut down, was "[b]orn out of the wellness programming at the Surf Lodge, Founder Jamya Cardoso and Marisa Hochberg." Dkt. No. 33-8. The pitch deck contained also the names of brands and celebrities that had worked with The Surf Lodge in the past and identified them as "potential partners." *Id.* Plaintiffs had not approved of these communications and learned of them only when a production company reached out and communicated that "Cardoso appeared to be irresponsible due to her lack of participation in the process" of forming the brand partnerships. SAC ¶ 59–60. Thus, Plaintiffs state that the unauthorized actions had "devastating effects" on The Surf Lodge's "reputation, and various business relationships related to The Surf Lodge." *Id.*

Neither the slide deck attached as an exhibit to the SAC, nor the SAC itself, indicate that Defendant expressly stated that The Sanctuary was one and the same as The Surf Lodge. *See*

---

[8] Plaintiffs do not allege that any service or experience was advertised on @TheSurfLodgeSanctuary Instagram page. They point to no authority supporting their argument that the fact that a party attempting to affirmatively reach out to The Surf Lodge might accidentally reach out to The Sanctuary based on that handle is cognizable under the false advertisement prong as opposed to the false association prong of the Lanham Act.

Dkt. No. 33-8 (explaining that The Sanctuary was "born out of wellness programming at The Surf Lodge," and attaching multiple older news articles regarding the collaboration between Cardoso and Hochberg on the initial Sanctuary concept). That solicitation, "while not literally false, is nevertheless likely to mislead or confuse customers." *Tiffany (NJ) Inc.*, 600 F.3d at 112; *see Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 270 (E.D.N.Y. 2014) (Defendant promoting infringing products on its website, "while not false in the literal sense, could imply a false message."). As Plaintiffs allege, it did confuse a production company and the brands with which Defendant was attempting to collaborate. SAC ¶ 60. And third, this falsehood was material, as it went "to the very nature of the" brand and reputation that The Surf Lodge trades on. *See C=Holdings B.V.*, 992 F. Supp. 2d at 243. Although there are no specific allegations as to whether the false pitch was transmitted in interstate commerce, it is a fair inference based on the SAC that communications between Hochberg and AMEX/Saks were conducted via the Internet. *See United States v. Clarke*, 979 F.3d 82, 93 n.6 (2d Cir. 2020) ("[t]he interstate commerce element of the statute is satisfied by the use of the internet to transmit the files.") Finally, the false promotion was material as it "disrupt[ed]" The Surf Lodge's "relationships with customers and potential business partners." *Id.*; *see* SAC ¶ 61.

Plaintiffs' claim founders, however, on the requirement that they prove the infringing conduct was in connection with commercial advertising or promotion. "The ordinary understanding of both 'advertising' and 'promotion' connotes activity designed to disseminate information to the public." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). "Thus, the touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of

widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement. Thus, businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action." *Id.* Plaintiffs have made no allegations about the size of the relevant market of vendors/potential partners, and have pointed to only the one false representation. That is not sufficient. *See Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1004–05 (10th Cir. 2002) (finding evidence of dissemination of information to two customers, where the plaintiff made up to 150 bids per year, insufficient to constitute "commercial advertising or promotion"); *contra Noble Security, Inc. v. ACCO Brands Corp.*, 2018 WL 11542581, at *9 (S.D.N.Y. Mar. 31, 2018) (false statements to one party in a two-supplier market sufficient). Plaintiffs therefore fail to state a claim under 15 U.S.C. § 1125(a)(1)(B).

Accordingly, the Court will enter judgment in favor of Plaintiffs on only their false association claim under 15 U.S.C. § 1125(a)(1)(A) with respect to Defendant's advertisement of its false affiliation with Surf Lodge in marketing The Sanctuary.

