UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

JC HOSPITALITY d/b/a THE                           Case No. 1:23-cv-02051-(LJL)

SURF LODGE AND JAYMA CARDOSO

                Plaintiffs,

v.

MARISA HOCHBERG

(IN HER INDIVIDUAL AND PROFESSIONAL

CAPACITIES)

                Defendants.


**DEFENDANT'S DECLARATION IN SUPPORT OF HER REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HER EMERGENCY APPLICATION FOR A LIMITED STAY OF ENFORCEMENT**


**Marisa Hochberg**
**Marisjh@gmail.com**
**(917) 858-5063**
**Pro-Se**

DECLARATION OF MARISA HOCHBERG

I, Marisa Hochberg, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.  I am the Defendant in this action and submit this declaration in further support of my request for a limited temporary stay of enforcement pending completion of the Court-ordered Rule 55 and Rule 60 briefing schedule.
2.  I do not seek to avoid any lawful judgment or obtain an indefinite delay. I seek only to preserve the status quo while the Court considers the Rule 60 motion it has already directed me to file.
3.  Plaintiffs characterize my request as a delay tactic. That characterization is inaccurate.
4.  Immediately following entry of judgment, Plaintiffs transmitted a demand letter requiring payment within seven days and threatening enforcement activity. **Annexed hereto as Exhibit A is a true and correct copy of that demand letter.**
5.  Plaintiffs transmitted that demand despite knowing that I am proceeding pro se, despite my well-documented financial hardship, and despite the existence of ongoing post-judgment proceedings. I raise this point in part because it is not an isolated incident, but rather one example of a broader course of conduct of Plaintiffs that I intend to address more fully in my forthcoming Rule 60 motion.
6.  Shortly thereafter, during the May 27, 2026 conference, the Court addressed the existence of Rule 62's automatic stay and established an expedited schedule for Rule 55 and Rule 60 proceedings.
7.  Plaintiffs' demand for immediate payment is difficult to reconcile with their present claim that a brief stay tied to the Court's own schedule would cause substantial prejudice.
8.  Plaintiffs also suggest that I possess substantial financial resources because they assume I currently reside in or have spent time in East Hampton, Manhattan, Miami, and other locations. Those assertions are not only false, but omit critical context and create a misleading picture of my financial circumstances.
9.  I raise the following facts not to seek special treatment, influence, sympathy, or consideration based upon my family background, but because Plaintiffs repeatedly attempt to use aspects of my prior life to imply that I presently possess substantial wealth and resources. The reality is far different.
10. I was raised on Manhattan's Upper East Side as the only child of Herman Hochberg and Dr. Polly Etkind Hochberg.
11. My **parents** owned a cooperative apartment on Manhattan's Upper East Side where I was raised.
12. My family spent summers in Montauk throughout my childhood and adult life. My **parents** maintained a residence there beginning in or about 1985.

13. My **father** also maintained an apartment in Miami that had long been used by members of our family.

14. My mother, Dr. Polly Etkind Hochberg, was a highly respected scientist and breast cancer researcher who devoted her professional life to advancing breast cancer research and helping patients suffering from that disease. **Annexed Hereto as Exhibit B is a True and Correct Copy of my mom's feature in Newsday for her life-changing work.**

15. My mother spent much of her career associated with Memorial Sloan Kettering Cancer Center and was widely respected within her field, operating one of the most respected laboratories devoted to breast cancer research and the development of a breast cancer vaccine.

16. Tragically, my mother ultimately passed away from cancer when I was only twenty-nine years old. **Annexed Hereto as Exhibit C is a True and Correct Copy of My Mother's Death Certificate.**

17. I was my parents' only child.

18. After my mother's death, my elderly father, who was much older than my mother, became my sole remaining parent and principal source of emotional and financial support.

19. My father, Herman Hochberg, was a self-made businessman, philanthropist, and community leader who served as President of Park East Synagogue.

