**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JC HOSPITALITY d/b/a THE SURF LODGE
AND JAYMA CARDOSO,

Plaintiffs,

v.

MARISA HOCHBERG,

Defendant.

**Case No. 1:23-cv-02051-(LJL)**

**DEFENDANT MARISA HOCHBERG'S REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF HER MOTION TO VACATE DEFAULT JUDGMENT**

Marisa Hochberg
Marisjh@gmail.com
(917) 858-5063
Pro Se

Case 1:23-cv-02051-LJL

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT....................................................................................................1

II. GOVERNING STANDARDS..................................................................................................2

III. DEFENDANT SEEKS RELIEF UNDER RULE 60(b)(1), OR, IN THE ALTERNATIVE,

RULE 60(b)(6), AND PRESERVES HER RULE 60(b)(3) AND RULE 60(d)(3) GROUNDS....3

IV. DEFENDANT HAS ESTABLISHED THAT HER DEFAULT WAS NOT STRATEGIC....3

V. THE COURT MAY CONSIDER NEW EVIDENCE REGARDING THE MERITS ON A

RULE 60 MOTION....................................................................................................................9

VI. DEFENDANT HAS PRESENTED MERITORIOUS DEFENSES.......................................19

    A. Plaintiffs' Opposition Mischaracterizes the Pre-Suit Chronology That Materially

    Undermines Their Narrative.................................................................................................20

    B. The Rule 60 Meritorious-Defense Standard Is Modest........................................................23

    C. The Court's Own November 27, 2023 Dismissal Confirms It Has Not Accepted Plaintiffs'

    Allegations Wholesale, and the Surviving Claims Have Never Been Tested.........................23

VII. DEFENDANT'S INSTAGRAM AND META EVIDENCE DIRECTLY BEARS ON

PLAINTIFFS' FALSE-ASSOCIATION THEORY UNDER THE LANHAM ACT AND

NYGBL...................................................................................................................................25

VIII. VACATUR WILL NOT PREJUDICE PLAINTIFFS.........................................................38

IX. RULE 60(b)(3), RULE 60(b)(6), AND RULE 60(d)(3) INDEPENDENTLY WARRANT

RELIEF...................................................................................................................................41

X. CONCLUSION...................................................................................................................45

Case 1:23-cv-02051-LJL

**TABLE OF AUTHORITIES**

**Cases**

American Alliance Insurance Co. v. Eagle Insurance Co., 92 F.3d 57 (2d Cir. 1996)2, 4, 8, 10, 14

Gucci America, Inc. v. Gold Center Jewelry, 158 F.3d 631 (2d Cir. 1998)...................................2

ILGWU National Retirement Fund v. Empire State Mills Corp., 696 F. Supp. 885 (S.D.N.Y. 1988)................................................................................................................................ 11

In re Barquet Group, Inc., 477 B.R. 454 (Bankr. S.D.N.Y. 2012)....................................................4

In re Chalasani, 92 F.3d 1300 (2d Cir. 1996).........................................................................11, 12

In re Curreri, 231 B.R. 199 (Bankr. S.D.N.Y. 1999)..................................................................13

In re FairPoint Communications, Inc., 462 B.R. 75 (Bankr. S.D.N.Y. 2012).................................9

In re JWP Information Services, Inc., 231 B.R. 209 (Bankr. S.D.N.Y. 1999). .3, 10, 13, 23, 38, 46

In re Santoli, 627 B.R. 595 (Bankr. S.D.N.Y. 2021)...............................................................45, 46

In re Suprema Specialties, Inc., 330 B.R. 40 (S.D.N.Y. 2005)....................................3, 38, 39, 46

JLM Couture, Inc. v. Gutman, 91 F.4th 91 (2d Cir. 2024)...........................................................35

King v. Galluzzo Equipment & Excavating Inc., 223 F.R.D. 94 (E.D.N.Y. 2004)................11, 40

Knox v. Palestine Liberation Organization, 248 F.R.D. 420 (S.D.N.Y. 2008)...................9, 44, 46

Long v. Carberry, 151 F.R.D. 240 (S.D.N.Y. 1993)...................................................................11

Mason Tenders District Council Welfare Fund v. M & M Contracting & Consulting, 193 F.R.D. 112 (S.D.N.Y. 2000)..................................................................................................15, 16, 19

Matrix Polymers, Inc. v. A-E Packaging, Inc., 2017 WL 9485652 (E.D.N.Y. Jan. 5, 2017)..11, 12

Melo v. Milagro Grocery Corp., 750 F. Supp. 3d 38 (E.D.N.Y. 2024)........................................11

New York v. Green, 420 F.3d 99 (2d Cir. 2005)..........................................................2, 3, 10, 23

Case 1:23-cv-02051-LJL

Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380 (1993)

.................................................................................................................2, 8, 9, 12, 14, 46

Rogers v. Astrue, 895 F. Supp. 2d 541 (S.D.N.Y. 2012)...............................................................13

Sasso v. M. Fine Lumber Co., Inc., 144 F.R.D. 185 (E.D.N.Y. 1992)....................................11, 12

Solomon v. 318 Fashion, Inc., 1994 WL 702008 (S.D.N.Y. Dec. 14, 1994)..........................11, 12

Sony Corp. v. S.W.I. Trading, Inc., 104 F.R.D. 535 (S.D.N.Y. 1985).........................................40

Traguth v. Zuck, 710 F.2d 90 (2d Cir. 1983)..........................................................................18, 19

Wagstaff-El v. Carlton Press Co., 913 F.2d 56 (2d Cir. 1990).....................................................10

**Statutes**

15 U.S.C. § 1125(a)(1)(A)................................................................................................throughout

New York General Business Law §§ 349, 350................................................................throughout

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 43(c)..........................................................................................................47

Fed. R. Civ. P. 60(b)...............................................................................................2, 9, 44

Fed. R. Civ. P. 60(b)(1)...........................................................................................2, 3, 45

Fed. R. Civ. P. 60(b)(3).......................................................................................1, 3, 41, 45

Fed. R. Civ. P. 60(b)(6).......................................................................................3, 11, 44, 45

Fed. R. Civ. P. 60(c)(1).................................................................................................2, 3

Fed. R. Civ. P. 60(d)(3)....................................................................................1, 2, 3, 41, 45

Case 1:23-cv-02051-LJL

## I. PRELIMINARY STATEMENT

Defendant Marisa Hochberg respectfully submits this reply memorandum in further support of her motion to vacate the default judgment entered against her. Plaintiffs repeatedly suggest that Defendant strategically withheld evidence until after the entry of default judgment. That theory cannot be reconciled with Defendant's own interests: no litigant seeking to prevail would knowingly withhold evidence while exposing herself to injunctive relief, attorneys' fees, and a judgment approaching $100,000. Defendant had every incentive to present this evidence before judgment, not after. She did not do so because she faced extraordinary personal and medical circumstances that prevented her from participating in this litigation, not because her conduct was strategic or willful.

The expanded record now before the Court — including sworn medical evidence, an independent attorney's declaration, and documentation not previously available — supports revisiting the Court's prior willfulness finding, and Rule 60 permits the Court to consider that record on this Motion.

Defendant has also presented meritorious defenses to Plaintiffs' surviving claims. Platform-generated Meta records materially undermine the account-conversion allegation underlying those claims, and Plaintiffs' own pre-suit correspondence and prior pleadings are inconsistent with the narrative Plaintiffs now advance. Vacatur will not prejudice Plaintiffs, who identify no lost evidence and who themselves took more than a year to renew their own motion for default judgment. To the extent the Court finds the record establishes more than ordinary factual disputes, Plaintiffs' repeated, sworn misrepresentations regarding the basic history of the trademarks at issue independently warrant relief under Rule 60(b)(3) and, in the alternative, Rule 60(d)(3).

Case 1:23-cv-02051-LJL

## II. GOVERNING STANDARDS

Fed. R. Civ. P. 60(b) permits relief from a final judgment for, among other reasons, mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, or any other reason justifying relief. Fed. R. Civ. P. 60(c)(1) further provides that a Rule 60(b) motion must be made within a reasonable time, and for reasons under Rule 60(b)(1), (2), and (3), no more than one year after judgment. Fed. R. Civ. P. 60(d)(3) preserves the Court's power to set aside a judgment for fraud on the court.

In the default-judgment context, the Second Circuit's principal framework remains willfulness, meritorious defense, and prejudice. New York v. Green, 420 F.3d 99, 108 (2d Cir. 2005). The Second Circuit has also emphasized that default judgment is an extreme sanction and that doubts should be resolved in favor of adjudication on the merits where reasonably possible. New York v. Green, 420 F.3d 99, 104, 108 (2d Cir. 2005).

Under American Alliance Ins. Co. v. Eagle Ins. Co., 92 F.3d 57, 60-61 (2d Cir. 1996), willfulness in this context turns on whether the default reflects egregious or deliberate conduct rather than mere negligence, mistake, or administrative failure. Gucci America, Inc. v. Gold Center Jewelry, 158 F.3d 631, 634-35 (2d Cir. 1998), clarified that bad faith is not required, but deliberate default is. And Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 395 (1993), instructs that excusable neglect is ultimately an equitable determination taking account of all relevant circumstances, including prejudice, length of delay, reason for delay, and good faith.

A meritorious defense need not be conclusively proven at this stage. The question is whether the movant has presented facts that, if proven at trial, would constitute a complete defense

2

Case 1:23-cv-02051-LJL

or at minimum give the factfinder something substantial to decide. New York v. Green, 420 F.3d 99, 109 (2d Cir. 2005); In re JWP Information Services, Inc., 231 B.R. 209 (Bankr. S.D.N.Y. 1999).

Prejudice requires more than delay, fees, or loss of tactical advantage. To establish prejudice, the non-movant must ordinarily show loss of evidence, increased discovery difficulties, unavailability of witnesses, or similar impairment of the ability to litigate on the merits. In re Suprema Specialties, Inc., 330 B.R. 40 (S.D.N.Y. 2005).

## III. DEFENDANT SEEKS RELIEF UNDER RULE 60(b)(1), OR, IN THE ALTERNATIVE, RULE 60(b)(6), AND PRESERVES HER RULE 60(b)(3) AND RULE 60(d)(3) GROUNDS

Defendant principally seeks relief under Rule 60(b)(1), but alternatively relies on Rule 60(b)(6), and preserves her Rule 60(b)(3) and, in the alternative, Rule 60(d)(3) grounds. The Motion is timely. Fed. R. Civ. P. 60(c)(1) requires that motions under Rule 60(b)(1), (2), and (3) be filed within a reasonable time and no later than one year after entry of the judgment or order. Defendant filed the present Motion on June 16, 2026, seeking relief from the Court's November 7, 2025 default-judgment order and the Court's May 21, 2026 fee order. On those dates alone, Defendant's Rule 60(b)(1) and Rule 60(b)(3) requests fall within Rule 60(c)(1)'s one-year outer limit.