### B.    Liability Under the New York General Business Law (Counts VII and VIII)

Sections 349 and 350 of the NYGBL are a part of New York's consumer protection laws, and "prohibit deception of consumers and false advertising." *Orlander v. Staples, Inc.*, 802 F.3d 289, 292 (2d Cir. 2015). Section 349 of the NYGBL prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). Section 350 of the NYGBL prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 350. The New York Court of Appeals has "recognized that General Business Law §§ 349 and 350 'on their face apply to virtually all economic activity, and their application has been correspondingly broad.'" *Plavin v. Grp. Health Incorporated*, 146 N.E.3d

1164, 1168 (N.Y. 2020) (quoting *Karlin v. IVF Am.*, 712 N.E.2d 662, 665 (N.Y. 1999)). In order

to state a claim under either of the two sections, a plaintiff must allege: "(1) that the defendant's

acts were consumer oriented, (2) that the acts or practices are deceptive or misleading in a

material way, and (3) that the plaintiff has been injured as a result." *Orlander*, 802 F.3d at 302

(quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)). Claims may

be brought by "any person who has been injured by reason of any violation of this section,"

NYGBL §§ 349(h), 350-e(3), and the statute "allows recovery by non-consumers if there is some

harm to the public at large." *Electra v. 59 Murray Enter., Inc.*, 987 F.3d 233, 258 (2d Cir. 2021).

On the first element, Plaintiffs have alleged that Defendant's actions were consumer

oriented, as she "intentionally misl[ed] consumers into believing that The Sanctuary is affiliated

with The Surf Lodge in order to gain social media traction and to use The Surf Lodge's well-

known branding and reputation to influence customers." Dkt. No. 115 at 43. The consumer-

oriented element is met when the act or practice "has 'a broader impact on consumers at large.'"

*Himmelstein, McConnell, Gibben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 171

N.E.3d 1192, 1197 (N.Y. 2021) (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine

Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995)). The consumer-oriented element does

not depend "on the use to be made of the product," "what matters is whether the defendant's

allegedly deceptive act or practice is directed to the consuming public and the marketplace." *Id.*

Here, Plaintiff has alleged that the Instagram account @TheSurfLodgeSanctuary was targeted at

the general public—that is sufficient. *See Plavin*, 146 N.E.3d at 1168–69 (collecting cases).[9]

---

[9] Although Plaintiffs have alleged also that Hochberg deceptively used The Surf Lodge brand in
attempting to market partnerships and deals with The Sanctuary, SAC ¶ 57–58, Dkt. No. 33-8,
that single use of The Surf Lodge brand was "'a single shot transaction,' not a typical consumer
transaction and therefore not covered." *Oswego*, 647 N.E.2d at 744 (quoting *Genesco
Entertainment v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984)). In other words, the marketing

The act or practice must also be deceptive.  Under the NYGBL, a deceptive act is one "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego*, 647 N.E.2d at 745.  As discussed in this Court's discussion of the Lanham Act violation, a reasonable consumer acting reasonably would be misled by @TheSurfLodgeSanctuary Instagram username given its similarity to the distinctive The Surf Lodge brand, and the fact that it advertises itself as located in Montauk.  SAC ¶¶ 26–27, 78.

Plaintiffs have also been injured as a result of Defendant's use of @TheSurfLodgeSanctuary.  Although Plaintiffs are not a consumer misled by the deceptive use of The Surf Lodge mark, "corporate competitors . . . now have standing to bring a claim under this statute so long as some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (internal citation omitted).  As alleged, the injuries to Plaintiffs include "mental anguish, embarrassment, emotional distress injuries, physical manifestations of emotional distress injuries, and diminished professional reputation."  SAC ¶ 145.  They include too "lost profits, a diminished ability to maintain a profitable business, and a diminished business reputation" of JC Hospitality.  *Id.*; *see Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 2024 WL 3526853, at *4 (S.D.N.Y. July 23, 2024) ("Skillz has adequately pleaded an injury from Papaya's false advertising through a loss of sales and market share.  While a difficulty in quantifying its monetary losses may prevent it from obtaining an award of damages, it would not prevent that it from obtaining injunctive relief.")

That is sufficient to establish liability under the New York General Business Law.

## C.    New York Common Law Liability (Count X)

Plaintiffs do not, however, state a claim for tortious interference with prospective

---

deck did not have "ramifications for the public at large." *Genesco Entertainment*, 593 F. Supp. at 752.

economic advantage.  "To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'"  *Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, 2020 WL 7774377, at *2 (S.D.N.Y. Dec. 30, 2020) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)).  Moreover, plaintiffs face a "high bar" in establishing wrongful interference.  *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015); *see also Symquest Grp., Inc. v. Canon U.S.A., Inc.*, 186 F. Supp. 3d 257, 268 (E.D.N.Y. 2016).  In the specific context of tortious interference with business relations, distinct from tortious interference with contract, "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations."  *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004); *see also XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 187 (E.D.N.Y. 2016).  While New York courts have found an exception to this rule where the defendant "engage[d] in conduct for the sole purpose of inflicting intentional harm," that exception is "narrow." *16 Casa Duse, LLC*, 791 F.3d at 262.