20. During his tenure, Park East Synagogue was attended by prominent public figures and community leaders including Dr. Henry Kissinger, Professor Alan Dershowitz, Elie Wiesel, and many others. **Annexed Hereto as Exhibit D is a True and Correct Copy of My Father's Leadership at Park East Synagogue.**

21. My father was deeply committed to charitable, civic, and religious causes and was highly respected within the community.

22. When Plaintiffs knew me, my father was alive and I lived a very different life than I do today.

23. I had stable luxury housing, family support, and financial security because my father remained actively involved in my life and provided substantial assistance.

24. The circumstances Plaintiffs reference regarding my prior lifestyle existed during a period when my father was alive and before the events that followed.

25. My father passed away on October 19, 2023, at the age of ninety-three. **Annexed Hereto as Exhibit E is a True and Correct Copy of my Father's Death Certificate and Obituaries honoring his legacy.**

26. His death fundamentally changed every aspect of my life.

27. Since my father's death, I have been involved in substantial estate and trust litigation.

28. I am currently contesting a supposedly purported Will executed a few months before my father's death because I do not believe it reflects his true intentions and because he was elderly, infirm, and vulnerable at the time of the supposed date of its execution.

29. Among my concerns are that individuals associated with my father's synagogue, one of whom he didn't know, were inserted into positions as executors and trustees shortly

before his death and that one of their sons was designated as a successor fiduciary in those same positions.

30. I am actively litigating those issues in Manhattan Surrogate's Court.

31. **Annexed hereto as Exhibit F** are representative records reflecting those proceedings.

32. Because of those disputes, I have been locked out of ALL assets, residences, accounts, and resources that Plaintiffs appear to assume are available to me.

33. I do not presently have access to **any** estate funds.

34. I do not presently have access to **any** accounts that I believe should ultimately benefit me.

35. I do not presently have access to **any** family properties.

36. I have been forced to litigate estate-related disputes while simultaneously defending this action.

37. Plaintiffs' portrayal suggests that because my family once possessed assets, those assets are presently available to me. That is not true.

38. Any assets that may ultimately be distributed pursuant to my parents' estate plans are currently the subject of litigation.

39. To the extent assets are ultimately distributed, those assets are expected to be held in a lifetime trust and not distributed outright to me.

40. At present, however, that trust has not been funded because the underlying estate and trust disputes remain unresolved.

41. I therefore do not have access to the assets Plaintiffs imply are available to me.

42. I have serious concerns regarding the administration of the estate and whether all assets have been properly accounted for.

43. Those concerns are among the issues currently being litigated.

44. The current Fiduciaries in the Estate Matter have repeatedly attempted to use this litigation and judgment to portray me negatively in connection with those estate proceedings.

45. The reality is that I have spent the last couple of years fighting to gain access to assets and resources that Plaintiffs incorrectly assume I already possess.

46. If I had unrestricted let alone any access to the assets and residences Plaintiffs imply are available to me, I would not be experiencing the severe financial hardship described herein, but rather residing in the luxury residences my father intended be for my use and benefit.

47. Furthermore, I would not be in a Landlord Tenant dispute for my Manhattan Sublet for which I can no longer afford my L/T attorney and just had to let go of and find public counsel.

48. **Annexed Hereto as Exhibit G** are true and correct copies of me having to let my L/T attorney go due to the inability to replenish his $3500 retainer.

49. I previously spent substantial time at my father's apartment in Miami.

50. I have effectively been excluded from that apartment for approximately two and one-half years by referenced Fiduciaries.

51. I remain involved in ancillary proceedings relating to those issues.

52. I have been unable to retrieve all of my personal belongings located there.

53. I would only travel to Miami to stay in that apartment to which I no longer have access, therefore, Plaintiff's characterization that I spent my winter in Miami is false.

54. Likewise, the fact that my family historically owned residences in Manhattan and Montauk does not mean that I presently own or control those properties.

55. During further investigation, I have developed concerns that certain properties may have been used in ways inconsistent with my interests as a beneficiary. Those concerns are among the issues presently being examined in Surrogate's Court.

56. I have communicated with representatives associated with the New York County District Attorney's Office, particularly via Joel Seidemann with Jeanine Launey, regarding concerns involving elder abuse and potential financial crimes relating to the estate, but I nevertheless must continue to pursue relief through the Surrogate's Court process which is a slow moving Court.