## IV. DEFENDANT HAS ESTABLISHED THAT HER DEFAULT WAS NOT STRATEGIC

3

Case 1:23-cv-02051-LJL

Plaintiffs repeatedly portray Defendant as calculating, manipulative, and strategically refusing to participate in this litigation. That theory does not withstand common sense or the governing Second Circuit standard, and it is difficult to reconcile with Defendant's own opening motion, which openly acknowledged fault for her nonappearances rather than asking the Court to excuse them without explanation. Defendant's motion stated plainly that she "deeply apologizes to the Court for the prior delays and failures to appear," takes "full responsibility for these actions," and assures the Court that "there was never an intent to disrupt, disrespect, or act vexatiously toward the judicial process." A litigant pursuing the calculated strategy Plaintiffs describe would have little reason to lead with that acknowledgment.

In American Alliance Insurance Co. v. Eagle Insurance Co., 92 F.3d 57, 60-61 (2d Cir. 1996), the Second Circuit distinguished deliberate default from neglect that, although serious, may still be excusable in the default-judgment context. Courts applying American Alliance look for conduct that is deliberate, egregious, or evidencing bad faith; mere negligence, or even gross negligence, does not automatically preclude relief. Under the Second Circuit's framework, willfulness turns on whether the default reflects a deliberate, egregious, or bad-faith decision rather than neglect that may be excusable. In re Barquet Group, Inc., 477 B.R. 454 (Bankr. S.D.N.Y. 2012).

That distinction is critical here. Plaintiffs ask the Court to infer deliberate strategy from Defendant's nonparticipation alone. But every consequence of that nonparticipation ran against Defendant, not Plaintiffs. If Defendant had been acting strategically to advance her own interests, she would have participated in discovery, served her own discovery demands, opposed default, opposed liability, opposed injunctive relief, and presented her documentary defenses before judgment was entered. She did none of those things — and gained nothing by not doing them.

4

Case 1:23-cv-02051-LJL

Instead, Defendant suffered the harshest consequences available in civil litigation. She lost the opportunity to contest liability before judgment. She lost the opportunity to conduct discovery. She lost the opportunity to oppose Plaintiffs' factual narrative on a full merits record. She became subject to default judgment, injunctive relief, and an attorneys' fees and costs award approaching $100,000 — ultimately $99,240.10. Plaintiffs themselves state that default judgment was entered on Counts II, VII, and VIII under 15 U.S.C. § 1125(a)(1)(A) and New York General Business Law §§ 349 and 350.

That is not a rational litigation strategy. It is the opposite. No litigant deliberately seeking to improve her legal position would intentionally engineer liability findings, fee exposure, injunctive consequences, and the loss of virtually every procedural protection available under the Federal Rules — while simultaneously withholding evidence that, if presented, could have helped her avoid that very outcome. Plaintiffs' strategic-default theory asks the Court to accept exactly that irrational premise, and the Court should reject it.

The far more plausible explanation is the one supported by Defendant's medical and circumstantial evidence: Defendant's ability to make rational litigation decisions and protect her legal interests was substantially impaired during the relevant period. This is precisely why NP Bumpars' declaration is so significant. Rather than reflecting calculated litigation strategy, NP Bumpars explains that Defendant's psychiatric conditions substantially impaired her judgment, executive functioning, and ability to protect her legal interests during the period immediately following her father's death — which coincided with the decision on Defendant's initial motion to dismiss and Plaintiffs' cross-motion to file a Second Amended Complaint. Defendant did not ignore this litigation outright: from the moment it commenced, she obtained counsel and sought to defend herself, and even that counsel attributed her conduct to grief over her father's death rather

5

Case 1:23-cv-02051-LJL

than to any intent to abandon her defense, and cautioned the Court not to treat his withdrawal as grounds to deny Defendant a hearing on the merits.

The months immediately following her father's death were themselves marked by escalating hardship, independently corroborated by the declaration of Micah Salb, Esq., an estate and fiduciary-litigation attorney with thirty years of practice who has no financial or personal ties to Defendant. (Dkt. 166 ¶¶ 1-3.) Mr. Salb's declaration states that shortly before Defendant's father's death, two attorneys advised him to change his will, and that the will he then executed endowed those same two attorneys with fiduciary authority over his assets, after which, per Mr. Salb's declaration, no action was taken to ensure Defendant had access to funds for basic living, healthcare, or legal expenses. (Dkt. 166 ¶ 10.) Mr. Salb further states that Defendant's then-counsel in this litigation, Steven Storch, "had various dealings with those same individuals during the relevant period," and that he understands and believes Mr. Storch's decision to withdraw was related, directly or indirectly, to those dealings. (Dkt. 166 ¶ 11.) Defendant was, in other words, contending with a sudden loss of access to her own inheritance at the same time she was attempting to maintain counsel in this litigation. Even so, when Mr. Storch withdrew, Defendant did not disengage from this litigation. Within days, she retained substitute counsel, Alexander Dudelson, specifically so that someone could appear on her behalf at the February 8, 2024 hearing as the Court had ordered, funding his retainer through a longtime family friend because her own resources had been cut off. That is not the conduct of someone who had made a calculated decision to abandon her defense; it is the conduct of someone actively trying, in the midst of compounding personal crises, to comply with the Court's orders.

That period reached its most acute point in April 2024. That month, Defendant was hospitalized after a wellness check performed by EMS personnel responding to a report that she

6

Case 1:23-cv-02051-LJL

was suicidal, and was placed on suicide watch. The day after her release, Defendant was evicted from her home by a New York City Marshal in front of her neighbors and community, in the wake of the death of her father — her last surviving immediate family member. NP Bumpars began treating Defendant the following month and attributes the severe PTSD, depression, and related psychiatric impairment documented in her declaration to this period. (Dkt. 165 ¶¶ 2-3.) It is against that backdrop — not the calculated indifference Plaintiffs describe — that the missed appearances and deadlines identified in the Court's November 7, 2025 Opinion must be evaluated.

During the most acute period of that crisis, Defendant did not simply neglect this litigation — she did not believe she would survive to see its outcome, and did not see the point in fighting a case she expected she would not be alive to see resolved. That is not the mindset of a calculating litigant weighing strategic advantage; it is consistent with the severity of the psychiatric crisis NP Bumpars describes. (Dkt. 165 ¶¶ 3-4, 8.)

Nor was this litigation uniquely affected. During the same period, Defendant was similarly unable to participate in a separate, unrelated estate litigation, in which she is now likewise seeking relief from orders entered during this period of incapacity. The same impairment that Plaintiffs characterize as calculated strategy in this case produced the identical pattern of nonparticipation in an entirely different proceeding, involving different parties, different counsel, and different stakes — a pattern far more consistent with a general incapacity to participate in litigation during this period than with a deliberate strategy targeted at this case alone.

That explanation is also consistent with Defendant's conduct since judgment. Since regaining sufficient stability, Defendant has not abandoned the case; she has done the opposite. She has represented herself pro se, opposed attorneys' fees, immediately filed a motion to stay

7

Case 1:23-cv-02051-LJL

enforcement, attended all telephonic conferences, assembled hundreds of exhibits, conducted months of case-law research, obtained Meta's native account records, researched Rule 60, and sought to have this case decided on the merits. Essentially, Defendant has made this litigation her life.

Plaintiffs' discovery-refusal authorities do not displace American Alliance, because those cases turn on a deliberate refusal to participate — a premise Defendant's current medical evidence, cumulative extraordinary circumstances, and post-judgment diligence directly contest.

Defendant's conduct since judgment further confirms good faith rather than gamesmanship. Defendant has made extensive efforts to obtain counsel, including seeking pro bono representation, but has been unable to secure representation despite her continuing financial hardship. Although Defendant has been advised that bankruptcy may be a more practical course given her present financial circumstances, Defendant has chosen instead to continue defending this action pro se because she seeks a merits determination on a materially disputed record and refuses to act strategically as Plaintiffs accuse her of doing, or to take the easy way out when she possesses significant evidence. Defendant believes that taking that easier path would not only be a disservice to herself, but that, possessing evidence she believes bears directly on the truth of these matters, declining to bring that evidence before this Court would be a disservice to the Court's own interest in deciding this case on an accurate and complete record.

That continued engagement, despite the significant and ongoing burden it has imposed — including diverting time from Defendant's related estate litigation, which could itself be jeopardized — is inconsistent with Plaintiffs' theory that Defendant is attempting to evade this litigation, and is directly relevant to the Rule 60 analysis. Under Pioneer, excusable neglect

Case 1:23-cv-02051-LJL

considers all relevant circumstances, including whether the movant acted in good faith, and Defendant's efforts to litigate this case pro se despite severe hardship support exactly that finding. Presenting this expanded record, not withholding it, is what serves both Defendant's interests and the Court's own interest in deciding this case on a complete record.

## V. THE COURT MAY CONSIDER NEW EVIDENCE REGARDING THE MERITS ON A RULE 60 MOTION

Fed. R. Civ. P. 60(b) expressly authorizes relief for "newly discovered evidence" and for "any other reason that justifies relief." Under Pioneer, the excusable-neglect determination takes account of "all relevant circumstances surrounding the party's omission." A Rule 60 motion therefore necessarily looks at the record as it exists when relief is sought, not only the record that existed when default was entered. That is especially true in the default-judgment context. In Knox v. Palestine Liberation Organization, 248 F.R.D. 420 (S.D.N.Y. 2008), the court held that Rule 60(b) is "the appropriate procedural vehicle for vacating the Default Judgment" and explained that circumstances asserted in support of a Rule 60 motion may properly be considered even if they "were not a part of the appellate record." Rule 60 would be hollow if a party seeking vacatur were forbidden from presenting medical evidence, documentary evidence, or later-obtained platform records bearing directly on willfulness and the existence of a defense.

Defendant does not ask the Court to disregard its November 7, 2025 finding of willfulness lightly, and she recognizes that finding controls unless she carries her burden, on this Motion, of showing that the expanded record now before the Court warrants revisiting it. That is precisely what Defendant's sworn medical evidence, contemporaneous account-history records, and other documentation not previously before the Court are offered to do. In In re FairPoint

9

Case 1:23-cv-02051-LJL

Communications, Inc., 462 B.R. 75, 80 (Bankr. S.D.N.Y. 2012), applying the Second Circuit's Rule 60 framework, the court explained that the key willfulness question is whether the movant made a conscious decision to allow the matter to proceed without a response. Likewise, in In re JWP Information Services, Inc., 231 B.R. 209, 212-13 (Bankr. S.D.N.Y. 1999), the court explained that willfulness in this context means conduct that is deliberate, egregious, or in bad faith, not mere negligence.