Although Plaintiffs allege that Defendant used her name and The Surf Lodge mark in connection with business decks with AMEX and Saks Fifth Avenue, SAC ¶¶ 57–58, they have not alleged that the conduct was criminal or independently tortious.  *See Carvel Corp.*, 818 N.E.2d at 1103.  Nor do they allege that Hochberg engaged in the conduct "for the sole purpose of inflicting intentional harm on plaintiffs."  *Id.* (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 628 N.Y.S.2d 408, 410 (3d Dep't 1995), *aff'd*, 664 N.E.2d 492 (N.Y. 1996)).  It is

more likely that the motive was "normal economic self-interest." *Id.*  Nor have Plaintiffs

adequately shown an injury to their relationship with AMEX, stating only that they lost out on

"business opportunities" with it, without any further detail.  Dkt. No. 115-4 ¶ 36.  Plaintiffs

"must allege that they would have entered into an economic relationship but for the defendant's

wrongful conduct." *Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.*, 331 F. Supp. 3d

221, 244 (S.D.N.Y. 2018) (quoting *Berwick v. New World Network Int'l, Ltd.*, 2007 WL 949767,

at *14 (S.D.N.Y. Mar. 28, 2007) *aff'd sub nom. Servin v. New World Network Int'l, Ltd.*, 639 F.

App'x 43 (2d Cir. 2016)).  Plaintiffs have not provided the kind of detail necessary to state a

claim for tortious interference with prospective economic advantage here.

## III.    Relief

Plaintiff seeks an award of injunctive relief, damages, and attorneys' fees and expenses.

### A.    Injunctive Relief

Plaintiffs seek a permanent injunction requiring Defendant to (1) immediately remove the

@TheSurfLodgeSanctuary Instagram account from Instagram and any other social media

platforms or websites; (2) prohibiting and enjoining Defendant from further using any name,

trademark, or other intellectual property associated with Plaintiffs and The Surf Lodge; and (3)

requiring Defendant, prior to the removal of the @TheSurfLodgeSanctuary Instagram account to

provide the current password for the account and the history and all direct messages and

correspondence received via @TheSurfLodgeSanctuary.  Dkt. No. 115-1 at 48.  Plaintiffs also

request further injunctive relief in the form of an order directing that Defendant refrain from

making defamatory statements about Cardoso and The Surf Lodge and/or any persons known to

be associated with Cardoso and The Surf Lodge, including employees, independent contractors,

and clients.  Dkt. No. 115-1 at 49.  The Court will grant Plaintiffs a limited permanent injunction

requiring Plaintiff to remove "The Surf Lodge" from the handle for "The Sanctuary" and to

desist from using The Surf Lodge trademarks in a manner that would create consumer confusion. Plaintiffs have not demonstrated an entitlement to any broader injunction.

A court may enter a permanent injunction if the plaintiff has demonstrated: "(1) that [the plaintiff] suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships between the parties warrants a remedy in equity for the plaintiff; and (4) that the public interest would not be disserved." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *Mickalis Pawn Shop*, 645 F.3d at 145. Even though a "party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party," the injunction "must nonetheless be narrowly tailored to fit specific legal violations." *Victorinox AG v. B & F Sys., Inc.*, 709 F. App'x 44, 51 (2d Cir. 2017) (summary order) (internal quotation marks and citations omitted).

Plaintiffs have met all four factors with respect to Defendants' use of The Surf Lodge trademarks. First, "'[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither calculable nor precisely compensable.'" *Int'l Council of Shopping Ctrs., Inc. v. Glob. Infotech LLC*, 2019 WL 2004096, at *5 (S.D.N.Y. May 7, 2019) (quoting *U.S. Polo Ass'n, Inc v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011)). Plaintiffs have demonstrated that they are suffering irreparable harm and will continue to suffer irreparable harm from Defendant's unauthorized use of The Surf Lodge marks if that use is not enjoined. In particular, The Surf Lodge uses its Instagram account @TheSurfLodge to communicate with numerous lifestyle and wellness brands. Dkt. No. 115-4 ¶¶ 16–17. That

Instagram account currently has over 159,000 active followers. *Id.* ¶ 18. The Surf Lodge's social media presence is important to its business. Large scale brands that do business with The Surf Lodge analyze its social media to determine how many followers it has and their level of engagement. *Id.* ¶ 20. The @TheSurfLodgeSanctuary Instagram account presently has approximately 1,161 active followers on Instagram, *id.* ¶ 39, and, when searching for The Surf Lodge on Instagram using the search bar, the @TheSurfLodgeSanctuary account comes up as the first search option ahead of the official The Surf Lodge Instagram account, *id.* ¶ 44. Thus, Cardoso attests that the ongoing use of the @TheSurfLodgeSanctuary account is creating confusion among consumers that "The Sanctuary" is affiliated with The Surf Lodge. *Id.* ¶ 45.