57. During the relevant period, I experienced and continue to experience significant housing instability.

58. At various times I stayed in temporary accommodations, short-term rentals, and with family friends.

59. Due to the social demographic and geographical location of where I grew up, many of my family friends summer in The Hamptons and in Montauk.

60. In the summer months, many of those friends go out East to The Hamptons and Montauk.

61. In many instances those family friends, concerned about my safety and well-being given this litigation, have provided their own accommodations to me as a courtesy so I would not have to stay in Manhattan alone in the summer, isolated.

62. Those arrangements do not reflect wealth or access to substantial assets.

63. Last summer and as recently as this spring, finances got so bad that I had to sell my expensive jewelry and handbags. **Annexed Hereto in Exhibit H are True and Correct Copies of the Receipts of those transactions.**

64. Plaintiffs claim I reside in East Hampton and am renting via Airbnb.

65. **Annexed hereto as Exhibit I** is a representative Airbnb timestamped screenshot of my account asking me to Build The Perfect Trip. If I currently had a residency booked in The Hamptons as Plaintiff's Counsel claims, the trip would be on top. This reflects the inaccuracy of Plaintiff's Counsel's sworn statements.

66. If I stay in East Hampton or Montauk, it is often due to the generosity of friends and family who are concerned about my wellbeing and safety while I navigate multiple litigations, grief, severe health issues, and financial hardship.

67. Plaintiffs imply that because I traveled or stayed in certain locations, I must possess substantial assets.

68. That implication is false.

69. Plaintiffs portray me as possessing substantial financial resources. My banking records demonstrate otherwise.

70. **Annexed hereto as Exhibit J** are records reflecting my Chase personal account balance as recently as yesterday, June, 9 2026.

71. **Annexed hereto as Exhibit K** are records concerning my Chase business account.

72. Those records reflect negative balances and overdraft issues.

73. Contrary to Plaintiffs' portrayal, I have been unable to conduct meaningful business and recently "network" during all of this litigation.

74. **Annexed hereto in Exhibit L** is correspondence with Chase Business about how they had to close my overdrawn business account.

75. **Annexed hereto as Exhibit M** is documentation concerning interruption of cellular service resulting from nonpayment as recently as June 1, 2026.

76. A family friend recently assisted me with that obligation because I was unable to pay it myself. **Attached hereto in Exhibit N** is a true and correct copy of that communication with the family friend stating "Just Paid ATT acct :)." For their privacy purposes, I have redacted their full identity.

77. **Annexed hereto as Exhibit O** is documentation reflecting my Medicaid eligibility and coverage.

78. Plaintiffs repeatedly argue that I have relied upon medical issues as a litigation tactic.

79. That assertion is inaccurate and unfair.

80. I referenced my medical circumstances because they are relevant to my financial condition, my excusable-neglect showing, and my inability to post a supersedeas bond.

81. Medicaid eligibility requires demonstration of financial need.

82. My enrollment in Medicaid therefore constitutes objective evidence of financial hardship, not a litigation strategy.

83. It is personally embarrassing for me to be dependent upon Medicaid given the life I once had and the accomplishments of my parents and my prior accomplishments.

84. My mother devoted her life to medicine and scientific research. I would not voluntarily place myself in a position requiring Medicaid benefits unless I was genuinely experiencing financial hardship as that would be fraud.

85. **Annexed hereto as Exhibit P** are representative medical and treatment records reflecting serious medical circumstances during the relevant period.

86. Plaintiffs state that I cannot demonstrate emotional distress or emotional harm arising from this litigation. That assertion is incorrect.

87. I have long suffered from depression, anxiety, and post-traumatic stress disorder, and the circumstances surrounding this litigation substantially exacerbated those conditions.

88. At one point, a close friend became so concerned for my wellbeing relating to this litigation that he contacted law enforcement and requested a wellness check after I expressed thoughts of self-harm and hopelessness relating to the circumstances I was facing from this litigation.