Plaintiffs' Opposition begins from the premise that because the Court previously found Defendant's conduct willful on the default record, the same conclusion must control now regardless of what the expanded record shows. Plaintiffs repeatedly rely on the Court's prior findings that Defendant acted with "persistent defiance" of the rules and orders of this Court, and "cavalier disregard" toward court orders. (Nov. 7, 2025 Op. at 10-11, 20-21.) The Court unquestionably may consider its prior findings, but Rule 60 exists so the Court can decide whether relief is warranted on the expanded record now before it. In New York v. Green, 420 F.3d 99, 108 (2d Cir. 2005), the Second Circuit applied the traditional Rule 60 factors to the motion before the court; it did not hold that prior default findings become irrebuttable once new evidence is presented. Likewise, American Alliance, 92 F.3d 57, 59-61 (2d Cir. 1996), teaches that the willfulness inquiry is functional and fact-sensitive, separating deliberate default from neglect that, though serious, may still be excusable in the default-judgment context. Plaintiffs' position would effectively convert the default judgment into a permanent evidentiary bar. That is not how Rule 60 operates. The Court is asked to decide whether, on the expanded record now before it, the judgment should stand or the case should be reopened. Even if the Court concludes that the prior procedural record weighs against Defendant, willfulness does not mechanically require denial where the movant presents substantial defenses and the nondefaulting party cannot show concrete prejudice. See Wagstaff-El

10

Case 1:23-cv-02051-LJL

v. Carlton Press Co., 913 F.2d 56, 57 (2d Cir. 1990) (affirming vacatur of a default judgment notwithstanding a finding that the default was willful, where the defendant established meritorious defenses and the plaintiff would not be prejudiced).

Plaintiffs rely on cases such as King v. Galluzzo Equipment & Excavating Inc., 223 F.R.D. 94 (E.D.N.Y. 2004), In re Chalasani, Sasso v. M. Fine Lumber Co., Inc., Matrix Polymers, Inc. v. A-E Packaging, Inc., Solomon v. 318 Fashion, Inc., Melo v. Milagro Grocery Corp., 750 F. Supp. 3d 38 (E.D.N.Y. 2024), ILGWU National Retirement Fund v. Empire State Mills Corp., 696 F. Supp. 885 (S.D.N.Y. 1988), and Long v. Carberry, 151 F.R.D. 240 (S.D.N.Y. 1993), for the proposition that inability to retain counsel, financial hardship, personal problems, and refusal to engage in discovery do not constitute excusable neglect. But, as Plaintiffs themselves present those cases, they involve parties who "sat on [their] hands," "deliberately failed to respond in any fashion," or "willfully default[ed]" after being warned of default, with no medical or circumstantial explanation offered. King itself involved defendants who failed to obtain counsel after being warned of default, failed to appear, and failed to respond to pre- and post-judgment discovery, leading the court to conclude their conduct "bespeak[s] a deliberate decision to default" — a far cry from a record that now includes psychiatric evidence and overlapping personal crises offered to explain why Defendant's judgment and functioning were substantially impaired. ILGWU and Melo support only the unremarkable proposition that lack of funds or inability to hire counsel, standing alone, does not justify ignoring the court, and Defendant's motion is not based on standing-alone circumstances. Long is quoted for the proposition that illness and financial hardship, though sympathetic, are not necessarily "extraordinary" under Rule 60(b)(6); even accepting that proposition, Defendant's showing is not limited to illness and financial hardship in isolation, but rests on the cumulative record described below, not disconnected fragments. None of these

Case 1:23-cv-02051-LJL

authorities establish a categorical rule that any defendant against whom discovery closed, or who faced hardship, is forever barred from making a Rule 60 showing on a materially different record.

Defendant has never argued that financial hardship alone excuses default. Defendant has never argued that loss of counsel alone excuses default. Defendant has never argued that illness standing alone excuses default. Rather, Defendant's motion presented a cumulative and extraordinary set of circumstances: severe PTSD and major depressive disorder documented by NP Bumpars; the death of Defendant's father; prolonged estate litigation; loss of legal funding; disruption of counsel; eviction; homelessness; severe financial collapse; significant medical hardship; and an inability to function meaningfully during the relevant period, followed by prompt efforts to seek relief once Defendant regained sufficient stability to do so. Plaintiffs' own brief confirms the over-simplification: Plaintiffs describe Defendant as invoking "bereavement, loss of legal funding, counsel disruption, psychiatric crisis, eviction, homelessness, and medical hardship," while elsewhere reducing those circumstances to mere "personal problems." That framing ignores the difference between ordinary life stress and documented psychiatric impairment offered to explain litigation incapacity, and is inconsistent with the governing equitable framework: Pioneer directs courts to examine the reason for the delay, prejudice, good faith, and related equitable considerations together, not to isolate financial hardship, counsel loss, illness, and personal hardship one by one and treat none as sufficient.

Plaintiffs' discovery-refusal authorities — Chalasani, Sasso, Matrix Polymers, and Solomon — address a different question than the one this record presents: whether a defendant who does not dispute willfulness may nonetheless raise undeveloped defenses. They do not address whether a defendant who has come forward with substantial new evidence bearing on willfulness itself has carried her burden of showing the Court's prior finding should not stand on the present

Case 1:23-cv-02051-LJL

record. The same principle appears in In re JWP Information Services, Inc., 231 B.R. 209, 211-13 (Bankr. S.D.N.Y. 1999): willfulness includes conduct that is deliberate, egregious, or in bad faith, while mere carelessness or negligence does not constitute willfulness, even though gross negligence may weigh against relief. Plaintiffs repeatedly ask the Court to infer strategic abandonment from the fact of default itself, while largely bypassing the new evidence offered to explain why the default was not strategic. While not a Rule 60 default case, Rogers v. Astrue, 895 F. Supp. 2d 541 (S.D.N.Y. 2012), is still instructive on that point: there, the court described evidence of PTSD, major depression, flashbacks, hallucinations, and inability to concentrate, underscoring why diagnosed psychiatric conditions are not properly dismissed as routine "personal problems."

Plaintiffs' reliance on cases denying vacatur after willful default does not control here for the same reason. In In re Curreri, 231 B.R. 199 (Bankr. S.D.N.Y. 1999), the court denied relief where the default was willful and egregious and the movant failed to provide concrete factual and legal submissions demonstrating a reasonable basis to prevail if the case were reopened. Here, Defendant has made precisely the kind of concrete showing that was missing in Curreri: medical evidence explaining the default, former counsel's contemporaneous statements, Meta account-history records, account-access evidence, and documentary defenses bearing directly on Plaintiffs' surviving claims.

Plaintiffs cite no authority addressing a comparable combination of circumstances, much less one involving unrebutted treating-provider evidence offered to explain why a litigant's judgment and functioning were substantially impaired during the default period. Their cases involve litigants who had notice, the ability to act, and nevertheless made a deliberate or inadequately explained choice not to participate. Defendant does not contend that every litigant

13

Case 1:23-cv-02051-LJL

suffering from depression or anxiety is entitled to Rule 60 relief. Rather, Defendant submits that the unrebutted declaration of NP Bumpars provides the evidentiary explanation for why the extraordinary circumstances present here substantially impaired Defendant's ability to protect her legal interests during the relevant period. (Dkt. 165 ¶¶ 7-8, 12.) That medical evidence is therefore directly relevant to the Court's evaluation of willfulness, excusable neglect, and good faith under Pioneer and American Alliance.

Plaintiffs repeatedly rely upon Mr. Storch's withdrawal declarations as purported evidence that Defendant acted in bad faith, intentionally defaulted, and lacked any meaningful defense. That reliance ignores what Mr. Storch actually told this Court. First, although Mr. Storch described a breakdown in the attorney-client relationship, he expressly attributed Defendant's conduct during that period to the extraordinary circumstances surrounding the death of Defendant's father. Specifically, Mr. Storch informed the Court that although Defendant "had made explicit threats against me and my Firm," he "attributed that to grief over the passing of her father" and nevertheless agreed to continue working with Defendant. Second — and even more importantly — Mr. Storch expressly cautioned this Court that "nothing herein should be construed as a weakness in Ms. Hochberg's defense of this case on the merits." (Dkt. No. 60, filed Dec. 14, 2023.) Plaintiffs nevertheless ask this Court to use Mr. Storch's withdrawal motion for the precise purpose that Mr. Storch instructed it should not be used: namely, as evidence that Defendant lacked meritorious defenses or deliberately abandoned this litigation.

Read fairly, Mr. Storch's declaration supports the opposite conclusion. It reflects an attorney attempting to navigate an exceptionally difficult period marked by Defendant's father's death, grief, communication breakdowns, and funding issues — not an attorney concluding that Defendant lacked defenses or intentionally sought default. Plaintiffs' selective reliance on isolated

14

Case 1:23-cv-02051-LJL

allegations while ignoring Mr. Storch's express statements regarding grief and the merits is therefore misplaced. This point is particularly significant because Mr. Storch was not an advocate retained for this Rule 60 motion; he was Defendant's counsel at the time of the events Plaintiffs now invoke as proof of willfulness. His statement that "nothing herein should be construed as a weakness in Ms. Hochberg's defense on the merits" is therefore highly probative of the limited purpose of the withdrawal motion, and his contemporaneous attribution of Defendant's difficulties to grief over her father's death confirms that the explanation NP Bumpars now offers is not a post hoc litigation invention, but is consistent with observations made by Defendant's own counsel at the time. (Dkt. 165 ¶¶ 3-4.)

Plaintiffs' portrayal of Defendant as having deliberately abandoned this litigation is also difficult to reconcile with Mr. Storch's own description of events immediately preceding his withdrawal. Mr. Storch informed the Court that, after meeting with Defendant on December 3, 2023, the parties had what he believed was a "fruitful discussion," during which Defendant agreed to use another attorney as an intermediary and they discussed a schedule for responding to the Second Amended Complaint — a plan with which Defendant "seemed to be in agreement." (Dkt. No. 60.) Those contemporaneous statements are inconsistent with Plaintiffs' theory that Defendant had already made a calculated decision to abandon her defense. Rather, they support Defendant's position that her ability to participate in the litigation fluctuated during an extraordinarily destabilizing period, culminating in the circumstances described by NP Bumpars, rather than reflecting a deliberate strategy to default. (Dkt. 165 ¶¶ 4-5, 11.)

Indeed, Mason Tenders District Council Welfare Fund v. M & M Contracting & Consulting, 193 F.R.D. 112 (S.D.N.Y. 2000), illustrates why Plaintiffs' authorities do not control. There, the court rejected Rule 60 relief where defendants blamed counsel but then failed to make

Case 1:23-cv-02051-LJL

inquiry for months despite repeated mailings and ample opportunity to do so. The problem in Mason Tenders was unexplained inaction after notice, not a materially expanded post-judgment record offered to explain why the movant was not functioning during the relevant period. That is not Defendant's showing here.

Plaintiffs separately argue that Defendant "was presented with countless opportunities prior to Plaintiffs' August 2025 Motion for Default Judgment to communicate with opposing counsel," that she "deliberately chose not to communicate with the Court or Plaintiffs' counsel," and that "the first time when Defendant Hochberg decided to respond and communicate with Plaintiffs' counsel was on May 28, 2024," when she sent the email Plaintiffs cite as proof of her hostility. That characterization is incomplete in two respects. First, Plaintiffs' own account contradicts itself: a party who "deliberately chose not to communicate" and a party who communicated once, on May 28, 2024, are not the same thing, and Plaintiffs' own narrative describes the latter.