Second, a "plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue" its infringement. *Pearson Educ., Inc. v. Vergara*, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010) (citation omitted). The evidence that Plaintiffs have asked Defendant to cease and desist from use of The Surf Lodge marks without any response demonstrates a strong probability that, absent an injunction, Defendant will continue to violate Plaintiffs' mark. Monetary damages are also inadequate to compensate Plaintiffs for the reputational harm they have suffered and may continue to suffer. *See Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y. 2008) ("In view of the irreparable harm that would flow from Defendant's continuing infringement, including lost sales of Rowling's companion books and the injury to Rowling as a writer, Plaintiffs have shown that money damages alone are an insufficient remedy."). Third, the balance of hardships favors Plaintiffs. "It is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) (citation omitted) (in context of preliminary injunction). Finally, a permanent injunction would serve the public

interest because "the public has an interest . . . in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

The Court declines to grant Plaintiffs' request that it enter an injunction requiring Defendant to provide the password and message history of @TheSurfLodgeSanctuary, and to direct Defendant to refrain from making defamatory statements about a range of persons including Plaintiffs but also persons associated with Cardoso and the Surf Lodge. "Plaintiff bears the burden of showing why the specific relief it requests is appropriately tailored and does not pose an undue hardship." *Global Refining Grp., Inc. v. PMD Analysis, Inc.*, 2023 WL 5733968, at \*16 (S.D.N.Y. Aug. 15, 2025) (quoting *Smart Team Glob. LLC v. HumbleTech LLC*, 2022 WL 847301, at \*2 (S.D.N.Y. Feb. 18, 2022)). The requested injunction directing Defendant to provide both the password and message history of her Instagram account is not "narrowly tailored to fit specific legal violations," and would "impose unnecessary burdens on lawful activity." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994); *see also Mickalis Pawn Shop*, 645 F.3d at 145 ("An injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation."). Plaintiffs have not demonstrated why possession of the password or messages is necessary. The SAC nowhere mentions that control over the Instagram account or its messages was necessary to remedy the alleged violations.

As to Plaintiffs' request that the Court enjoin Defendant from making defamatory statements regarding Cardoso and The Surf Lodge and/or any persons known to be associated with Cardoso and The Surf Lodge, including employees, independent contractors, and clients, that request is "overbroad" and "seeks to restrain the defendants from engaging in . . . illegal

conduct that was not fairly the subject of this litigation." *Mickalis Pawn Shop*, 645 F.3d at 145.

Since defamation is already illegal, the proposed injunction resembles the "very kind of broad-

based, 'obey the law' injunctive relief that courts, including the Second Circuit, have criticized."

*New York v. Shinnecock Indian Nation*, 560 F. Supp. 2d 186, 190 (E.D.N.Y. 2008).  "And to the

extent the proposed injunction reaches more broadly to include non-defamatory speech, it would

raise serious First Amendment concerns."  *Absolut Care of Allegany, LLC v. Anderson*

*Alexander PLC*, 2025 WL 1640206, at *1 n.2 (E.D.N.Y. June 10, 2025) (citing *Metro. Opera*

*Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Intern. Union*, 239 F.3d 172, 178

(2d Cir. 2001) (holding  that "the First Amendment strongly disfavor injunctions that impose a

prior restraint on speech.")); *see Sparman v. Edwards*, 325 F. Supp. 3d 317, 320 (E.D.N.Y.