89. As a result, emergency medical personnel responded and transported me for psychiatric evaluation as I discussed ending my life due to the constant harassment of Plaintiffs in this litigation and the worthless life they have caused me as a result and at the time, before I understood I could proceed Pro Se, let the world know the truth about this litigation and have a chance to clear my name.

90. The records generated from that incident reflect extensive discussion concerning this litigation, my fear regarding its consequences, my belief that I required legal assistance and protection from Plaintiffs, and the severe distress I was experiencing at that time.

91. Because those records contain highly personal medical and mental-health information, I respectfully request permission to submit them for in camera review should the Court deem them relevant.

92. Immediate enforcement would put me in danger and cause irreparable harm given my current mental health status and the effects this case continues to have on me.

93. In addition, my treating psychiatrist has personal knowledge concerning the impact these events and Plaintiffs actions not yet presented before this Court have had upon my mental health and is expected to provide a declaration in connection with my forthcoming Rule 55 and Rule 60 motion.

94. Plaintiffs also repeatedly emphasized recently the importance of obtaining my address so that they could serve me and recently sought sanctions based on the fact that I failed to provide one (even though I was in cancer care at Memorial Sloan Kettering).

95. After I provided the address information requested by the Court, Plaintiffs did not thereafter attempt service at that address and instead continued communicating through email.

96. **Annexed Hereto as Exhibit Q** are Communications Demonstrating I Provided Address Information Requested by the Court as Plaintiffs' requested so they could serve me, and even sought sanctions but yet have not sent me one piece of mail to that address as you can see in the **digital mailbox linked to my mailbox at that address Annexed in Exhibit R.**

97. Plaintiff's Counsel states in his declaration that Plaintiff continues to experience "harm". Plaintiff has been flying private to St. Barths, Miami, Recently listed on "The List" among names such as Ralph Lauren in Hamptons Magazine's Memorial Day Issue (one of the most exclusive lists in the world to make), Was seated front and center next to Victoria Beckham in a 250K+ seat at Time Magazine's annual Gala just last month and just did a seven-figure partnership deal for The Surf Lodge, the largest in its history. **Annexed hereto in Exhibit X, are a few of the instances contradicting Plaintiffs "harm" mentioned above.**

98. These facts bear directly on Plaintiffs' characterization of my conduct and on issues that will be addressed more fully in my forthcoming Rule 60 motion.

99. My forthcoming Rule 60 motion will also present evidence concerning the Instagram accounts that form the basis of Counts II, VII, and VIII and the central factual premise of this lawsuit.

100. **Annexed hereto as Exhibit T** is evidence showing that @TheSurfLodgeSanctuary existed in 2019 when we opened The Sanctuary. .

101. **Annexed hereto as Exhibit U** is evidence reflecting Plaintiff Cardoso's public reference to and use of @TheSurfLodgeSanctuary in 2019 in connection with The Sanctuary, The Surf Lodge and myself.

102. **Annexed hereto as Exhibit V** are screenshots reflecting that @TheSurfLodgeSanctuary and @TheSanctuaryWellness presently exist as separate Instagram accounts and continue to both exist today making it factually impossible for me to have converted @TheSanctuaryWellness into @TheSurfLodgeSanctuary as Plaintiffs keep alleging.

103. My forthcoming Rule 60 motion will present additional evidence concerning the parties' business relationship, ownership and control of social media accounts, public representations regarding The Sanctuary venture, prior communications, business records, and other facts bearing directly on liability and damages.

104. The Court has not previously evaluated this evidence on a developed factual record because judgment was entered by default rather than after adjudication on the merits.

105. Immediate enforcement before completion of the Court-ordered Rule 55 and Rule 60 process would impose substantial hardship while those issues remain pending.

106. By contrast, the stay I seek is limited, temporary, and tied directly to the Court's existing schedule.

107. I respectfully request only a temporary stay preserving the status quo until the Court has an opportunity to review the forthcoming Rule 60 motion and the evidence supporting it.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 10, 2026

Marisa Hochberg

/s/Marisa Hochberg
Defendant, Pro Se