Second, and more significantly, Plaintiffs' Opposition omits the reasons that May 28, 2024 communication was as guarded as it was. In opposing Plaintiffs' fee application, filed April 24, 2026 [Dkt. No. 143], Defendant testified under oath that, before that email, she received an August 2023 email purporting to come from a former Surf Lodge employee with whom she had a good working relationship, using a sender format inconsistent with that person's known correspondence, and that a follow-up response led her to believe Plaintiffs' counsel was involved. (Hochberg Opp. to Fee Application ¶¶ 25–33; Declaration of Marisa Hochberg ¶¶ 145-157.) Plaintiffs' Opposition portrays Defendant as calculating, manipulative, and deceptive throughout this litigation, yet it does not address, dispute, or even acknowledge that sworn testimony anywhere in its thirty-eight pages, despite that testimony having been part of the record before this Opposition was filed. If Defendant's conduct reflected the pattern of bad faith Plaintiffs describe, one would expect

16

Case 1:23-cv-02051-LJL

Plaintiffs to respond to a specific, sworn allegation of deceptive contact directed at their own side rather than leave it unanswered.

Days after her April 2024 hospitalization and eviction, addressed further in Section IV above, Defendant received documented email and voicemail contact from Amy Julia Harris, a senior investigative journalist at The New York Times, raising alarming, unverified allegations concerning Plaintiffs' business and referencing a law enforcement investigation — contact consistent with Defendant's own statement to Plaintiffs' counsel days later, on May 28, 2024, that she had involved "someone from law enforcement... who specializes in financial crimes." That contact arrived against the backdrop of Defendant's prior experience with intense and unwanted media scrutiny, which made unsolicited press contact especially alarming and destabilizing to her, not a routine occurrence she could take in stride. Defendant's functioning during this period was further affected by ongoing psychiatric medication management. NP Bumpars' declaration explains that Defendant's treatment required continued adjustment of medications and dosages over time, and that her symptoms and level of functioning fluctuated throughout that process before an effective and stable regimen was identified. (Dkt. 165 ¶ 11.) Defendant's reactions during that period of adjustment, including the tone of the May 28, 2024 email, are consistent with that documented fluctuation, not a calculated litigation tactic. Defendant does not ask the Court to credit those unverified allegations, and offers this only to explain why, arriving days after a psychiatric hospitalization and eviction, following the earlier contact described above, during a period of ongoing medication adjustment, and consistent with her documented history of media-related distress, she responded to Plaintiffs' outreach defensively rather than deliberately.

That context Plaintiffs' Opposition omits: Defendant's reluctance to initiate further direct outreach to Plaintiffs' counsel was not an unexplained refusal to communicate, but followed two

17

Case 1:23-cv-02051-LJL

separate contacts she reasonably believed to be misleading or alarming, arriving during the most acute period of the psychiatric crisis documented elsewhere in this Motion.

Plaintiffs raise a separate point regarding the September 27, 2025 deadline Defendant did not meet after requesting and receiving an extension, arguing that because Defendant requested the extension herself, she was obligated to check the docket for the Court's ruling. That argument omits context bearing directly on why she did not. On July 20, 2025 — approximately five weeks before requesting the extension — Defendant was again hospitalized after a friend contacted emergency services regarding Defendant's suicidal ideation, one of the three documented wellness checks and psychiatric holds addressed above and covered in NP Bumpars' declaration. (Dkt. 165 ¶ 10.) The September 27, 2025 deadline itself fell within the Ten Days of Repentance between Rosh Hashanah and Yom Kippur, one of the most significant periods of the Jewish calendar and one Defendant experienced that year for the first time as her father's last surviving immediate family member, isolated from the community and synagogue connection her related estate litigation had also disrupted. (Declaration of Marisa Hochberg ¶¶ 175-179.) Defendant does not offer this as an excuse for missing the deadline. She offers it as the same category of documented, verifiable circumstance the Court is asked to weigh throughout this Motion, not as a bare assertion that she simply forgot to check a docket.

Similarly, Plaintiffs cite Traguth v. Zuck, 710 F.2d 90 (2d Cir. 1983), as an example of a pro se litigant who promptly communicated with the Court after learning of the responsive-pleading deadline, documented efforts to obtain counsel, and responded diligently. But that only underscores why Plaintiffs' presentation is incomplete. Traguth does not hold that a litigant is categorically barred from Rule 60 relief whenever she previously failed to communicate. Rather, Plaintiffs' own description of Traguth confirms that equitable context matters, diligence matters,

Case 1:23-cv-02051-LJL

and the Court must look at what the present record now shows about the earlier default. Neither Mason Tenders nor Traguth resolves this motion. One involved unexplained delay after notice; the other reflects that courts examine the surrounding equitable circumstances rather than mechanically enforcing default. Neither addresses the combination of evidence and circumstances now before the Court.

## VI. DEFENDANT HAS PRESENTED MERITORIOUS DEFENSES

The evolution of the evidentiary record concerning Plaintiffs' Instagram account-conversion theory is significant to the Court's Rule 60 analysis. The issue has developed in three stages so far. First, Plaintiffs alleged that Defendant converted @TheSanctuaryWellness into @TheSurfLodgeSanctuary and relied upon that allegation throughout this litigation. Second, Defendant's opening Rule 60 Motion presented contemporaneous documentary evidence calling that theory into question. Third, Plaintiffs' Opposition responded by arguing that Defendant's evidence did not disprove the alleged account conversion, relying principally on a generalized explanation of Instagram's tag-retroactivity functionality, speculation about punctuation variations, and attorney argument — specifically, Plaintiffs' Exhibit L (a Meta AI Support Assistant export) and Plaintiffs' suggestion that a differently punctuated version of "@TheSanctuaryWellness" may account for the account Defendant identified.

Since filing the Opposition, Plaintiffs' own submissions have put a specific, checkable factual question squarely at issue: whether Meta's own account-history records show that the account now known as @TheSurfLodgeSanctuary was ever formerly named @TheSanctuaryWellness or any comparable variation. In direct response, Defendant has obtained Meta's native account records directly from the @TheSurfLodgeSanctuary account itself, offered

19

Case 1:23-cv-02051-LJL

not as a new, freestanding claim but as rebuttal to the specific factual assertions Plaintiffs made in their Opposition regarding retroactive tag behavior and possible alternate punctuation of the handle, addressed fully in Section VII below. Because those records were obtained only after Plaintiffs filed their Opposition, Defendant respectfully requests the Court's leave to consider them on this reply.

**A. Plaintiffs' Opposition Mischaracterizes the Pre-Suit Chronology That Materially Undermines Their Narrative**

Plaintiffs' thirty-eight-page Opposition portrays Defendant as someone who received repeated, good-faith warnings from Plaintiffs and simply ignored them. That portrayal does not withstand comparison with the actual pre-suit correspondence, including correspondence Plaintiffs themselves put before this Court.

Before Plaintiffs' January 9, 2023 cease-and-desist letter — the letter Plaintiffs characterize as the point at which Defendant was placed on notice and refused to comply — Defendant's then-counsel, Dianne K. LeVerrier of Jordan & LeVerrier, P.C., sent Plaintiff Cardoso two demand letters, dated November 15, 2022 and December 5, 2022. Those letters asserted Defendant's claimed 50% ownership interest in JM Sanctuary LLC, sought payment of $8,500 in unpaid invoices and the return of property Defendant alleges Cardoso retained, and instructed Plaintiffs to preserve, among other things, the @TheSurfLodgeSanctuary Instagram page pending anticipated litigation. The November 15, 2022 letter went unanswered for three weeks; the December 5, 2022 follow-up was sent both by email and by personal service, as reflected on the face of the letter itself. Plaintiffs' January 2023 cease-and-desist letter followed those demands.

20

Case 1:23-cv-02051-LJL

Plaintiffs' Opposition does reference the December 5, 2022 letter, but mischaracterizes it. Relying solely on Plaintiff Cardoso's own declaration, Plaintiffs tell this Court that the letter was sent "indicating their client's intentions to not comply with the cease and desist and instead, would stall the process." The letter itself says nothing of the kind. It does not respond to, mention, or purport to address compliance with any cease-and-desist letter at all. It is an affirmative demand letter from Defendant's counsel seeking payment and asserting Defendant's ownership interest in JM Sanctuary LLC — the opposite of the letter Plaintiffs describe. Cardoso's declaration is the sole source Plaintiffs cite for this characterization, and it does not match the document itself. That discrepancy bears directly on the reliability of the declaration underlying Plaintiffs' broader narrative, including the account-conversion allegation addressed below.

That mischaracterization is not merely inaccurate; on Plaintiffs' own chronology, it is impossible. Plaintiffs' own Opposition identifies January 9, 2023 as the date of the cease-and-desist letter first raising the Instagram account and trademark theory at the center of this litigation. The December 5, 2022 letter necessarily predates that January 9, 2023 letter by more than a month. A letter cannot be sent in response to a cease-and-desist demand to "stop infringing" that had not yet been made. Cardoso's declaration asks this Court to credit a sequence of events that does not fit the dates in the record Plaintiffs themselves supplied.

Nor is this the only instance in which Plaintiffs have described the same letter differently in different filings across this litigation.

That mischaracterization matters. It is difficult to reconcile Plaintiffs' narrative that Defendant was a unilateral bad-faith infringer who received a warning and defiantly continued, with a chronology in which Defendant's own counsel first demanded payment, asserted an

21

Case 1:23-cv-02051-LJL

ownership interest, and specifically instructed Plaintiffs to preserve the very Instagram page Plaintiffs now say Defendant wrongfully retained. A factfinder could reasonably conclude that Plaintiffs' cease-and-desist campaign was, at least in part, a reaction to Defendant's payment and ownership demands rather than a neutral effort to stop infringement uncovered independently of that dispute.

Plaintiffs' Opposition remains silent on related points. First, Defendant's evidence indicates that JM Sanctuary LLC remained active into 2022, including a text message from Cardoso proposing that the parties discuss the entity's taxes and dissolution together — difficult to reconcile with Plaintiffs' pleaded position that Cardoso unilaterally dissolved the entity in 2020. Second, Defendant's evidence indicates that her access to her Surf Lodge email account had already been terminated before October 28, 2020 — the date of the letter Plaintiffs identify as their first cease-and-desist notice — raising a genuine question as to whether that letter ever reached her. Third, and consistent with that gap in notice, Defendant's evidence indicates that she continued to perform paid work benefiting The Snow Lodge Aspen, at Cardoso's request, into February 2021 — well after the October 2020 letter Plaintiffs identify as the start of the parties' dispute, and difficult to reconcile with the notion that Defendant had received and understood herself to be defying a clear infringement warning at that time. None of these facts is addressed anywhere in Plaintiffs' Opposition. Nor do Plaintiffs address why the entity at the center of this dispute is named JM Sanctuary LLC — Jayma/Marisa.

None of this requires the Court to resolve who is right at this stage. It requires only that the Court recognize these are genuinely disputed facts bearing on authorization, motive, and the accuracy of Plaintiffs' narrative — precisely the kind of dispute Rule 60 exists to permit the parties to test through the adversarial process rather than fix permanently on a one-sided default record.