2018) ("[U]se of injunctive powers of federal courts to suppress any publication is highly

disfavored and requires an exceedingly persuasive justification").  Plaintiffs argue also that an

injunction preventing such defamatory statements is similar to this Court's order on June 24,

2024 ordering Hochberg to "refrain from making threats, disparaging remarks, or engaging in

disrespectful conduct towards Plaintiffs' counsel, Plaintiffs' counsel's attorneys and staff, and

any persons known to be associated with Plaintiffs' counsel," and that further Hochberg "shall

refrain from making threats toward Jayma Cardoso and any persons known to be associated with

Plaintiff Cardoso and The Surf Lodge, including employees, independent contractors, and clients

of the same."  Dkt. No. 103.  That Order, however, is meaningfully distinct.  An order "that

regulates the conduct of the litigation . . . is not considered an injunction . . . even though

punishable by contempt."  *Germano v. Dzurenda*, 455 F. App'x 58, 60–61 (2d Cir. 2012)

(summary order) (quoting *Frutiger v. Hamilton Cent. Sch. Dist.*, 928 F.2d 68, 72 (2d Cir. 1991)).

The Court's power to issue that order stems from its inherent power to "protect their jurisdiction

from conduct which impairs their ability to carry out Article III functions." *Bush v. Danziger*, 2006 WL 3019572, at *9 (S.D.N.Y. 2006) (quoting *In re Martin-Trigona*, 737 F.2d 1254, 1261 (2d Cir. 1984)). And in exercising those powers, "the usual standards for injunctive relief do not apply." *Id.* Thus, the Court's June 24 order does not support Plaintiffs argument for an injunction here. In sum, "[t]he injunctive relief requested by Plaintiff is not tailored to the specific infringing conduct in this case and therefore is overly broad." *Cawthon v. Yongchunhengyuanmaoyiyouxiangongsi*, 2024 WL 4716232, at *13 (S.D.N.Y. Oct. 29, 2024).

To reiterate, the Court grants a limited permanent injunction requiring Plaintiff to remove "The Surf Lodge" from the handle for "The Sanctuary" and to desist from using The Surf Lodge trademarks in a manner that would create consumer confusion.

### B.    Damages

Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and its remedial provision, Section 35(a), 15 U.S.C. § 1117(a), a successful plaintiff may recover: (1) defendant's profits; (2) any damages sustained by the plaintiff; and (3) the costs of the action. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d Cir. 2014). Under NYGBL §§ 349 and 350, "remedies available to private plaintiffs are compensatory damages, limited punitive damages and attorneys' fees." *Karlin*, 712 N.E.2d at 666.

Plaintiffs state that they suffered in excess of $200,000 in lost profits. DKt. No. 115-1 at 51. However, they offer no evidence in support of that claim.[10] They state only that "Plaintiff Cardoso and JC Hospitality have suffered economic damages and losses by way of multiple brands and partnerships declining to do business with Plaintiffs because of Hochberg's conduct and false ongoing association with the Plaintiffs," *id.* at 50–51, but they offer no evidence of

---

[10] The most that Plaintiffs allege is that over the last two years, they have incurred over $150,000 in attorney's fees and costs. Dkt. No. 115-4 ¶ 83.

which brands or partnerships declined to do business, what services they might have offered, or what value that would have been worth.  In her affidavit in support of the motion for default judgment, Cardoso does not mention money damages.  Dkt. No. 115-4.  In order to obtain damages in the context of a default judgment, "[o]nce liability has been established, a plaintiff must provide admissible evidence establishing the amount of damages with reasonable certainty."  *Reisman v. Northeastern Power and Gas LLC*, 720 F. Supp. 3d 279, 291 (S.D.N.Y. 2024).  "There must be an evidentiary basis for the damages sought by plaintiff, and a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence."  *Cement & Concrete Workers Dist. Council Welfare Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012).  A district court cannot "just accept [the plaintiff's] statement of damages" at "face value" without satisfying "the court's obligation to ensure that the damages were appropriate."  *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Division of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997); *see also Lenard*, 889 F. Supp. 2d at 527.

Because Plaintiff has provided no evidence to support the requested $200,000 in money damages, the Court declines to award damages.  *See Grp. One Ltd. v. GTE GmbH*, 625 F. Supp. 3d 28, 80 (E.D.N.Y. 2022) (granting default judgment but awarding no damages because they were insufficiently supported); *Hutchins v. Palmer*, 2018 WL 2031941, at *6 (E.D.N.Y. Feb. 9, 2018) ("It is within the discretion of the [c]ourt to decline to award damages pursuant to a default judgment where plaintiffs who have secured the default judgment fail to submit any documentary evidence to substantiate the calculation of damages.")