Case 1:23-cv-02051-LJL

Notably, even on that one-sided record, the Court declined to enter default judgment on Count X, confirming that the SAC's allegations were not simply accepted wholesale merely because Defendant defaulted.

### B. The Rule 60 Meritorious-Defense Standard Is Modest

At this stage Defendant need not prove the entire case or win every factual dispute. As Plaintiffs themselves recognize, a Rule 60 motion is guided in part by whether the defendant demonstrates a meritorious defense. New York v. Green, 420 F.3d 99, 108 (2d Cir. 2005). And under In re JWP Information Services, Inc., 231 B.R. 209, 213 (Bankr. S.D.N.Y. 1999), a defense is meritorious if it is "good at law so as to give the fact finder some determination to make," and it "need not be ultimately persuasive at this stage."

Plaintiffs' Opposition repeatedly argues the weight, interpretation, and credibility of Defendant's evidence. That is the language of factual dispute, not the absence of a defense.

### C. The Court's Own November 27, 2023 Dismissal Confirms It Has Not Accepted Plaintiffs' Allegations Wholesale, and the Surviving Claims Have Never Been Tested

The Court's November 27, 2023 Opinion demonstrates that Plaintiffs' allegations were not accepted wholesale. Applying the Rule 12(b)(6) standard, the Court dismissed Plaintiffs' trademark infringement, trademark dilution, and cybersquatting claims, while permitting only certain claims to proceed based upon the assumption that Plaintiffs' well-pleaded factual allegations were true. Those surviving claims — including Plaintiffs' false-association claim under Section 43(a) — were never tested through discovery, depositions, or an evidentiary record. Instead, because of the procedural posture of the case, those allegations ultimately became the basis

23

Case 1:23-cv-02051-LJL

for the November 7, 2025 default judgment. Defendant now presents contemporaneous evidence directly disputing several of those factual premises.

The dismissal of three Lanham Act claims shows that the Court was already willing to reject portions of Plaintiffs' case when the law or the record required it. The Court has never had the opportunity to evaluate the surviving claims on a developed factual record, because they proceeded from a motion to dismiss to a default judgment without the benefit of discovery or adversarial testing. The record on which those claims currently rest is therefore Plaintiffs' pleaded allegations, assumed true at the Rule 12(b)(6) stage and never independently tested — the same allegations Defendant's evidence now directly disputes.

That gap between what the Court was required to assume true at the pleading stage and what has ever actually been tested is not merely theoretical. Defendant's father, then 93 years old, terminally ill, and her last surviving immediate family member, passed away on October 19, 2023, while Defendant's motion to dismiss remained pending before the Court. Notwithstanding that loss, Defendant had retained counsel, Steven Storch, the moment this litigation commenced, and asked him to file an Answer so that Defendant's position could be placed directly in the record. Mr. Storch instead pursued a motion to dismiss. In evaluating that motion, the Court explained that "[t]o survive a 12(b)(6) motion to dismiss, a complaint must include 'sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" (Nov. 27, 2023 Op. at 12 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).) That motion succeeded in part: the Court dismissed three of Plaintiffs' four Lanham Act theories, including Plaintiffs' cybersquatting claim, on the ground that, "[a]s the exclusive licensee, rather than owner of the Surf Lodge trademark, Plaintiffs are not within the 'zone of coverage' of the ACPA, and therefore lack the right to bring an ACPA claim." (Nov. 27, 2023 Op. at 23-24.) That finding — that Plaintiffs are licensees, not

24

Case 1:23-cv-02051-LJL

owners, of the trademark — is the Court's own characterization, not Defendant's. But when the November 27, 2023 Opinion issued, approximately one month after Defendant's father's death, the one Lanham Act claim and the state-law claims that survived did so because the Court was required, at that procedural stage, to accept Plaintiffs' remaining factual allegations as true — not because those allegations had been tested against an Answer, discovery, or any evidentiary record.

It was at that moment, weeks after her father's death, that Defendant sought to change course and pursue an Answer and counterclaims that would place her own evidence — including the account-history and business-relationship evidence now before this Court — into the record. Despite her grief, Defendant met with Mr. Storch on December 3, 2023 for that purpose, a meeting Mr. Storch's own declaration describes as a "fruitful discussion." Had that course been pursued, a factfinder could reasonably conclude that Defendant's evidence disputing the account-conversion allegation would have been tested at the same procedural juncture that resolved the other three Lanham Act theories. Instead, the attorney-client relationship deteriorated in the weeks that followed, Mr. Storch withdrew, and the sole surviving Lanham Act claim and the accompanying state-law claims were never answered, tested, or adjudicated on the merits — not because Defendant lacked a defense, but because the same sequence of events Plaintiffs point to as evidence of willful default is what prevented that defense from ever being presented.

## VII. DEFENDANT'S INSTAGRAM AND META EVIDENCE DIRECTLY BEARS ON PLAINTIFFS' FALSE-ASSOCIATION THEORY UNDER THE LANHAM ACT AND NYGBL

Plaintiffs' own Opposition confirms that the Instagram theory sits at the center of their liability narrative. Plaintiffs allege that Defendant "willfully/deceptively/deliberately changed" the

Case 1:23-cv-02051-LJL

username of The Sanctuary from @thesanctuarywellness to @thesurflodgesanctuary in order to create a "clear false association and likelihood of confusion" with The Surf Lodge, and they further allege that the account presently has approximately 1,161 followers, lists "716 Montauk Highway, Suite #3, Montauk, New York" as its business address, contains no disclaimer, and appears ahead of the official @thesurflodge account in Instagram search results. Plaintiffs also rely on cease-and-desist letters demanding that Defendant change the @thesurflodgesanctuary handle and stop allegedly infringing uses of The Surf Lodge name and brand.

This is not a stray or collateral allegation. The assertion that Defendant converted @TheSanctuaryWellness into @TheSurfLodgeSanctuary has been the basis for Plaintiffs' pre-suit cease-and-desist letters; the decision to commence this action; the factual allegations of the original Complaint and the operative Second Amended Complaint; Plaintiffs' request for injunctive relief; Plaintiffs' request that Defendant be compelled to turn over the account's login credentials and message history; both Plaintiffs' original and renewed motions for default judgment; and, ultimately, the entry of default judgment on Plaintiffs' sole surviving federal claim under Section 43(a) of the Lanham Act, as well as the related New York General Business Law claims. Evidence materially disputing that allegation therefore does not raise a collateral issue. It goes to the foundation of everything Plaintiffs have built on top of it in this litigation.

Plaintiffs' own Opposition illustrates a shift in position worth noting at the outset. Plaintiffs' Opposition itself states, without qualification, that Defendant "willfully/deceptively/deliberately changed" the username from @thesanctuarywellness to @thesurflodgesanctuary — the same specific, unhedged factual assertion Plaintiffs have advanced throughout this litigation, including in their pre-suit correspondence, their pleadings, and both motions for default judgment. Faced with Defendant's evidence that @TheSanctuaryWellness continues to exist as a separate account,

Case 1:23-cv-02051-LJL

Plaintiffs' Opposition does not reaffirm that specific factual claim with account-specific evidence of its own. Instead, in the same brief, Plaintiffs offer that the relevant account "may have contained a minor period (.) or an underscore (_) or any other minor punctuation mark" — a hedge that sits uneasily beside the certainty of Plaintiffs' own prior allegation. A claim asserted as unqualified fact across years of correspondence and pleadings, and only qualified into speculation once tested against documentary evidence, is itself probative of how much evidentiary support the claim ever had.

Defendant's motion presented extensive evidence directly bearing on that exact theory. Defendant showed that @TheSanctuaryWellness continues to exist today, making Plaintiffs' repeated allegation that it was converted into @TheSurfLodgeSanctuary difficult to reconcile with the current record. Defendant further showed that @TheSanctuaryWellness has existed since approximately 2014 and has been operated by third parties unrelated to Defendant. Defendant also submitted evidence that Plaintiff Cardoso publicly tagged @TheSurfLodgeSanctuary in 2019 when announcing the opening of The Sanctuary, including in connection with the Vogue article, "This Summer, The Surf Lodge Chills Out With a New Wellness Venue," in a post that also tagged @Vogue (now displayed as @VogueShopping, discussed further below). (Declaration of Marisa Hochberg ¶¶ 91-93.) Defendant further submitted evidence that on April 2, 2019, the day @TheSurfLodgeSanctuary was created, Defendant transmitted the username and password for that account directly to Plaintiff Cardoso. (Dkt. 167, Ex. P.) Defendant also submitted contemporaneous emails, email signatures, business cards, marketing materials, websites, programming calendars, branding documents, and other business records reflecting use of the @TheSurfLodgeSanctuary handle as an independent Surf Lodge Sanctuary-branded account from its inception. (Dkt. 167, Exs. W-X.)

Case 1:23-cv-02051-LJL

Plaintiffs' Opposition confirms that these are the precise issues in dispute. Plaintiffs acknowledge that Defendant relies on the existence of a separate Instagram page using the handle "thesanctuarywellness," that Defendant contends The Sanctuary Instagram page only ever used TheSurfLodgeSanctuary from 2019 forward, and that Defendant disputes ever converting the handle in the manner Plaintiffs allege. Plaintiffs also acknowledge that Defendant relies on 2019 public tagging of @thesurflodgesanctuary and on branding and promotional materials using Surf Lodge Sanctuary terminology.

Defendant's supplemental declaration authenticates the Meta records described below by explaining how Defendant accessed the account, when she obtained the export, which credentials were used, and how the records correspond to the account at issue. That authentication matters because Plaintiffs' Opposition relies on inference and speculation, while Defendant's evidence comes from the account-specific platform records Plaintiffs' own theory placed directly at issue.

In direct rebuttal, Defendant has obtained Meta's native account activity export directly from the @TheSurfLodgeSanctuary account itself. Those platform-generated records materially strengthen the meritorious-defense showing and respond squarely to the two arguments Plaintiffs raised for the first time in their Opposition — retroactive tag behavior and possible alternate punctuation of the handle. According to Defendant's motion papers, the Meta records show the account creation date, the permanent Instagram account identifier assigned by Meta, the account's official username history, and continuous branding history. Most significantly, the records reflect that on April 2, 2019 at 8:09:38 p.m. UTC, the account's username was changed from @tsl_sanctuary to @tslsanctuary ("tsl" standing for The Surf Lodge), and then, twenty-four seconds later, at 8:10:02 p.m., to @thesurflodgesanctuary. The account's recorded activity history does not identify @TheSanctuaryWellness, thesanctuarywellness, or any comparable variation of

Case 1:23-cv-02051-LJL

punctuation as a former username at any point in that history. The records further reflect that @TheSurfLodgeSanctuary and @TheSanctuaryWellness have different permanent Meta account identifiers, and that the same username and password transmitted to Plaintiff Cardoso on April 2, 2019 continue to access the account today — which is what enabled Defendant to obtain the Meta export, since login access to the account is required to generate the platform's own downloaded history report. The account's own registration record confirms the account was created at that same moment — April 2, 2019 at 6:03:25 p.m. UTC — and verified using Defendant's personal phone number, (917) 858-5063. The account's displayed business contact email is marisa@thesurflodge.com — an address on Plaintiffs' own company domain, independently corroborated by a May 2019 Instagram message from the account itself directing a business contact to "email me marisa@thesurflodge.com." Defendant has not had access to that Surf Lodge-domain email since 2020; Plaintiffs, who control the underlying domain, are the party positioned to access or monitor that channel, not Defendant. (Declaration of Marisa Hochberg ¶¶ 77-90.)