### C.    Attorneys' Fees and Costs

Under Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), in "exceptional cases" a

court "may award reasonable attorneys' fees to the prevailing party[.]"  *See also* NYGBL §

349(h) (the court "may award reasonable attorney's fees to a prevailing plaintiff.")  The Second

Circuit has held that "under the Lanham Act, an exceptional case is one that stands out from

others in the manner articulated by *Octane Fitness*[.]"  *Sleepy's LLC v. Select Comfort Wholesale

Corp.*, 909 F.3d 519, 530 (2d Cir. 2018) (citing *Octane Fitness, LLC v. ICON Health &Fitness,

Inc.*, 572 U.S. 545, 554 (2014)).  Under *Octane Fitness*, "an 'exceptional' case is simply one that

stands out from others with respect to the substantive strength of a party's litigating position

(considering both the governing law and the facts of the case) or the unreasonable manner in

which the case was litigated."  572 U.S. at 554.  *Octane Fitness* gave district courts wide latitude

to determine whether a case is exceptional in a "case-by-case exercise of their discretion,

considering the totality of the circumstances."  *4 Pillar Dynasty LLC v. N.Y. & Co., Inc.*, 933

F.3d 202, 215 (2d Cir. 2019) (citing *Octane Fitness*, 572 U.S. at 554).  "Relevant factors include

'frivolousness, motivation, objective unreasonableness (both in the factual and legal components

of the case) and the need in particular circumstances to advance considerations of compensation

and deterrence.'"  *Id.* (citing *Octane Fitness*, 572 U.S. at 554 n.6).  Most cases in which fees are

awarded "involve substantial litigation misconduct."  *Hockeyline, Inc. v. STATS LLC*, 2017 WL

1743022, at *5 (S.D.N.Y. Apr. 27, 2017).

  "[A] defendant's default—standing alone—is not 'exceptional.'"  *Mintable Pte. Ltd. v.

Mintology Inc.*, 2024 WL 3454825, at *12–13 (S.D.N.Y. July 18, 2024) (quoting *Antetokounmpo

v. Costantino*, 2021 WL 5916512, at *7 (S.D.N.Y. Dec. 15, 2021) (collecting cases) *report and

recommendation adopted sub nom. Antetokounmpo v. Constantino*, 2022 WL 36232 (S.D.N.Y.

Jan. 4, 2022)).  Indeed, as courts in this district have acknowledged: "[f]ailing to answer a

complaint does not constitute unreasonable litigation conduct; it is simply the absence of

litigation conduct." *Travel Leaders Grp., LLC v. Corley*, 2019 WL 6647319, at *14 (S.D.N.Y.

Dec. 5, 2019) (citation omitted), *report and recommendation adopted*, 2022 WL 950957

(S.D.N.Y. Mar. 30, 2022); *Experience Hendrix, L.L.C. v. Pitsicalis*, 2020 WL 3564485, at *15

(S.D.N.Y. July 1, 2020) (same), *report and recommendation adopted sub nom. Experience

Hendrix, LLC v. Hendrix*, 2020 WL 4261818 (S.D.N.Y. July 24, 2020).

  Here, the Court finds that exceptional circumstances exist such that an award of

attorney's fees is merited.  As to the Lanham Act violation, this Court has already determined

that there was a violation, and there is substantial evidence of Defendant's "willful

infringement."  *See Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co., Inc. Marquis Mills, Int'l,

Inc.*, 2023 WL 3815276, at *3 (S.D.N.Y. June 5, 2023).  Although the claim itself is not

"uncommonly strong," *id.*, there is substantial indicia of the willfulness of Defendant's

violations, coupled with vexatious conduct throughout this litigation.  An award of attorneys'

fees is appropriate where "it furthers the goals of the Lanham Act, including deterrence of

similarly willful conduct by defendants and other possible infringers."  *Mintable Pte.*, 2024 WL

WL 3454825, at *13 (quoting *Focus Prod. Grp. Int'l*, 2023 WL 3815276, at *3); *see Doctor's

Assocs., Inc. v. Patel*, 2019 WL 3916421, at *4 (S.D.N.Y. July 19, 2019) (explaining that a case

is exceptional where infringement was willful and intentional, defendant failed to appear, and

infringing conduct continued after receiving cease-and-desist letter); *Santana Prods., Inc. v.

Sylvester & Assocs., Ltd.*, 279 F. App'x 42, 43 (2d Cir. 2008) (summary order) (finding

attorney's fees should be awarded under the Lanham Act where there is evidence of fraud or bad

faith).