Defendant's records further corroborate who created and controlled the account from the outset. The same profile-change records reflect that the phone number used to verify the account at its creation on April 2, 2019 was (917) 858-5063 — Defendant's own personal phone number. Those records also reflect that the account's last substantive edit occurred on October 15, 2021, when its bio link was removed — a date that aligns closely with the last recorded login session on the account, September 24, 2021, addressed further below. Both dates are consistent with Defendant's position that she stepped back from active use of the account around the time of the parties' dissolution, not that she has continued to actively operate it since, as Plaintiffs allege.

If proven, that evidence goes directly to the factual premise of Plaintiffs' false-association theory. Plaintiffs' Lanham Act claim under 15 U.S.C. § 1125(a)(1)(A) depends on alleged false

29

Case 1:23-cv-02051-LJL

association, unauthorized use, and likelihood of confusion. Plaintiffs' New York General Business Law §§ 349 and 350 theories likewise depend on allegedly deceptive conduct and consumer confusion. Evidence that the account was created in April 2019 as a Surf Lodge Sanctuary-branded account, that Plaintiff Cardoso received the credentials when it was created, that Plaintiffs themselves publicly used the handle in 2019, and that Meta's native account history does not show a prior username of @TheSanctuaryWellness would materially affect whether Plaintiffs' account-conversion narrative is accurate, whether Defendant's use was unauthorized in the manner alleged, whether Plaintiffs had access or control from the outset, whether Defendant later excluded Plaintiffs by changing credentials, and whether the alleged confusion and false association arose in the way Plaintiffs claim. That is more than sufficient to satisfy the meritorious-defense requirement at the Rule 60 stage.

Plaintiffs' responses do not eliminate that dispute — they confirm it exists. Plaintiffs suggest that a different punctuated version of "TheSanctuaryWellness" may have existed, that Instagram tags update retroactively after handle changes, and that the "real" issue is merely Defendant's alleged post-dissolution retention and use of the account. Each is addressed in turn below.

Plaintiffs also argue that their August 6, 2025 default-judgment materials showed that the current @thesurflodgesanctuary account had "two former usernames," which they say defeats Defendant's position that she never changed the handle. Defendant's Meta records confirm the count Plaintiffs themselves cite, while directly refuting the identity Plaintiffs assign to it: the account's recorded history reflects exactly two former usernames — @tsl_sanctuary and @tslsanctuary — both changed within twenty-four seconds of each other on April 2, 2019, before

30

Case 1:23-cv-02051-LJL

the account became @thesurflodgesanctuary. Neither former username is @thesanctuarywellness or any variation of it. (Declaration of Marisa Hochberg ¶ 84.)

Nor does Plaintiffs' retroactive-tag theory dispose of the issue — if anything, it defeats their own position. Plaintiffs rely on an image export from Meta's AI Support Assistant explaining that when an account changes its username, previously tagged posts update retroactively because tags are linked to the account's permanent identifier rather than the visible username displayed at the time of the original post. Defendant does not dispute that general proposition; Defendant's own evidence confirms it. Plaintiff Cardoso's 2019 Instagram post announcing the opening of The Sanctuary, for example, originally tagged @Vogue and @TheSurfLodgeSanctuary; today those same tags display as @VogueShopping and @TheSurfLodgeSanctuary, respectively, because Instagram updated the visible username associated with each account's permanent identifier. The underlying tagged accounts did not change — only the displayed names did. (Declaration of Marisa Hochberg ¶¶ 91-93.)

That principle is exactly why Meta's permanent account identifiers, not visible usernames, are the relevant evidence here — and why Defendant obtained them. Meta's native records identify the permanent account identifier assigned to @TheSurfLodgeSanctuary. Defendant separately obtained the permanent account identifier associated with @TheSanctuaryWellness. Those identifiers are different. Because Meta assigns each account a permanent identifier that does not change when a username changes, two different identifiers means two different accounts — not one account renamed over time. Plaintiffs' account-conversion theory necessarily requires that @TheSurfLodgeSanctuary and @TheSanctuaryWellness be the same account at different points in time; Meta's own records establish that they are not. Plaintiffs' retroactive-tag explanation, correct

31

Case 1:23-cv-02051-LJL

as a general matter, therefore supports Defendant's position rather than Plaintiffs'. (Declaration of Marisa Hochberg ¶¶ 87-90.)

The same is true of Plaintiffs' login-credential argument, and the expanded record now answers the question Plaintiffs' Opposition poses. Plaintiffs argue that if Cardoso had access to the Instagram account "all along," Plaintiffs would not have needed to send cease-and-desist letters and could simply have shut the page down themselves. Defendant agrees that this is the right question. The April 2, 2019 email transmitting the account's username and password to Plaintiff Cardoso, together with Meta's own records confirming the account was created that same day, establish that Cardoso received working credentials to the account from its inception. (Dkt. 167, Ex. P; Declaration of Marisa Hochberg ¶¶ 49, 52.) Notably, Plaintiffs' Opposition does not dispute the authenticity of that email, nor does it contend that the credentials Defendant reproduced as an exhibit to her opening Rule 60 Motion are inaccurate or nonfunctional. Defendant has demonstrated that those same credentials remain functional today, and provided them again as an exhibit to her opening Rule 60 Motion. (Declaration of Marisa Hochberg ¶ 52.) Had Plaintiffs tested those credentials, or simply searched Plaintiff Cardoso's own email for the April 2, 2019 message, they could have logged into the account themselves and obtained the same Meta account-history records Defendant now presents to this Court — before default judgment was ever entered, and without the need for this motion at all. At minimum, the fact that functioning credentials were transmitted to Plaintiff Cardoso at the account's creation and remain functional today is difficult to reconcile with Plaintiffs' repeated assertion that Defendant's alleged conduct alone prevented Plaintiffs from accessing the account — and that inconsistency goes directly to the factual premise underlying the cease-and-desist letters, the Complaint, both motions for default judgment, and the default judgment itself.

Case 1:23-cv-02051-LJL

Plaintiffs' representation that Defendant alone controlled the @TheSurfLodgeSanctuary Instagram account is further contradicted by Defendant's contemporaneous conduct long before this litigation commenced. After discovering that posts had been removed from the account — including posts Defendant considered important evidence of her role in and relationship to The Sanctuary — Defendant brought those removals to the attention of her then-counsel, Dianne LeVerrier, and sought legal assistance concerning them. (See Declaration of Marisa Hochberg ¶¶ 42–43.) That contemporaneous conduct is irreconcilable with Plaintiffs' litigation narrative that Defendant alone possessed or controlled access to the account. Defendant could not plausibly have been the sole person capable of accessing and modifying the account while simultaneously retaining counsel to address the unauthorized removal of posts that she wanted preserved. Nor can these communications reasonably be dismissed as a litigation-driven explanation: they predated the commencement of this action. When considered together with the April 2, 2019 documentary evidence showing that the account credentials were provided to Cardoso, Defendant's contemporaneous communications with counsel constitute additional evidence that others had access to and were using the account. Plaintiffs' contrary representation of Defendant's exclusive control was therefore not merely unsupported; it was materially inconsistent with the contemporaneous evidence and contributed to the false factual premise on which the default judgment was entered.

Plaintiffs tell this Court that Defendant "continues to this date to knowingly, deceitfully, and willfully use" Plaintiffs' intellectual property through the account. The account's own records say otherwise. Defendant's login-history export shows no session activity on the account between September 24, 2021 and July 6, 2026 — a gap of nearly five years during which Defendant did not access, post to, or otherwise administer the account. (Declaration of Marisa Hochberg ¶ 95.) That

33

Case 1:23-cv-02051-LJL

silence is consistent with Defendant's position that she left the account untouched in good faith precisely because she did not seek to associate herself or any business with The Surf Lodge, not because she was actively operating it to trade on any association with Plaintiffs, as Plaintiffs allege. Had Defendant in fact been actively using the account to conduct business or solicit customers during that period, the account's own login history would reflect that activity; it does not. The single login session outside the 2019–2021 period, on July 6, 2026, reflects Defendant's access to the account for the limited purpose of retrieving the native account-history records submitted in support of this Motion, after learning from Meta that such records could be obtained through the account's login credentials — not a resumption of any business use. (Declaration of Marisa Hochberg ¶¶ 96-97.)

Plaintiffs likewise acknowledge that Defendant submitted exhibits from 2019 through 2021 showing that Defendant participated in branding and promotion for The Sanctuary and that Cardoso informally referred to Defendant as her "partner" in communications with vendors, media outlets, and leasing offices. Plaintiffs respond that Cardoso was the sole listed member of JM Sanctuary LLC, that The Sanctuary was legally separate from The Surf Lodge, and that Defendant was never granted a license, sublicense, legal right, contract, or agreement to use The Surf Lodge's trademarks or intellectual property. That is a merits argument, not the Rule 60 standard. Evidence of contemporaneous joint branding, partnership descriptions, promotional authority, business communications, and disputed social-media control bears directly on authorization, consent, good faith, affiliation, and confusion. Those are merits questions, not reasons to foreclose vacatur.

Defendant's evidence further indicates a specific business rationale for The Sanctuary's creation as an off-site venture: that The Surf Lodge's zoning classification restricted it to serving wellness programming to hotel guests only, and that municipal and liquor-license concerns gave

34

Case 1:23-cv-02051-LJL

Cardoso reason to avoid hosting public wellness programming at The Surf Lodge's own address. If credited, that evidence would support Defendant's position that The Sanctuary was conceived as a collaborative extension of The Surf Lodge's own wellness offerings rather than an independent venture created to trade off Plaintiffs' goodwill. The Court need not resolve that dispute now to grant this Motion; the point is that it is a genuine, fact-intensive dispute, not one that can be fixed by treating a one-sided default record as the last word.

Plaintiffs further argue that Defendant's reliance on JLM Couture, Inc. v. Gutman, 91 F.4th 91 (2d Cir. 2024), is misplaced because that case involved a non-compete dispute and use of a designer's own name or variation of her own name on social media, whereas Plaintiffs contend there is "no dispute" here that Defendant lacked any right to continue using The Sanctuary Instagram page after dissolution. But whether JLM Couture is ultimately analogous does not resolve the Rule 60 question. The point of Defendant's Instagram evidence is not that JLM Couture controls this case; it is that Plaintiffs' allegations regarding ownership, access, branding history, authorization, control, and consumer confusion are factually contested. That factual dispute matters under both 15 U.S.C. § 1125(a)(1)(A) and New York General Business Law §§ 349 and 350 because Plaintiffs' own Opposition continues to premise those claims on allegedly unauthorized use of The Surf Lodge name and a resulting false association in the marketplace.