  Here, Defendant continued the violating conduct (using and affiliating her accounts and

businesses with The Surf Lodge) despite multiple cease-and-desist letters from the Plaintiffs.

SAC ¶¶ 64–66; Dkt. 33-8.  And, as detailed extensively in this opinion, Defendant is clearly aware of both this litigation and the potential legal consequences, but has nevertheless submitted only an answer in which she states that her conduct was "not willful or intentional."  Dkt. No. 80 ¶ 169.  She failed to appear for at least six court-ordered appearances, including a mandatory settlement conference.  She failed to respond to Plaintiffs' request for discovery, and she did not oppose or otherwise respond to the Motion for Default Judgment.  Dkt. No. 115-7 ¶ 7.  She has also had two different attorneys representing her at different points in the litigation, both of whom felt it necessary to withdraw from the representation.  *Id.* ¶ 8.  Where such conduct "frustrated the litigation process at every turn" and "displayed an 'utter lack of respect for the judicial process,'" an award of attorney's fees is merited.  *E. Mishan & Sons, Inc. v. Novel Brands LLC*, 2020 WL 9815178, at *7 (S.D.N.Y. Feb. 13, 2020), *report and recommendation adopted*, 2022 WL 407393 (S.D.N.Y. Feb. 10, 2022).

Having determined that an award of attorney's fees is due, the Court turns next to whether the claimed attorney's fees are appropriate.  To do so, the "starting point" and "lodestar" in analyzing whether claimed attorneys' fees are appropriate is "the product of a reasonable hourly rate and the reasonable number of hours required by the case."  *Milea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *see also Lilly v. City of New York*, 934 F.3d 222, 227–34 (2d Cir. 2019) (discussing calculation of reasonable hourly rates and reasonable number of hours expended).  "The party seeking fees bears the burden of demonstrating that its requested hours and hourly rates are reasonable, and must provide a court with sufficient information to assess the fee application."  *Zero Carbon Holdings, LLC v. Aspiration Partners, Inc.*, 2024 WL 3409278, at *4 (S.D.N.Y. July 15, 2024).  The reasonableness of attorneys' fees must be evaluated by "adequate documentation supporting the attorneys' fees and costs," which "should

normally [include] contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done." *Wolinsky v. Scholastic, Inc.*, 900 F. Supp. 2d 332, 335–36 (S.D.N.Y. 2012).

Attached to the motion for Default Judgment, Plaintiffs' counsel included an affidavit in support of their application for attorney's fees. Dkt. No. 115-7. In it, counsel states that three different attorneys worked on the case, each at a different billing rate. John J. Zidziunas billed 115.7 hours to the case, for a total value of $86,150—making his effective rate $744.60 per hour. *Id.* ¶ 14. Caroline McCallan worked 153.5 hours on the case, for a total value of $66,135— making her effective rate $434.76 per hour. *Id.* And Nicorie Clarke worked 16.5 hours on the case for a total of $4,950—making his effective rate $300 an hour. *Id.* Counsel also affirms that it accrued $931.80 in "filing fees and service of process fees." *Id.* ¶ 15. In total, they request a lodestar amount of $158,166.80. *Id.* ¶ 16. This Court will consider in turn the hourly rate and the number of hours worked.

Courts assess the reasonableness of a proposed hourly rate by considering the prevailing market rate for lawyers in the district in which the ruling court sits. *Polk v. N.Y. State Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir. 1983). "The rates used by the court should be current rather than historic hourly rates." *Reiter v. Met. Transp. Auth. Of N.Y.*, 457 F.3d 224, 232 (2d Cir. 2006) (internal quotation marks omitted). "[C]ourts may conduct an empirical inquiry based on the parties' evidence or may rely on the court's own familiarity with the rates if no such evidence is submitted." *Wong v. Hunda Glass Corp.*, 2010 WL 3452417, at *2 (S.D.N.Y. Sept. 1, 2010) (internal quotation marks omitted). Additionally, "the range of rates that plaintiff's counsel actually charge their clients . . . is obviously strong evidence of what the market will bear." *Rozell v. Ross-Holst*, 576 F. Supp.2d 527, 544 (S.D.N.Y. 2008); *see also Lilly v. County*

44

*of Orange*, 910 F. Supp. 945, 949 (S.D.N.Y. 1996) ("The actual rate that counsel can command in the market place is evidence of the prevailing market rate").