At minimum, Defendant's Instagram, Meta, branding, and access evidence gives the factfinder substantial determinations to make. That is enough at the Rule 60 stage.

Plaintiffs tell this Court that Defendant's account-conversion defense "has absolutely no logical or legal merit." That characterization does not survive a comparison with the record Plaintiffs themselves filed. Considered together, the evidence corroborates Defendant's position

Case 1:23-cv-02051-LJL

independently and in multiple ways: the contemporaneous April 2, 2019 email transmitting the account's username and password to Plaintiff Cardoso; Meta's own native account-activity records confirming that creation date and showing no username history involving @TheSanctuaryWellness or any punctuation variant of it; Meta's permanent account identifiers, which are different for @TheSurfLodgeSanctuary and @TheSanctuaryWellness and confirm they are separate accounts; Plaintiffs' own retroactive-tag explanation, which — correctly applied to permanent identifiers rather than visible usernames — supports Defendant's position rather than Plaintiffs'; and Plaintiff Cardoso's own 2019 public tagging of @TheSurfLodgeSanctuary. Considered collectively, that chronology — credentials transmitted April 2, 2019; Cardoso's public promotion of the account on May 21, 2019; those same credentials still authenticating the account today; two accounts with two different permanent identifiers; and Meta's own records reflecting no conversion — is difficult to reconcile with Plaintiffs' allegations, and Plaintiffs' Opposition responds to individual pieces of it without ever addressing the chronology as a whole.

Plaintiffs cannot now retreat to speculation about punctuation. From their initial cease-and-desist letter through every filing in this lawsuit, Plaintiffs have claimed it was clear that Defendant converted @TheSanctuaryWellness into @TheSurfLodgeSanctuary. Plaintiffs' Opposition, by contrast, offers no comparable corroboration for its own account-conversion allegation. It identifies no Meta record, no contemporaneous screenshot, and no account-specific evidence of any kind showing @TheSanctuaryWellness was ever a prior username of the disputed account. Instead, faced with Defendant's evidence, Plaintiffs' own operative allegation — asserted without qualification in their cease-and-desist letters, their pleadings, and both motions for default judgment — is now offered only as speculation that the original username "may have contained a minor period (.) or an underscore (_) or any other minor punctuation mark." Plaintiffs characterize

Case 1:23-cv-02051-LJL

Defendant's evidence as a "red herring," but Plaintiffs are the ones who have identified no Meta username-history record showing that any such differently punctuated account was ever converted into @TheSurfLodgeSanctuary. A claim asserted as unqualified fact across years of correspondence and pleadings, and reduced to unsupported speculation about punctuation the moment it was tested against documentary evidence, is itself probative of how much evidentiary support the claim ever had. Plaintiffs' characterization of Defendant's defense as lacking "legal merit" is difficult to reconcile with a record in which Plaintiffs cannot identify a single piece of account-specific evidence supporting their own theory.

The defense also has legal merit, not merely factual support. Plaintiffs' surviving claim under Section 43(a) of the Lanham Act requires a false or misleading representation of fact creating a likelihood of confusion as to affiliation or association, and Plaintiffs' New York General Business Law §§ 349 and 350 claims likewise require a materially misleading act. If Meta's own records establish that @TheSurfLodgeSanctuary was created as an independently branded Surf Lodge Sanctuary account from its inception — not derived from a pre-existing Sanctuary-only handle — and that its creator transmitted access credentials to Plaintiff Cardoso at that same moment, then the specific representation Plaintiffs allege — that Defendant unilaterally and secretly rebranded an existing Sanctuary account to manufacture a false association — did not occur as pleaded. That is a defense going to an essential element of Plaintiffs' claims, not a technical or collateral dispute.

Plaintiffs' remaining response — that "the continued retention of The Sanctuary Instagram page ... is a direct infringement on The Surf Lodge's trademarks/intellectual property" — is conclusory, not evidence. It assumes the very authorization question Defendant's evidence disputes: whether Defendant's continued use of an account she created, funded, and branded as "The Surf Lodge Sanctuary" from its inception, and which Plaintiff Cardoso herself publicly used

37

Case 1:23-cv-02051-LJL

and tagged in 2019, was in fact unauthorized. Labeling continued use "infringement" does not answer that question; it restates Plaintiffs' position on the very issue Rule 60 requires the Court to recognize as disputed. Nor do Plaintiffs' ownership and license arguments eliminate that dispute: whether Cardoso's sole membership in JM Sanctuary LLC forecloses Defendant's authorization, branding, and course-of-conduct evidence is itself a merits question this Court need not resolve to grant vacatur.

A defense is meritorious if it is sufficient to give the factfinder a determination to make. In re JWP Information Services, Inc., 231 B.R. 209, 213 (Bankr. S.D.N.Y. 1999). This record does far more than that: it calls into question the factual basis upon which Plaintiffs obtained default judgment, including the alleged account conversion, alleged exclusion from account access, alleged lack of authorization, alleged consumer confusion, and alleged post-dissolution false association. Plaintiffs' Opposition does not show that Defendant lacks a defense. It confirms that Plaintiffs cannot establish the factual basis for their surviving claims without resolving disputed facts that were never tested through discovery, testimony, cross-examination, or merits adjudication. That is precisely why vacatur is warranted.

## VIII. VACATUR WILL NOT PREJUDICE PLAINTIFFS

The final Rule 60 factor is whether vacatur would cause Plaintiffs legally cognizable prejudice. Plaintiffs argue that this case has been pending for years, that discovery closed long ago, that Defendant previously failed to cooperate, that vacatur would force Plaintiffs to continue litigating, and that the alleged infringement remains ongoing. That is not enough.

In In re Suprema Specialties, Inc., 330 B.R. 40 (S.D.N.Y. 2005), the court explained that prejudice sufficient to deny Rule 60 relief requires more than delay and ordinarily means loss of

Case 1:23-cv-02051-LJL

evidence, increased difficulties of discovery, or similar concrete impairment of the non-movant's ability to litigate the case on the merits. Delay alone does not suffice. Neither do attorneys' fees already incurred, nor the loss of a tactical advantage. If those consequences alone were enough, Rule 60 relief would have little practical application.

Plaintiffs argue that continued use of @TheSurfLodgeSanctuary constitutes ongoing infringement. But for Rule 60 prejudice, the relevant issue is litigation impairment, not whether Plaintiffs believe they will win on the merits. Plaintiffs' assertion of ongoing infringement is a merits contention, not a showing of the concrete litigation impairment Suprema requires.

Plaintiffs also cannot fairly place the entire passage of time at Defendant's feet. Plaintiffs' own chronology confirms that they filed their initial motion for default judgment on May 28, 2024, and that the Court denied that motion on November 27, 2024 due to Plaintiffs' procedural filing errors. Plaintiffs then did not renew their motion for default judgment until August 6, 2025 — more than eight months after the denial, and more than a year (435 days) after their own original motion. That substantial gap was not caused by Defendant's present Rule 60 Motion, Defendant's current evidentiary submission, or Defendant's request to litigate the case on the merits. It resulted from Plaintiffs' own failure to promptly cure and renew their procedurally defective default application. Plaintiffs cannot attribute the extended duration of this litigation to Defendant while omitting that more than a year of that span is attributable to their own delay in correcting their own filing errors.

Plaintiffs' delay argument is further undermined by the sequence of events after default judgment. Plaintiffs filed their supporting declaration for attorneys' fees and expenses on November 14, 2025, and the Court issued its fee order on May 21, 2026. During that period, Plaintiffs actively pursued adjudication of their fee request, including through follow-up letters to

Case 1:23-cv-02051-LJL

the Court seeking action on their fee application. Plaintiffs were entitled to seek fees, but they cannot selectively invoke delay as prejudice while ignoring both their own more-than-eight-month delay in renewing the default application and their later efforts to press for fee relief before Defendant sought vacatur.

Plaintiffs identify no lost witness, no destroyed document, no unavailable evidence, and no category of proof that can no longer be obtained. Plaintiffs instead argue that reopening the case would require further litigation after Defendant previously failed to participate and would risk further delay. But that is the ordinary burden of litigating a reopened case, not the type of concrete litigation impairment required to show prejudice.

To the contrary, Plaintiffs' own Opposition demonstrates that the relevant evidence remains available. Plaintiffs rely on LLC formation documents, the August 6, 2025 Declaration of Cardoso, cease-and-desist letters, Instagram materials, former-username evidence, and AMEX/Saks-related communications. Defendant likewise has submitted extensive documentary evidence, including the Meta records addressed above. This case is therefore driven primarily by documents, social-media records, business records, communications, and platform-generated materials — not by evidence shown to have disappeared. Plaintiffs' thirty-eight-page Opposition, which disputes Defendant's evidence in detail, itself shows that Plaintiffs remain fully capable of litigating those issues. Those arguments demonstrate readiness to litigate, not prejudice resulting from doing so.

Plaintiffs' reliance on cases such as King v. Galluzzo Equipment & Excavating Inc. and Sony Corp. v. S.W.I. Trading, Inc. does not change that result. Plaintiffs cite those authorities for the proposition that vacatur can be prejudicial where a defendant's history suggests only more stonewalling or risks to evidence. But Plaintiffs still do not identify any actual evidence here that

40

Case 1:23-cv-02051-LJL

has been lost, any witness who has become unavailable, or any specific discovery that can no longer be obtained. Without that showing, their prejudice argument remains speculative.

This evidentiary dispute is not collateral. Plaintiffs repeatedly represented to this Court that Defendant converted @TheSanctuaryWellness into @TheSurfLodgeSanctuary, and made that allegation central to their surviving claims, yet never produced Meta's official username-history records showing that such a conversion actually occurred. If the account history alleged by Plaintiffs is materially inaccurate, then the factual foundation upon which default judgment was entered is likewise materially disputed. That is precisely the type of dispute Rule 60 favors resolving on the merits rather than by procedural default.

Finally, any delay must be viewed in light of the extraordinary circumstances underlying Defendant's motion and the strong preference for adjudicating disputes on the merits. The question is not whether Plaintiffs would prefer the judgment remain in place. The question is whether reopening the case would concretely impair their ability to prove it. On this record, Plaintiffs have not made that showing. Accordingly, Plaintiffs have failed to demonstrate legally cognizable prejudice sufficient to outweigh the equitable considerations favoring vacatur.

## IX. RULE 60(b)(3), RULE 60(b)(6), AND RULE 60(d)(3) INDEPENDENTLY WARRANT RELIEF

To the extent the Court concludes that the cumulative record establishes more than ordinary factual disputes, Defendant respectfully submits that Plaintiffs' repeated, sworn misrepresentations to this Court warrant relief under Rule 60(b)(3), and, in the alternative, Rule 60(d)(3).