As to Zidziunas, his rate of $744.60 per hours is reasonable considering his "level of experience." *Proimmune Co., LLC v. Holista Colltech Ltd.*, 2025 WL 54281, at *3 (S.D.N.Y. Jan. 24, 2024). He is the sole owner of his firm and has been in practice for nineteen years. Dkt. No. 115-7 ¶ 23–24. Courts in this district have recently determined that "hourly rates ranging from $250 to $1,260 per hour for work on a commercial litigation matter" are appropriate. *Tessemae's LLC v. Atlantis Cap. LLC*, 2019 WL 2635956, at *4 (S.D.N.Y. June 27, 2019) (collecting cases). Last year, a Court determined that a partner billing at $895 dollars an hour was reasonable, particularly in light of the fact that "cases examining prevailing community rates are backward-looking," and so "courts may 'increase the rates awarded in the same cases over time' as 'hourly rates continue to increase.'" *Proimmune Co.*, 2025 WL 54281, at *3 (quoting *Gulino v. Bd. of Educ. Of City Sch. Dist. Of City of N.Y.*, 2021 WL 4463116, at *5 (S.D.N.Y. Sept. 24, 2021)); *see also Top Jet Enters., Ltd. v. Kulowiec*, 2022 WL 1184245, at *3 (S.D.N.Y. Apr. 21, 2022) (finding $825 rate for experienced counsel to be appropriate). As to McCallan and Clarke, billed out at $434.76 per hour and $300 per hour respectively, their rates are also reasonable. McCallan has been an admitted attorney since 2019, and Clarke since 2023. *See Top Jet Enters.*, 2022 WL 1184245, at *3; *Reisman*, 720 F. Supp. 3d at 293–94.

Turning next to the number of hours worked, "the court must examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Tlacoapa v. Carregal*, 386 F. Supp.2d 362, 371 (S.D.N.Y. 2005) (citing *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998)). "In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity

with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger*, 160 F.3d at 876 (internal quotation marks omitted). "The relevant issue . . . is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *see also Mugavero v. Arms Acres, Inc.*, 2010 WL 451045, at *6 (S.D.N.Y. Feb. 9, 2010) (same). A court thus should exclude from the lodestar calculation "excessive, redundant or otherwise unnecessary hours." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999); *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997) ("If the district court concludes that any expenditure of time was unreasonable, it should exclude these hours from the lodestar calculation").

Plaintiffs' counsel states that 285.7 hours total were worked on the case: 115.7 by Zidziunas, 153.5 by McCallan, and 16.5 by Clarke. However, it has provided those hours only in the aggregate amount. In a federal question case, a party seeking court-ordered compensation for its attorneys' work must document the application with contemporaneous time records. *N.Y. State Ass'n for Retarded Child. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir. 1983). Such contemporaneous records "should normally [include] contemporaneous time records indicating, for each attorney, the date, the hours expended, and the nature of the work done." *Wolinsky*, 900 F. Supp. 2d at 335–36. Absent such detailed records, this Court cannot conclude that the amount of time spent, or the tasks on which it was spent, is reasonable. *See Mintable Pte.*, 2024 WL 3454825, at *13 (where the time records do not list "the activities corresponding to [the] time entries," there was "insufficient evidence of the reasonableness of Plaintiff's requested fees."); *Singh v. Meadow Hill Mobile, Inc.*, 2021 WL 3862665, at *17 (S.D.N.Y. Aug. 29, 2021) (an

attorney must at least identify the general subject matter of his or her time expenditures).

Accordingly, Plaintiff is ordered to submit detailed entries that, among other things, identify the

specific activities of the listed professionals by no later than November 15, 2025.[11]

<strong>CONCLUSION</strong>

The Court grants a default judgment to Plaintiffs on Counts II, VII, and VIII of the SAC

alleging claims respectively for violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §

1125(a)(1)(A) and the New York Consumer Protection Act, NYGBL §§ 349 and 350.  The Court

denies default judgment on Count X for tortious interference with prospective economic

advantage.

The Clerk of Court is respectfully directed to close Dkt. No. 115.


SO ORDERED.


Dated: November 7, 2025
      New York, New York                                    LEWIS J. LIMAN
                                                      United States District Judge

---

[11] By that same date, Plaintiffs shall also indicate whether they are prepared to dismiss those
Counts of the SAC as to which the Court has not granted judgment.