Case 1:23-cv-02051-LJL

Plaintiffs' surviving claims have repeatedly relied on the account-conversion allegation as a central factual premise establishing deceptive intent, unauthorized conduct, and false association: that Defendant converted @TheSanctuaryWellness into @TheSurfLodgeSanctuary to manufacture a false association with The Surf Lodge. That premise was not confined to a single declaration — Cardoso swore to it in both default-judgment declarations, and it was pleaded in the Second Amended Complaint and both supporting memoranda, all filed by Plaintiffs' counsel. The record now before this Court raises a substantial factual dispute as to whether that premise was true. Cardoso does not merely dispute Defendant's evidence on this point; she personally participated in independent press accounts published in May and June 2019 — within weeks of the account's creation — describing and endorsing the account by the very name Plaintiffs now claim was fraudulently adopted years later. (See Declaration of Marisa Hochberg ¶ 74.) Cardoso personally tagged @TheSurfLodgeSanctuary from her own Instagram account on May 21, 2019, announcing the opening of The Sanctuary. (See Declaration of Marisa Hochberg ¶¶ 91–92.) Weeks later, Cardoso sat for a joint interview published by Forbes on June 30, 2019 under the headline "A Look Inside The Surf Lodge Sanctuary," in which she was asked directly why she decided to open "The Surf Lodge Sanctuary" and answered substantively, without correcting or disputing the name. Plaintiff Cardoso's own words and conduct in 2019 are difficult to reconcile with the account-conversion narrative repeated across every one of these filings — a narrative that itself shifted, from unqualified fact to speculation about "a minor period... or an underscore," the moment Defendant's opening motion identified @TheSanctuaryWellness as a separate, currently-existing account. That shift occurred not because new facts came to light, but because Plaintiffs' own theory had never been tested against the platform's actual records, notwithstanding that Plaintiff Cardoso had held working login credentials to the account since its creation and never used them to check.

42

Case 1:23-cv-02051-LJL

Meta's own account-specific records, obtained by Defendant only after Plaintiffs offered that speculation in their Opposition, lend substantial support to what Plaintiffs' own hedge already suggested: that the account-conversion allegation is difficult to sustain on this record.

Defendant does not ask this Court to reach that conclusion lightly, and is mindful that fraud on the Court is reserved for the most serious circumstances. She raises it because the account-conversion allegation was not a stray or collateral assertion: it was the factual foundation for Plaintiffs' pre-suit cease-and-desist campaign, the operative pleadings, both motions for default judgment, and the default judgment itself. Plaintiffs contend that Defendant has wasted the Court's judicial resources by being deceptive and strategic in this litigation; the record does not bear that out. Cardoso's own declaration mischaracterizes the December 5, 2022 demand letter as noncompliance with a cease-and-desist demand, when the letter itself is an affirmative payment demand that predates any such demand, as addressed in Section VI.A; the account-conversion allegation shifted from unqualified fact to unsupported speculation once tested against documentary evidence, as addressed in Section VII; and, as addressed below, Cardoso's declaration misstates the basic trademark history at issue in this case. Defendant again apologizes for the appearances and deadlines she missed, and does not minimize that record — including the rental dispute Plaintiffs raise, where in fact the rent at issue was paid (see Declaration of Marisa Hochberg ¶ 106), a matter unrelated to Plaintiffs' surviving claims. But the Rule 60 factors this Court must weigh are willfulness, meritorious defense, and prejudice, and missing a hearing during a documented psychiatric crisis is a failure of health and circumstance, not of candor to this Court.

Plaintiffs' unreliability on the question of trademark ownership is not limited to the legal theories this Court has already rejected — it extends to the basic factual history of the marks themselves. Cardoso declares under penalty of perjury that "[s]ince 2008, my attorneys have filed

43

Case 1:23-cv-02051-LJL

and obtained numerous trademarks with the United States Patent and Trademark Office for the names 'The Surf Lodge' and 'The Snow Lodge'" and that those assets were "initially held by the company Montauk Properties, LLC." (Dkt. 115-4 ¶ 9.) The public USPTO registration record for the SURF LODGE mark (Reg. No. 4093487, Serial No. 85330675) appears inconsistent with this sworn statement: the original applicant and registrant of record was Edward Scheetz, an individual, and the first recorded assignment was to Edgemere Montauk LLC, an entity distinct from the "Montauk Properties, LLC" identified in Plaintiffs' declaration and Second Amended Complaint. (See SAC ¶ 29; Nov. 27, 2023 Op. at 2-3; Declaration of Marisa Hochberg ¶¶ 182-189.) Defendant does not dispute that Montauk Properties later acquired rights in the mark; the point is narrower — Plaintiffs' sworn chronology of how and when that occurred is inaccurate, and it is not a fact Cardoso could learn only by chance: her own Licensing Agreement with TSLM identifies TSLM, by name, as the "Licensor" of the marks. (Nov. 27, 2023 Op. at 8 (quoting License Agreement Amendment § 4(n)).) Counsel bringing a trademark-based lawsuit on TSLM's behalf should reasonably have verified the actual chain of title before submitting that history to the Court. Combined with Plaintiffs' continued use of ownership-based "infringement" language this Court has already rejected, see supra, the pattern is one of recurring unreliability in Plaintiffs' factual representations regarding the very trademark rights at the center of this action.

Plaintiffs are correct that Rule 60(b)(6) is reserved for extraordinary circumstances. In Knox v. Palestine Liberation Organization, 248 F.R.D. 420 (S.D.N.Y. 2008), the court explained that Rule 60(b) is an equitable remedy that balances justice and finality, and that Rule 60(b)(6) may apply where extraordinary circumstances or extreme and undue hardship justify relief. Notably, the Knox court vacated a default judgment under Rule 60(b)(6) even after concluding that the underlying default was willful, holding that willfulness, while potentially sufficient to deny relief,

Case 1:23-cv-02051-LJL

"does not necessarily require denial" where the movant otherwise demonstrates meritorious defenses, an absence of prejudice, and other extraordinary circumstances warranting equitable relief. Id. at 432. Likewise, In re Santoli, 627 B.R. 595 (Bankr. S.D.N.Y. 2021), explains that Rule 60(b)(6) applies only when the asserted grounds are not recognized in Rule 60(b)(1)-(5) and extraordinary circumstances justify relief.

Defendant does not dispute those principles. Nor does Defendant contend that ordinary financial hardship, illness, or personal stress alone automatically warrant relief. As addressed above, Plaintiffs' characterization of Defendant's showing as mere "personal problems" does not fairly capture the cumulative, extraordinary circumstances of record, reinforced by NP Bumpars' medical evidence. To the extent the Court concludes that showing is not fully captured by Rule 60(b)(1), the same record supports alternative relief under Rule 60(b)(6), which exists to preserve equitable flexibility in extraordinary cases where strict finality would work an unjust result. (Dkt. 165 ¶¶ 3-4, 12.)

With respect to Rule 60(b)(3) and Rule 60(d)(3), Fed. R. Civ. P. 60(d)(3) expressly preserves the Court's power to set aside a judgment for fraud on the court. Plaintiffs argue that Defendant cannot meet the clear-and-convincing standard. Defendant maintains that the Court may consider the newly developed record and the discrepancies now before it. Even if the Court were to conclude that Rule 60(b)(3) or Rule 60(d)(3) does not provide the appropriate basis for relief, that would not defeat vacatur under Rule 60(b)(1), or alternatively Rule 60(b)(6).

## X. CONCLUSION

Plaintiffs' Opposition confirms this is not a case in which Defendant has no factual defense: Plaintiffs devote thirty-eight pages disputing Defendant's evidence on ownership, authorization,

45

Case 1:23-cv-02051-LJL

partnership, branding, licensing, social-media control, Instagram history, Meta records, account access, consumer confusion, and post-dissolution conduct. Those are merits issues, not issues that can be fairly resolved by treating the default record as conclusive. A meritorious defense need not be ultimately persuasive at this stage; it must be sufficient to give the factfinder something to decide. In re JWP Information Services, Inc., 231 B.R. 209, 213 (Bankr. S.D.N.Y. 1999). Plaintiffs' own Opposition demonstrates that there is something substantial to decide.

The expanded evidentiary record now before the Court bears little resemblance to the record that existed when default judgment was entered. Plaintiffs' Opposition itself acknowledges that Defendant's motion relies on bereavement, loss of legal funding, counsel disruption, psychiatric crisis, eviction, homelessness, and medical hardship, while also disputing Defendant's Instagram, account-history, ownership, authorization, and business-relationship evidence. Plaintiffs have likewise failed to identify the kind of concrete prejudice required to defeat vacatur under In re Suprema Specialties, Inc., 330 B.R. 40 (S.D.N.Y. 2005).

Throughout their Opposition, Plaintiffs repeatedly ask the Court to resolve disputed facts in Plaintiffs' favor without the benefit of the ordinary adversarial process. That is not the inquiry Rule 60 presents. Under Pioneer, excusable neglect is an equitable determination that takes account of all relevant circumstances surrounding the omission. And under Knox, on a motion to vacate a default judgment, doubts should be resolved in favor of the party seeking relief so that disputes may be decided on their merits. Default judgment remains an extreme sanction disfavored in this Circuit. In re Santoli, 627 B.R. 595 (Bankr. S.D.N.Y. 2021).

This case no longer presents a record in which Defendant simply asks the Court to excuse a default. Defendant has now presented contemporaneous medical evidence explaining the default,

46

Case 1:23-cv-02051-LJL

substantial documentary evidence supporting multiple potentially meritorious defenses, and Meta records obtained in direct response to arguments Plaintiffs raised for the first time in their Opposition. Whether Defendant ultimately prevails is a question for another day. The question presented by Rule 60 is whether these disputed issues should be resolved through the adversarial process or remain determined by procedural default. Under the Second Circuit's strong preference for adjudication on the merits, the answer is clear.

To address any concern regarding delay, Defendant is willing to accept reasonable conditions on vacatur. Defendant is prepared to file an Answer within a short period set by the Court, serve written discovery responses and produce nonprivileged responsive documents on an expedited schedule, appear for deposition by a date certain, preserve all relevant electronic and social-media evidence, and comply with any case-management order the Court deems appropriate — an offer Plaintiffs' Opposition does not address. These conditions would eliminate any speculative concern about future delay while allowing the surviving claims to be resolved on the merits.

In the alternative, Defendant respectfully requests an evidentiary hearing limited to willfulness, her medical incapacity during the default period, the authenticity of the Meta records, and whether Plaintiffs would suffer cognizable prejudice from reopening the case. Fed. R. Civ. P. 43(c) permits the Court to hear a motion partly on oral testimony where it relies on facts outside the record.

Accordingly, Defendant respectfully requests that this Court:

● Grant Defendant's Motion pursuant to Fed. R. Civ. P. 60;

● Vacate the Clerk's Entry of Default;

47

Case 1:23-cv-02051-LJL

- Vacate the Default Judgment entered on November 7, 2025;

- Vacate the Court's subsequent award of attorneys' fees and costs entered on May 21, 2026, and the corresponding Judgment issued on May 22, 2026;

- Reopen this action;

- Permit Defendant to file an Answer and assert her defenses on the merits; and

- Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Marisa Hochberg

/s/ Marisa Hochberg

Defendant Pro Se